**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE:  DEPO-PROVERA (DEPOT        ) Case No. 3:25-md-3140-MCR-HTC
MEDROXYPROGESTERONE               )
ACETATE) PRODUCTS LIABILITY       )
LITIGATION,                       )
                                  )
                                  )
                                  ) Pensacola, Florida
                                  ) February 21, 2025
                                  )
_____) 9:03 a.m.


**FIRST CASE MANAGEMENT CONFERENCE**


**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE M. CASEY RODGERS,**
**DISTRICT JUDGE**
**(Pages 1 through 68)**


Stenographically Reported By:


HEIDI M. DOOGAN, RPR
Official U.S. Court Reporter
One North Palafox Street
Pensacola, Florida 32502
heidimdoogan@gmail.com


*Transcript produced with Computer-Aided Transcription.*

**APPEARANCES:**

For the Plaintiffs -

                    Aylstock, Witkin, Kreis & Overholtz, PLLC
          By:  BRYAN F. AYLSTOCK, ESQUIRE
                    17 East Main Street, Suite 200
                    Pensacola, Florida 32502

                    Weitz & Luxenberg, P.C.
          By:  ELLEN RELKIN, ESQUIRE
                    700 Broadway
                    New York, New York 10023

                    Anapol Weiss
          By:  TRACY A. FINKEN, ESQUIRE
                    130 N. 18th Street, Suite 1600
                    Philadelphia, Pennsylvania 19103

                    Seeger & Weiss, LLP
          By:  CHRISTOPHER A. SEEGER, ESQUIRE
                    55 Challenger Road, Suite 600
                    Ridgefield Park, New Jersey 07660

For the Defendants -
    Pfizer Inc., and Pharmacia & Upjohn Company, LLC, and
Pharmacia, LLC
                    Williams & Connolly, LLP
          By:  JOSEPH G. PETROSINELLI, ESQUIRE
                    JESSICA BODGER RYDSTROM, ESQUIRE
                    680 Maine Avenue S.W.
                    Washington, District of Columbia 20024

                          and

                    DLA Piper, LLP
          By:  LOREN H. BROWN, ESQUIRE
                    1251 Avenue of the Americas
                    New York, New York 10020-1104

                          and

                    Clark Partington
          By:  JEREMY C. BRANNING, ESQUIRE
                    125 East Intendencia Street, 4th Floor
                    Pensacola, Florida 32502

**APPEARANCES (cont'd)**:

For the Defendants -
    Greenstone, LLC and Viatris, Inc.

                        Pietragallo, Gordon, Alfano,
                         Bosick & Raspanti, LLP
                  By:   CLEM C. TRISCHLER, JR., ESQUIRE
                        FRANK H. STOY, ESQUIRE
                        301 Grant Street, 38th Floor
                        Pittsburg, Pennsylvania 15219

                             and

                        Dechert, LLP
                  By:   MARK S. CHEFFO, ESQUIRE
                        Three Bryant Park
                        1095 Avenue of the Americas
                        New York, New York 10036-6797

                             and

                        Moore, Hill & Westmoreland, P.A.
                  By:   CHARLES F. BEALL, JR., ESQUIRE
                        350 West Cedar Street
                        Pensacola, Florida 32502

For the Defendant -
  Prasco, LLC:          UB Greensfelder, LLP
                  By:   PAUL J. COSGROVE, ESQUIRE
                        312 Walnut Street, Suite 1400
                        Cincinnati, Ohio 45202-4029

P R O C E E D I N G S

(In open court:)

THE COURT:  All right.  Good morning.

Welcome.  I know we have a lot of folks from out of town, so welcome to Pensacola.

I'm Judge Casey Rodgers and it's indeed my pleasure this morning to have you all here for this initial case management conference in the Depo-Provera Products Liability Litigation.  I will be referring to this as MDL 3140, which it is, but that's for short.

This action was transferred to this Court and assigned to me as the presiding judge by the JPML on February 7th, just two weeks ago.  It feels a little bit like two months ago, but two weeks ago.

At the outset, I'm honored by the assignment and I look forward to working with all of you on the MDL.

It looks a little bit like jury selection here in the courtroom this morning, a sea of faces.

I'm going to start this morning with attorney introductions.  Some of you, I know.  Many of you, I do not know.  I'm at a bit of a disadvantage in terms of facial recognition; there's only one of me.  But at last count, I think, I heard we had 54 of you here in the courtroom.  It looks like more than that, but 54, and another 70 or so on the Zoom.

I am going to limit introductions though, to those who are here in the courtroom and who anticipate having a speaking role. At some point, I hope to meet all of you, but this morning for efficiency purposes, that's what we'll do.

Welcome to those who are here by Zoom as well.

So let's start with plaintiffs' side and I'll start with Mr. Aylstock, who I do know.

MR. AYLSTOCK: Good morning, Your Honor.

THE COURT: Good morning.

MR. AYLSTOCK: Bryan Aylstock for the plaintiffs.

THE COURT: Okay.

MS. RELKIN: Good morning, Your Honor, I'm Ellen Relkin from Weitz & Luxenberg in New York and New Jersey.

THE COURT: Thank you.

MS. RELKIN: It's an honor to be here.

THE COURT: Thank you.

MS. FINKEN: Good morning, Tracy Finken from Anapol Weiss for the plaintiffs.

THE COURT: All right.

MR. SEEGER: Good morning, Your Honor, Chris Seeger, Seeger Weiss for the plaintiffs.

THE COURT: All right. Very good. Anyone else for the Plaintiffs with a speaking role?

All right. Then let me turn to the defense side of the courtroom. Mr. Petrosinelli.

MR. PETROSINELLI:  Your Honor, nice to see you. Joe Petrosinelli of Williams and Connolly for Pfizer here with my partner, Jessica Rydstrom.

THE COURT:  Very good.

MS. RYDSTROM:  Good morning, Your Honor.  Nice to meet you.

THE COURT:  Nice to meet you too.

Mr. Brown.

MR. BROWN:  Good morning, Your Honor.  Loren Brown, DLA Piper, for Pfizer as well.

THE COURT:  Okay.  Hey, Jeremy.

MR. BRANNING:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BRANNING:  Jeremy Branning, Clark Partington for Pfizer.

THE COURT:  Nice to see you.

MR. BRANNING:  Likewise, Judge.

THE COURT:  Okay.  Mr. -- is it Trischler (Trish-ler)?

MR. TRISCHLER:  Trischler (Trish-ler).

THE COURT:  Trischler, all right.

MR. TRISCHLER:  Good morning, Your Honor.  My name is Clem Trischler.  I'm with the firm of Pietragallo, Gordon, I'm representing Greenstone, LLC, and Viatris, along with Mr. Beall, Mr. Cheffo, and Mr. Stoy.

THE COURT:  Okay.  Let me -- I appreciate you doing that but let me ask each of them to introduce themselves and, certainly, Charles is a familiar face.

MR. BEALL:  Good morning, Your Honor --

THE COURT:  Good morning.

MR. BEALL:  -- good to see you again.  Charles Beall with Moore, Hill & Westmoreland for, again, the same defendants, Viatris and Greenstone.  Thank you.

THE COURT:  Okay.  Thank you.  Good morning.

MR. CHEFFO:  Yes, good morning, Your Honor. Mark Cheffo from Dechert, I also represent Viatris and Greenstone.

THE COURT:  And I just saw you in at NYU, I think.

MR. CHEFFO:  You did, Your Honor.

THE COURT:  Okay.  All right.  Good to see you again.

MR. STOY:  Good morning, Your Honor.  Frank Stoy from the Pietragallo Firm, also representing Viatris and Greenstone.

THE COURT:  Okay.

MR. STOY:  Nice to meet you.

MR. COSGROVE:  Good morning, Your Honor.  PJ Cosgrove from UB Greenfelder in Cincinnati, Ohio, for Prasco.

THE COURT:  Okay.  Very good.  Good morning to all of you.  Thank you for those introductions.

For those on Zoom, I should have mentioned, if you have any type of -- or experience any type of technical

difficulties, please e-mail Barbara Rogers, and let her know that, and we'll do our best to fix the issue.

All right. I'm going to take a moment to introduce you to some of the court personnel that you'll be working with -- if you're involved in this litigation, you'll be working with them here in this MDL. Some of you may be acquainted with these folks from prior MDL. These are the workhorses of the MDLs in our court, most of them anyway. Some of them, again, you know, some you do not.

But let me introduce you first to someone you may not know and you will come to know and you'll come to appreciate is Magistrate Judge Hope Cannon.

Judge Cannon, would you stand for just a minute, just so everybody can see you.

All right, thank you.

Judge Cannon is the Magistrate Judge assigned to the MDL. She played an indispensable role in 3M both assisting with the efficient management of that litigation as well as the resolution of that litigation. So we're real fortunate to have her assisting in the litigation here.

Her career clerk is David Ricci. Mr. Ricci, is now standing. He's, again, her career law clerk.

Seated to my immediate right, we're switching sides, is Ms. Francie Berger. Ms. Berger is an MDL attorney advisor. And she will be working on this MDL. And she's worked on 3M as

well.

To my left is Ms. Annette Williams.  Ms. Williams is my career law clerk and this is her first hands-on involvement in an MDL.  With the other two that we've had, Abilify and 3M, Ms. Williams was responsible for keeping the rest of my docket moving and now she's going to get a taste of the MDL world in this litigation.

Many of you know Ms. Barbara Rogers, and you probably now know her from this morning.  Ms. Rogers is the Deputy Clerk of the District Court.  She serves as my courtroom deputy.  She'll be available to you for any courtroom logistical issues that may arise and she's -- will be handling all of the courtroom scheduling as well.

Ms. Heidi Doogan, here to my left, is my official court reporter.  Ms. Doogan is new to -- well, I won't say new to the court, she's new to this MDL.  She was not my court reporter at the time of 3M, but please reach out to her if you have any special requests for court reporter services, just reach out to Ms. Doogan.

Mr. Leonard Thomas, some of you know.  Where -- oh, there he is.  There -- Mr. Thomas, is the court security officer.  He's responsible for maintaining security here in the courtroom and, obviously, enforcing all of the Court's orders in the courtroom, which I don't think will be necessary that we'll be needing him to do that, but he's here if we do need

that.

Also, back now to the jury box is our Clerk of Court, Ms. Jessica Lyublanovits. And under Ms. Lyublanovits' leadership our Clerk's Office has successfully assisted in the management of the Court's prior two MDLs, I've referenced them, that would be Abilify as well as the gorilla 3M. And I say that with all due affection, as I am an avid and true animal lover, so -- but it was a bit of a gorilla.

All right. And next to, let's see, I guess, next to Ms. Lyublanovits is Mr. Terry Sanders. Mr. Terry Sanders is our Advanced Information Technology Specialist, ooh, that's a mouthful. Big job.

Mr. Sanders has been with our court for a very long time. We're fortunate to have him. He coordinates and manages all of the courthouse and courtroom technology needs. Which means that Mr. Sanders has the patience of Job, especially with me, so bless you, Terry.

And then next to Mr. Sanders is Ms. Donna Bajzik. Some of you have already had dealings with Ms. Bajzik. She is our MDL coordinator for the Clerk's Office and this is now her third MDL. She's been onboard for the prior two. She manages the electronic dockets for the MDL, all of the day-to-day activities for both the master as well as the individual case dockets. Big job. Yeah, and she's performed ably, again, in this role both in Abilify and in 3M. But if you need any

Clerk's Office assistance, Ms. Bajzik would be the person to contact.

And then back to the other end of the front row next to Ms. Lyublanovits is Ms. Erica Smith.  Ms. Smith is an administrative specialist for our court.  She can provide assistance and guidance to you with any technical PACER questions.  Another bless you to Erica for that.

Also, she'll handle attorney registration inquiries, if you have them.

And then next to Ms. Smith is my Judicial Assistant, Ms. Patty Romero.  And she is my right hand and my left hand.  For purposes of the MDL, she manages my schedule, you should know that.  And she's your first line of contact with my Chambers.

All right.  I -- one disclosure I'm going to make and then I'm going to allow or invite any of you all to exit, if you'd like.  I know you are all very busy, but I did want everyone to have an opportunity to see you, to -- to get to know your face and your name and put that together.  We didn't do this in the prior MDLs and I wish I had, so I appreciate you being here.

The disclosure I want to make is a Chamber's disclosure.  I have a term law clerk now with me in Chambers, Mr. Josh Short.  He is not in the courtroom -- he's actually out sick today -- but he has previously done quite a bit of

work for Viatris with his prior law firm, which was Hogan Lovells. I don't think this will be a problem at all. I wanted to just bring it up, let you all know this. He is completely walled off from the Depo-Provera MDL. He'll have no responsibilities whatsoever. He's got plenty of other work to do in Chambers. He'll be playing the role, a little bit like Ms. Williams, in keeping the rest of the docket moving while we all manage the MDL. But I just wanted you all to know that. If it is a problem or if you want more information about that, just let me know.

All right. So if anyone from the Clerk's Office and beyond wishes to leave, that's fine. You all can go through the jury room.

Thank you very much.

And Ms. Smith is going to stay because she is going to do -- I'm sorry, Erica. She is going to do a little bit of a demo for us in a few minutes regarding some -- well, I don't want to start off with mistakes, but there have been some errors made in opening cases on the docket so we just hope to go through that with you so you can pass that along to your own staff if need be and we can correct those errors right off the bat.

All right. We are going to have a website for the MDL. I don't believe it's up live just yet. Mr. Sanders handles that. We've been working on it, but we will post a

list of all of the individuals that you just met, their names and contact information on that website.  And we'll talk a little bit more about the website in a few moments.

All right.  Let's switch gears, I want to get past the introductions now.  I want to thank all of you for -- on both sides, for your pre-conference submissions.  The position papers were very helpful to me in preparing for today's conference.  One thing I've learned -- I've learned quite a few things, I hope.  I hope we all have in prior MDL work that we've done; they're full of lessons.

But one of the main things I've learned is that no one magic formula or recipe exists for handling an MDL.  I mean, every one is unique.  And approaches that work in one may not work or fit in another.  And I'll draw on my experiences, that's all we can do to draw on our experiences from prior MDL work, but I do recognize at the outset that this litigation will have its own unique character and its own unique, I'm sure, challenges.  I will listen to you, hopefully together we'll be able to collaborate and develop a case management plan for the Depo MDL.

That's what we're calling this, the Depo MDL.  If you all have some other catchy suggestions, I'll certainly hear from you on that, but so far it's just the Depo MDL.  But you all bring a wealth of experience to the table and I'll be relying on you, both sides, as we proceed.

I do see my role largely as facilitative.  And what I mean by that is that I see that it's -- I see it as my job, or view it as my job, to get you as much information as I can that will help you ultimately resolve these cases on the merits, either here in the MDL, back in the transferor courts or a settle- -- settlement, excuse me.  Every step that I take in the proceeding -- proceedings will be designed to generate important data points for you that will give you insights into the strengths and the weaknesses of your respective positions. And as you'll hear from me in just a few moments, I already have some ideas about that, and for some of you that won't be a big surprise.

All right.  It's not yet known precisely how many attorneys will eventually join this litigation, but, again, judging from the number of folks that are here today as well as on the Zoom link, I think we have approximately 124 attorneys, that's the last count I had.  We can assume that it will be a large number, it already is.

The attorneys involved in the MDL, both on the Plaintiffs' side collectively, you know, together on that side, as well as the Defense side and then working together as adversaries, but hopefully healthy adversaries on both sides, you're going to be working closely together throughout this litigation.  Some of you know one another, I'm sure that's the case.  Some of you may be complete strangers.

No question this litigation, as I said, will have its own unique challenges.  It has its own personality, and that will be obvious, I'm sure, as the litigation proceeds.

If it's -- if this MDL is like other MDLs, although they're all different, they are -- they do have common features, common threads, and they're all challenging.  That's been my experience and I know from talking to my colleagues around the country, that's a common view from the Bench.

It's complex litigation, almost always a high stakes, and it's also true that -- that because of that, there will be tensions and there will be strains and there will be times in which most everyone's patience and professionalism will be tested.  And, again, this is to be expected with complex litigation, with high stakes.  But the just and efficient resolution of this litigation will depend in large measure on the way in which the attorneys, you all, comport yourselves and the way in which you handle the temptations you will no doubt have to resort to a warlike Sparta mentality.  And sometimes even over the most mundane issues.

So from the outset, the Court will expect, and actually I will insist, that professionalism and courteous cooperation permeate the MDL until its conclusion.  And that is not just on the -- both sides of the v, but also within the Plaintiffs' side.  And you all -- you all know what I'm talking about, so, please, keep that in mind.  And if I need to, I'll

remind you of it from time to time. So thank you for that.

All right. In that spirit, let's turn to the agenda. I have my own checklist. Again, I appreciate what you all provided, and I know you did that off of what I provided to you in my -- in my pretrial order. I, again, appreciate that. I'm just -- I'm not going to track that perfectly, but, I think, what I'm about to go over will cover everything and if I don't, then I'll certainly invite you to address the Court at the appropriate time.

So let me start with the state of the MDL, as I said, the Panel's Transfer Order was entered two weeks ago today. And as I understand it, and that is as of this morning, we have 61 cases that are filed on the master docket. We are awaiting eight more to be transferred in, that would make a total of 69 cases, once we receive and Ms. Bajzik dockets the most recent transfers. That was -- I believe that consists of 27 cases that the JPML originally transferred, plus an additional 38 on the recently Finalized Transfer Order. There are another four cases that have been direct filed here in the Northern District.

As I understand it, the Panel has entered a Second Conditional Transfer Order, that will transfer 12 more cases to the Northern District of Florida. I believe the opposition period expires today, or it did yesterday, but it may be today. We expect those cases to transfer as well, and assuming that

occurs, then the state of the MDL here in this District will be 81 -- 81 cases.

Obviously, all of these cases are in their infancy and I have stayed all deadlines and discovery until further order.

My first question for you all, and it may be premature and none of us have a crystal ball, but I would like to know if you have some sense, and I'll start with the plaintiffs because you're going to have really the best view into this of how many cases you expect that we might see in the MDL, and I'm not going to hold you to it, because we know how that works.

MR. AYLSTOCK: Yes, Your Honor. Bryan Aylstock for the plaintiffs. I -- it is a -- it is a bit of a guess, but we would estimate between five and ten thousand at this point. And as you know, I was way off in 3M, so I hope I'm a little bit more accurate in this one.

THE COURT: Okay. Anyone have any different guesstimation? What I've just heard is the five -- five to ten thousand. Okay.

All right. Well, then let's move on. Again, this is part of any first CMC agenda, but I'd like to also ask you about federal and state coordination. From your position -- excuse me -- your position statements, you identified related state court actions where diversity jurisdiction does not

exist. I believe you identified ten cases in total. Does -- the respective states would be California, Pennsylvania, Delaware, and Ohio. And then there may -- what I think I read, there may be potentially additional non-diverse cases in New York, which is home to some of the defendants.

Anything beyond that?

Mr. Petrosinelli, do you know anything beyond that or any -- also while you're standing, I'm going to ask about where you have any other anticipated removals.

MR. PETROSINELLI: Yes, Your Honor. Thank you.

Joe Petrosinelli for Pfizer. A couple things. Those ten are the only cases we know about right now. But I do know from speaking with the law firms that filed those cases that at least they say they intend to file their inventories in state court. So I would expect that at least in some of those state jurisdictions, the numbers of cases will start to climb and so I do think that -- and I guess depending on how much they climb, there could be coordinated proceedings in those cases with one judge assigned. And so I do think -- and I talked to Mr. Seeger and Mr. Aylstock about this, who I know and respect greatly -- I think, it would -- a federal-state coordination here is going to be important for lots of reasons that, I think, would be obvious. And I know the Plaintiffs have suggested as part of their leadership appointing a Federal-State Liaison, and I fully support that because I do

think, you know, whatever number of cases get filed in the MDL, I think there will be a substantial number filed in state court.

THE COURT: Okay. All right, that -- any --

MR. PETROSINELLI: And in terms of removals, not yet. I mean, there's just this one case --

THE COURT: Right.

MR. PETROSINELLI: -- that was filed in Illinois that we removed. But there have not yet been other cases filed in state court that we've removed, though I suspect that particularly in Illinois and maybe in other states, if -- if there are more filings, there may be more removals.

THE COURT: Okay. Can I ask you about the Daniels case, the one that -- the one removal in Illinois. My understanding is it's facing -- there's an objection to transfer at the JPML. And there's also may be a briefing schedule actually in the District Court in Illinois, is that?

MR. PETROSINELLI: Yes, ma'am.

THE COURT: On a motion to remand, I'm sorry.

MR. PETROSINELLI: Judge Rosenstengel has the case and she set a briefing schedule. The Plaintiffs had -- the Plaintiff had asked for an expedited consideration, she denied that. She set a normal briefing schedule. But in the meantime, the objection to the conditional transfer order will be briefed in the JPML. And if it makes the March hearing

calendar of the JPML, I assume the JPML will decide on transfer before it's fully briefed in Illinois, but, obviously, I don't know that, but it's --

THE COURT:  We were trying to figure that out in terms of the timing with the -- with the briefing before the Panel on the objection to the transfer versus the briefing at the District Court Level on their motion to remand.

MR. PETROSINELLI:  I think it might be briefed before the JPML in time for the March calendar, in which case --

THE COURT:  Okay.

MR. PETROSINELLI:  -- presumably, they would decide it at the -- at the March hearing session.

THE COURT:  Okay.  All right.  Thank you.

Well, I am not -- I'm no stranger to federal-state coordination, this -- we certainly had some coordination in 3M in Minnesota with Judge Laurie Miller.  And then a good bit of federal-state coordination, considerable, in Abilify in New Jersey with Judge Jim DeLuca, who's since retired.  But we actually, just for those of you who aren't aware, Judge DeLuca and I held joint CMCs.  We held a joint science day.  A lot of coordination, that I thought was very, very beneficial in that MDL.  So we will certainly be looking at a Federal-State Liaison -- coordinator liaison position for Plaintiffs' leadership; and we'll talk more about that in just a little bit.

I did not see in your position papers any reference to any class proposals or suggestions for any class, not even -- I don't think I saw anything about a medical monitoring class or anything like that. I just want to confirm -- Ms. Relkin, you look like you're about to stand. Is there any update there? Do I need to be aware of anything?

MS. RELKIN: Yes, Your Honor. There were a few complaints filed for medical monitoring for women who were exposed to --

THE COURT: Oh, there are?

MS. RELKIN: Yes.

MR. PETROSINELLI: Okay. I wasn't sure about that.

MS. RELKIN: Yes. I believe there are three that have been filed.

THE COURT: Okay.

MS. RELKIN: One, I think. One was just filed for a California plaintiff and then there were, I think, two separate Pennsylvania.

THE COURT: Okay. I will look closer at that then.

MS. RELKIN: We can get you the -- the captions.

THE COURT: Okay. That would be helpful. Thank you.

Okay. Okay. I'm going to move on to some administrative matters. Pro hac vice admission, I've entered an order on this issue. If there's any questions, I can answer them or, as I said, Ms. Smith is here. Just please follow the

order, it is a little different, it's a bit of a modification from our local rule and a little bit different practice then in prior MDLs.

Anyone?  Speak or forever hold your peace, as far as Ms. Smith being here.

(No response.)

All right.  Now, I think now, Erica, let's go ahead and do the -- the brief demonstration, if we could.

This is -- as I said, this is a brief Powerpoint slide presentation on how to open a case.  And I -- because I have never opened a case, I asked Ms. Smith to help us with that.

MS. SMITH:  All right.  Well, I've never opened a case either, but I'm going to present this for the Clerk's Office because these are very important.

This is not the first screen you'll see when you're opening a civil case, but this is very, very important and that is the origin code.  Origin Code 8.

THE COURT:  Can you all hear that?  The origin code is very, very important.

MS. SMITH:  Yes.

THE COURT:  So please look at that.

MS. SMITH:  And then the next slide is what you will see when you're opening a civil case.  Just a reminder to input your lead case number as the MDL case.  And then also to

include the JPML number, which you'll notice is the last four digits of the MDL case number.

The next slide.

Fee Status: This is defaulted to paid. And it is -- also we have this printed for everyone, right?

THE COURT: We do. We have copies of these slides for everyone to take with you and they will also be posted on the website when the website is up and live.

MS. SMITH: Yes.

So Fee Paid: This is going to default to paid. Leave it as paid because this is going to be paid before your case actually gets opened, so leave that alone.

And then if you enter a demand, it's a little confusing, but you'll notice there's a dollar sign and three zeros that indicates that if you put in 75, you're demanding $75,000. If you put in $75,000, you will demand much more than $75,000.

The next slide.

This is the last reminder, it's just to make sure that you select Division 3 for Pensacola for all of your cases.

Party names must be entered in all caps. This is also referenced in our CM/ECF Attorney User Guide. We do not use any punctuation, lower punctuation -- hyphens are fine. Lower punctuation, do not use it.

And I think, is that the last side? It is our last

slide.

So again, I'm Erica Smith, if you-all have any questions, certainly feel free to e-mail or give me a call. I can get you in touch with who you need to be in touch with, if I can't answer it.

For our visitors to Pensacola, I hope you all enjoy.

THE COURT: Awe, thanks, Erica. Thank you.

And, as I said, we have copies. I know this is a bit granular for a case management conference, but again, from experience, we thought this might be helpful and might avoid some issues for the Clerk's Office going forward.

Barbara, back behind you are those copies of the slides, if anyone wants to take those.

Okay. As I mentioned, the website will be up and running.

Francie, do we know when that's going to be up?

MS. BERGER: No.

THE COURT: Not yet, okay. Well, soon it will be up. And it will be like -- most like every other MDL website that, you know, you're familiar with. There will be an overview of the case, relevant orders, and, you know, filings, important dates, contact information for court personnel as well as leadership counsel. There will be some frequently asked questions, links to additional resources, and copies of other important documents.

Any other suggestions for the website are welcome.

All right.  One of the most important lessons I've learned from my prior experience with the two MDLs here in this court, and, one, again, being the gorilla 3M, is that a litigation support firm is absolutely critical to the efficient and effective management of the cases.

And in my prior MDLs, BrownGreer PLC was appointed to provide that centralized litigation management support; that was both for Abilify and then also for 3M.

You know, I'm inclined to move forward in this litigation with -- with BrownGreer.  The reason for that really is I know from personal experience what kind of job they do.  And I'm not all -- I'm not about recreating the wheel or even trying to, especially when I have such an outstanding resource.

I believe the parties agree with that, at least the parties in my prior two MDLs agreed with that.  They were BrownGreer, meaning "they," BrownGreer, provided invaluable services in my opinion in those prior MDLs.

Their centralized document sort of repository is -- is -- goes without saying, but the MDL Centrality Litigation Support Apparatus in my opinion is superior and unmatched in the industry.

I see Mr. Brown and Mr. Woody here today.  And I'm happy you're here, but there must be a reason.  Someone must have brought them here or had them come here.

MR. SEEGER:  Yeah.

THE COURT:  Mr. Seeger.

MR. SEEGER:  Yeah, I'll go to the podium.

THE COURT:  Yep.  That will be good.  Thank you.

MR. SEEGER:  Chris Seeger, Seeger Weiss.  Good morning, Your Honor.

Yeah, Mr. Petrosinelli and I have had discussions about this with Bryan and others.  I think we agree with your assessment of BrownGreer and their product.  We asked -- and, Joe, you can address this, if I miss something.

THE COURT:  I do want to hear from the Defense too, of course.

MR. SEEGER:  Yeah.  We -- I asked Mr. Brown to come just in case the Court wanted a presentation of what he was thinking for this case.  Plus, I know there are probably people in the audience that might be slightly unfamiliar with MDL Centrality.  So if the Court wanted to entertain a few minutes with Mr. Brown presenting, that would be great.

THE COURT:  Okay.  Well, let me -- thank you, Mr. Seeger.  Let me hear from the Defense, Mr. Petrosinelli.

And I've already told you how I feel about BrownGreer but this is your litigation, and so I want to hear from both sides about this.

MR. PETROSINELLI:  Thank you, Your Honor.  On behalf of Pfizer, I've used BrownGreer in many, many MDLs, which is

probably not a surprise to the Court. I've known Mr. Brown for many years and I think they would be a great choice for this MDL. I -- as I said to Mr. Brown in the hallway, we'll want to see some pricing, as we always do. And I know he's happy to provide it.

But in terms of functionality, I've -- you know, I have them in probably five cases right now, so I'll be happy to have them.

THE COURT: And very fair. And it's easy for me to sit up here and speak to functionality and not pricing since I don't pay for -- and so fair enough. And I'll leave that to you all to deal with the pricing. And then you'll let me know. But I am glad they're here, and I -- if you all are in agreement, I would like them to be at your Rule 26 meeting, I think that would be helpful.

And then I do want to hear from them this morning or allow Mr. Brown and/or Mr. Woody to speak, but let me -- let me address the next topic I have and then -- and then maybe that will inform your presentation, not to put you on the spot. But let me tell you a little bit more about what I have in mind going forward, at least initially, and then we'll hear from BrownGreer.

All right. You've heard me now reference several times lessons and takeaways from -- from prior MDLs and our prior experiences. One of those for me, and it's a big one, is

in the area of vetting.  The bane of the MDL's existence and my existence, quite frankly.  You name it, I have tried it:  Fact sheets, profile forms, census forms, deficiency process on top of deficiency process.  I don't know if there's anything else other than fact sheet, profile forms, census forms.  I don't know if there -- we even had Bellwether sheets, I think, in 3M.  But in my view, none of these -- none of these things have really produced, in my mind, an effective vetting process.

It just, in my experience it -- it led to a lot of frustration, very time consuming.  I felt inefficient, delay, and again frustration.  So those of you who know me from prior MDLs probably you understand that I'm not afraid to try new things.  Some of you may even say, I like to try new things and think outside of the box when it comes to creativity.  And that's true and that's one of the main reasons I like or enjoy presiding over MDLs, it gives me that opportunity as a Judge to do that.  So I've spent a good bit of time over the last couple of weeks thinking about vetting, thinking about, you know, effective and efficient vetting and case management.  And I'm going to tell you now what I've -- what I've decided.  And we can talk about this, certainly, but this is -- this is -- this is what -- it's on my mind, and what I've come up with to get us started.

First off, all cases will be filed on the court's docket.  This shouldn't surprise you if you were an attorney

involved in Abil- -- excuse me, in 3M, that shouldn't surprise you, and I believe even in Abilify, but there's no free parking. Filing fees will be paid. There will not be any multi-plaintiff complaints. I haven't allowed them in my other MDLs and that was on the advice of very seasoned MDL judges whom I respect who told me many years ago, Casey, don't ever allow multi-plaintiff complaints. And I've learned and I've come to agree with that. I don't believe they comport with Rule 14 in these types of cases. They're a nightmare for the Clerk's Office and Chambers to handle administratively.

And, finally, some of you have heard me say this, plaintiffs, you need to have skin in the game. You need to pay the filing fee. Just that -- I feel strongly about that. Your case needs to be subject to the Court's jurisdiction. And I disagree respectfully with some of my colleagues who feel that, you know, lawyers can just agree or consent to the Court having jurisdiction over their case. That's -- that's not what I learned in Civil Procedure many moons ago. And so I believe in order for the Court, myself, to be able to effectively manage your cases and to effectively vet those cases, those cases need to be on my docket.

So with that in mind -- and we'll discuss pleadings and service in just a little bit -- but I believe that within 120 days, four months of a case being filed, there's no reason a plaintiff cannot, at that point, show proof of use and proof

of injury.  And there was reference to this in the position papers by the Defense.  I want you to discuss this at your upcoming Rule 26 meeting.  I am thinking about or envisioning very basic information.  What product did you use or did your client use.  When did your client use it or when was your client administered it.  A prescription record.  A medical record showing that.  Very basic information.  And then something showing, and it would need to be a record, showing a diagnosis of a meningioma, but there will be a record and there will be, most likely, some type of a inquiry, a questionnaire, I don't know what we'll call it.  But really, no more than probably five questions.  I mean, just something very, very basic.

Not a -- and I know I saw where at least some of the defendants said they wanted the factual bases for fraud claims and et cetera.  Not -- that's not what I'm talking about here. And I'm not talking about a ten-page fact sheet.  And I hope that that's clear so your discussions are informed by these thoughts.

All right.  Everyone's sitting down, so that's good.

All right.  I have identified five cases.  These five cases we'll refer to them as pilot cases not bellwethers, pilots.

The work of the MDL will be done in these five cases, at least initially.  And these five cases, which I'll identify

in just a minute, were selected by me based solely on claims pled, the defendants named, the fact that two of the cases are handled by local attorneys, and the fact that one was filed in this District initially, nothing else.  I don't know anything about the cases.  I didn't talk to anybody about this, other than my law clerks.

But these five cases will proceed in a more standard or traditional one-off fashion, sort of.  So bear with me.  The plaintiffs in these five cases will be subject to that same minimal proof of use and injury requirement that I just discussed for the broader inventory.  If the broader inventory has got that requirement, these five cases will have that requirement as well.  But there will be no other plaintiff discovery initially, other than that -- and discovery is too strong of a word, but those minimal requirements.

Instead, the named defendants in those cases will respond to the current complaints, the ones that are filed and on the docket, and you'll raise your defenses just like you would if you were facing a one-off case:  Your 12(b)(6) motions, your answer, if you don't have a 12(b)(6).

I know Viatris, I think, said they definitely wanted an opportunity to pursue 12(b)(6).  I don't know if it's a successor liability issue, but I saw something of that nature. So this will give you that opportunity to do that.  I intentionally selected cases -- because you're named -- Viatris

is named in some and not in others, meaning named in some complaints and not in others.

Also, I know from your papers that preemption and general causation, I'm not saying these are the only defenses, but these are two sort of premiere defenses that you all intend to raise in different variations maybe of preemption. But you will raise those in an answer most likely because I would expect there would need to be some discovery, so we'll talk about that in a minute.

If you can raise it as a 12(b)(6), by all means, that's up to you. But otherwise, what I envision is assuming that those are raised as defenses, those preemption and causation defenses are raised, and that discovery is required on those defenses -- which I anticipate that will be necessary -- there will be two simultaneous tracks for discovery in those cases. One will be obviously for preemption. The other will be for general causation.

And I have thoughts about the length of time for those discovery periods, if you're interested. You may have different thoughts. I'm going to put this out there just so you have the benefit of my preliminary thinking. I'm not entering a scheduling order here at all. I'm going to let you, again, digest this, work on it at your Rule 26 meeting and then come back to me with a proposal.

But just so you have a glimpse into what I think is

reasonable, doesn't mean you can't change my mind, but I'm thinking on preemption, 120 days.  And general causation, 180 days.

Again, you may convince me that that's crazy, and that something else needs to be -- needs to be decided as far as the length of discovery period.  But I'm certainly not looking at, you know, a year for discovery on these defenses.  So, again, we can talk about it.

Following discovery -- and again, no Plaintiffs' discovery at this point, other than that minimal proof of use and proof of injury requirement.

There will be an early Daubert and summary judgment dispositive briefing schedule put into place, think about that as well for your proposal.

And then following resolution -- and there will most likely be hearings, oral arguments, obviously, could be the case, and then -- but following resolution of those legal defenses, assuming that -- that they're not completely dispositive, then these five cases will proceed with case specific discovery for the Plaintiff, as well as any general corporate discovery that's not already been conducted as part of those two -- discovery for those two -- for the two defenses, preemption and general causation.

And let me pause for a minute particularly with preemption.  If you need full-blown corporate, general

corporate discovery, to the nth degree as far as preemption, that's one thing. If you don't, don't take it, you can have it later. I mean, talk a bit about this at your Rule 26 meeting. But it's not an invitation for full-blown corporate discovery, general corporate discovery, unless it is tailored and necessary to respond to those defenses. I hope that is clear.

Again, after the resolution of the issues, then there will be a detailed case management order that will be entered for the case specific fact discovery as well as expert discovery and there'll be deadlines Daubert and dispositive motions. And then, of course, from there, if any case is still alive, it will be tried or it will be remanded.

Now, there's only one of those five cases that is filed in this -- was filed in this District. So there's only one in which Lexecon is not an issue, of course, you can waive Lexecon and there may be -- and I'm getting way out ahead of my skis here, but it may be that there's some -- there's some alternative to a full-blown trial on the record. Maybe you all want to take one of these cases and try it in an ADR fashion or some ADR moot -- mock trial, excuse me, mock trial setting. I don't know. I'm open to it, but, otherwise, it's got to be resolved. And I say "it," there's five of them. If all five are left standing, then all five either have to be tried or they have to be remanded. And then we'll deal also then with the masses.

And I'm not -- and I'm not saying at some -- there may be at some point, and, you can, come to me and we'll talk about it, that you feel like there needs to be another wave of discovery for certain cases. We can talk about that, that would run simultaneous to what you're doing in these five for the -- for case specific Plaintiffs' work maybe, but, I think, that's something that is to be discussed later.

But let me go ahead, and I should -- I should tell you what five cases have been selected. The first is the one that was filed -- one of the ones that was filed in this District, that's Donna Toney, that's, Mr. Aylstock, your firm and, I think, Mr. Seeger may be too have a -- represent Ms. Toney.

The second is Alicia Wilson. I believe that's Virginia Buchanan. Is Ms. Buchanan here?

MS. BUCHANAN: Yes, Your Honor.

THE COURT: All right. So, Ms. Buchanan, that's Ms. Wilson is one that I've also identified.

Kristina Schmidt, I believe, Ms. Relkin, that is one of your cases.

MS. RELKIN: (Nods head.)

THE COURT: And then Ms. Rachel Valera-Arceo or Areco, that's Ms. Finken, that's one of your cases.

And then, Ms. Blonski, Mr. Seeger, that is one of your cases?

That was in New Jersey, I believe it's now on our docket.

MR. SEEGER:  Yes, ma'am.

THE COURT:  So those are the five and, again, there are variations of defendants in these cases.  And there are also a little bit vary -- some variations on the claims.  We don't need to go over all of that right now.

I do want to stress though that these cases are -- it may feel like they're bellwether cases, that's not my intent that they be true bellwethers.  There was no bellwether analysis done as part of selecting these cases.

As I said, I refer to them as pilot cases and they will serve as a vetting opportunity for the litigation and they'll certainly also narrow the issues for the entire inventory; that's really the main reason I'm doing this.  It's a way to get our hands around the issues, in my opinion.

Now, for the plaintiffs' benefit, the work that is done in these cases will be eligible for common benefit consideration.

All right.  Now that I have your attention, let's -- I want to turn to some pleading issues.  I do also want to hear from BrownGreer but maybe let's talk a little bit about some of these pleading issues, because, again, I think it may be helpful for Mr. Brown and Mr. Woody to hear this discussion maybe before they address us.

Direct filing, you all will talk about this at your meeting. You know, it -- if there's been a stipulation in that regard in my other MDLs, you all, I'm sure, will talk about this. You mentioned it in your position paper. Typically parties stipulate that the direct filing doesn't constitute a Lexecon waiver. It certainly doesn't constitute any determination by the Court on jurisdiction or venue in this District. It doesn't impact choice of law questions or statute of limitations questions so -- but you all -- anyone -- is there anyone who wants to speak now to direct filing. Do I need to hear from anyone on it?

MR. AYLSTOCK: We -- Your Honor, we have circulated what we did in 3M. I think all sides agree with Your Honor's proposition that where we don't need to reinvent a wheel, we won't.

THE COURT: Okay. All right. Very good.

I haven't seen any multi-plaintiff cases yet and maybe that's -- maybe word has gotten around. I don't permit them. I don't know if that's why I haven't seen any. And by multi-plaintiff, I certainly don't intend to include in that loss of consortium claims. Those are not multi- -- that's not what I'm talking about.

And we do have a few loss of consortium, obviously. The plaintiffs and at least one of the pilot cases includes loss of consortium. I think, it's the -- Ms. Finken's case,

the Valera-Arceo case has an LOC component to it.

All right.  Service of process.  I know from experience that BrownGreer can certainly assist with that.  I would expect in the larger inventory that service of process obviously still occur, but, of course, there will be a tolling of any time period for a response to those -- those complaints in those cases while we're working -- while you're working the five cases.

Okay.  This gets to, I think, the one pleading issue or area that is impacted probably most by the pilot cases and that's master and short form pleadings.  I don't know that we -- that the litigation would -- I'm not sure how much it would benefit from master and short form pleadings at this time, but I'm not opposed to them.  You all may want more time to think about this in light of the pilot cases.

Probably.  Yeah, okay.  All right.  Well, this should be part of your Rule 26 report to the Court.

Does anyone at this point anticipate additional parties adding additional defendants?  No, not at this --

MR. AYLSTOCK:  No, I don't believe so, Your Honor.

THE COURT:  All right.  Well, I will set a schedule -- or you -- why don't I ask that you include that in your Rule 26 report, but a deadline, just in case, for the addition of any -- any addition -- any new defendants.

Okay.  I'm going to -- let me pause here, and

Mr. Brown and Mr. Woody, are you -- are you comfortable, if I call on you now?

MR. BROWN: Thank you.

THE COURT: I think I've thrown a wrench in things for everyone, probably you too.

MR. BROWN: We can come up, Your Honor?

THE COURT: Yes, please do.

MR. BROWN: Good morning, Your Honor. I'm Orran Brown with BrownGreer.

MR. WOODY: Good morning, Your Honor. Jake Woody for BrownGreer.

THE COURT: Good morning.

MR. BROWN: So it's a pleasure to be here, Your Honor, as usual. And we did want to have some opportunity just to go over some quick things. We did have some slides, but we're not going to use them because our original goal was to say all right, there were eleven things in your PTO Number II. And BrownGreer in this MDL Centrality can support every one of those things in some support function.

The goal is let's start off on day one with systems in place so that we all share information, collect it, enter it once, and be done with it and never have to enter it again. Keep it all straight from the beginning.

But let me just take this time to react to some of the things the Court said today because thank you for comments

earlier about our work in Abilify and in Combat Earplugs.  This exchange system that we have is in use, and been in use, in about 45 MDLs and other state-coordinated proceedings.  So it's got a demonstrated track record.  But we don't rest on our laurels.  We want to prove our value in every program, including this one.  Because as the Court said, these are all unique.  These are all different issues, different parties, different needs, and we customize this system to fit the needs of the litigation of the MDL, of the program, it's not something we're trying to force into some existing thing off the shelf.  This is our system, we build it, we round it out. We keep it.  We make it work as you, the Court, the parties need it.

There are a few things you mentioned today I'd like it just touch on briefly.  The goal is provide the support from day one whether it's us or somebody like us, who gets in working with the parties, the Court, your clerks, your -- the Clerk's Office to coordinate all this information so that we get an all clean start entered from the beginning and avoid all the issues of duplicates and overlaps and identities.  We keep it all straight.  So we start off right off the bat.

And then you mentioned this sort of threshold entry requirement.  This sort of proof of use, proof of diagnosis. That's kind of a basic threshold step.  Whatever that sort of threshold form is or whatever the submissions are, we can keep

track of all of the cases that are filed, wherever they come from and the demographics, the people, the lawyers involved in each one; it's all in one central litigation support database. And then when each plaintiff reaches the point of this threshold requirement, and maybe has to fill out a few brief questions, we pre-fill that with what know about the person. They automatically can do it online. They can submit their proof of use, whatever the requirement is, and diagnostic record online. We then have it all in one place, it's accessible, searchable, we can -- it's all secure. And we can harvest information from it and sort of artificial intelligence that will make sure we've got the right records and people have complied and work with whatever system the parties want or the Court wants in terms of people that are missing things. So this threshold sort of eligibility or entry level, the system will support that in a central way and get it all started off on the right foot to begin with.

The other thing you mentioned, the pilot cases. And, of course, the discovery that happens in the pilot cases and if the parties can stipulate to service through this system, then automatically it gets served. Whatever the discovery is, the request, the responses, alerts that it's there, it's all in one place. It's searchable. So the system will support what happens in these five pilot cases, including any rulings that are made that we keep track of, that then are available to the

Court and your staff and the parties, just to keep track of what's going on and any results we have and what precedence they set going forward both on any issue, preclusion issues, that the Court rules on, we keep track of it all.

You mentioned the fifth thing is direct filing cases, working with the Clerk's Office, which we're familiar with, in terms of knowing all the cases, their origin, where they came from, anything that happens to them, lawyers. We have a way to integrate with the Clerk's Office to keep track of all of that. So we have need immediate at your fingertips information about how many cases, where they're from, who's in them, and what are their profiles.

We can do service of process through the system. They can do a stipulation to do that, it's automatic.

Any -- if there -- if they -- if the parties end up with a master complaint or a master answer, or whatever happens in those, those are templates that can be filled in on the system. We pre-fill what we have information already. So that's also easily done and online and searchable and collected in one place.

So the goal, Your Honor, is to get -- we'd be happy to attend the Rule 26 meeting because we'd like to be involved from the beginning to sort of lay out the systems and the processes to keep them all -- start off on the right foot, keep it all clean, all the information accessible and we've learned

a lot in these 45 proceedings, including massive ones like Combat Earplugs where there's so many parties and things going on.  But all of those lessons we could put to use here to make sure that this one is really done perfectly from the beginning.

THE COURT:  That sounds -- sounds like a plan to me, a good plan.

And I -- the only thing I would like maybe to hear you address and then others can ask questions, if they have them, is the firewall that you have that may be of -- something that people are thinking about or questions.

MR. BROWN:  Yes, of course, Your Honor.  And two things, one, overall security of the system, it is as secure as we can make it in terms of external penetration.

THE COURT:  Right.

MR. BROWN:  This is all private information:  Social Security numbers, medical records, we go to great lengths to keep that secure from any unauthorized users having access to it.

THE COURT:  When we -- by the way, in 3M with at one point almost 400,000 claims --

MR. BROWN:  Yes.

THE COURT:  -- I'm not aware of any issue of breach.

MR. BROWN:  We had no, no issues there --

THE COURT:  Yeah.

MR. BROWN:  -- and we've had no issues anywhere in

terms of any external access.  And a lot of these things are things that get a lot of attention like earplugs, like NFL concussion.  There are things that people would hack into, if they could.  We've been working hard to keep that from happening.

The other thing is within the system, there are various different users:  The Court, state court, if you want to have them have access, the state coordination with the court, your staff, Plaintiffs' counsel, lead counsel, all the different leadership roles, Defense counsel, they all have their workspaces within this MDL Centrality platform.  And each Plaintiff's firm has their own people, their clients, in the system uploaded.  So all of that is secure from each other.

In other words, your access to information is determined by how we program it so that your user credentials allow you to see certain things.  A law firm can see only its clients.  Leadership can see more than that.  Defense counsel can see more than that.  In the discovery phase, it's designed to where people have private workspaces.  If Counsel are working on their clients and gathering information before it's served or produced to the other side, then that system protects it.  No one else sees it until they're ready and the system then allows them to serve it on the other side.  So within the system there are firewalls or security built around each user or that firm's user so they only see what they're entitled to

see until they're ready to share it with someone else, and then it becomes a common set of information that people can access, research, report from. And we can help with the reporting.

But we've never had an issue with allowing or inadvertently having firms see things they shouldn't. Sometimes, as you know, when material gets put in the wrong person's file, it ends up in another client's file, we have to be very careful about that sort of thing. But I think we have got a lot of experience in systems and our own people, built this all ourselves, and all the security are things that we design to keep the firewalls intact from the outside and within each of the segments of the users within the system so that they only see what they're supposed to. And then when they are ready to share, it gets shared correctly.

THE COURT: And then from my standpoint, hopefully yours, the very nice thing about having you all in at the ground level is you can build -- you can build, design a system that's unique and tailored to the unique needs of this litigation and the wants of the parties and the lawyers involved in this litigation.

MR. BROWN: It will be, Your Honor. There are a lot of functions that repeat, which makes it less expensive because we can take modules, demographic information, things that are used in every program, we will push them over, change them as we need to. But any of the other functions that are really

unique to how you want this MDL to run, we just build it as we need it. And because we build it ourselves, we can program it -- our application developers can build anything we want. We can report on anything you want and it can change over time. If you want to add something, take out something, we can do that.

THE COURT: I'm smiling because the only thing I can think of right now that comes to mind is I want you to identify duplicates early.

MR. BROWN: Yes. Thank you.

THE COURT: Maybe you all don't know how much of a problem duplicate cases and plaintiffs can be, but we learned that in 3M.

MR. BROWN: We know that -- actually we were talking about that here. Like, ideally, if we're in this early, we can set up screens that kind of keep duplicates from happening. In other words, if we have a data of all the Plaintiffs, and a new case gets filed, it goes through an initial screening yet to see if it's already in there. And if it's already in there, then maybe we call a pause and say to the Counsel, You need to talk with this firm because we think this person is already a plaintiff. In other words, can we set up some filtering right off the bat that captures the information of a new case and identifies a potential duplicate right off -- early so that it never pollutes the system with multiple plaintiffs in -- from

different firms, or within the same firm, and -- so we clean it up on the front end instead of cleaning it up on the back end.

THE COURT: Okay. Terrific. Thank you. Anyone have any questions of BrownGreer, Mr. Brown or Mr. Woody?

MR. BROWN: And we work with a lot of these firms I see here today, Your Honor, glad to have a chance to work for them again, work with them again. We will work out with the parties kind of what the contours are assuming the Court's okay with us moving forward on that basis.

Again, we want to prove ourselves. We're not taking any of this for granted. This is something that we think would be a benefit to the parties and the Court here. We're going to show them how that would work and we'll work -- it's not that expensive. We want to make sure that that's kind of the least concern here about how we get paid and what it costs; we'll work that out with the parties and don't have any doubt that it will turn out fine.

THE COURT: Okay. All right. Terrific.

MR. BROWN: Okay.

THE COURT: So, obviously, feel free to remain for the rest of the conference, but then right -- at the end of the conference, I'm going to ask you and Mr. Woody to step out and I'm going to entertain any objection from anyone here in the courtroom to your appointment.

MR. BROWN: Of course, Your Honor.

THE COURT:  Okay.

MR. WOODY:  Thank you.

THE COURT:  All right.  Thank you.

Let me -- before we move on to the Rule 26 conference, let me go back to the pilot cases for a minute and my reference to you about the purpose of the pilot cases involving vetting.

Certainly, we're going to -- you all and the Court will be able to get those big ticket items the Defense -- the Defense has dealt with and resolved within the confines of those five cases, but we could do that -- you know, we could do that in just -- without having five pilot cases.

I like the idea of doing it this way, but it could be done the traditional way.  But what I think is unique about the pilot cases from a vetting standpoint is after those defenses are resolved and if the cases are proceeding, then there will be that traditional -- traditional discovery, plaintiff discovery that you don't get in the -- in the traditional setting of how the MDLs are worked up.  You don't get those until maybe you have a bellwether process, if you have that, down the road or until the case is remanded and you get back to your transferor district and that judge orders case specific discovery.

And so within the confines of these five cases, I mean, they'll be, again, the traditional interrogatories,

request for production, request for admission, both sides. We're not doing fact sheets, but this is going to -- in my opinion, I think it will narrow the issues of importance to the Defense in terms of vetting instead of the 50-page fact sheet for everybody, which, again, is a colossal waste of time and source of frustration at least in the MDLs I've been involved in.

Okay. Let's move on to the 26 conference, again, I -- my order, I think, there was a footnote that said, You don't have -- this can exceed one day. I think, in 3M it was a multi-day, at least two days, maybe -- maybe longer. I don't remember, Mr. Aylstock, but I've always referred to it as a multi-day 26 conference and that may be because of 3M.

If you can get it done in a day, that's fine too. I'm not insisting that you all just hang out. But if you're working and it's productive, then you shouldn't cut it off on the first day, it's March 3rd, and it may last longer.

So I'm open and I'm going to enter an order in this regard, but I'm open to other suggestions for topics. And this will be something you all, I'm sure, will massage and decide what works for you. But there's some items that I believe, agenda items that are critical. You are aware of these things.

First and foremost being, you know, the digital discovery data, your computer systems, how the Defendants' IT structure is set up, where the pertinent information is

located, how to best collect and retrieve it.  So for the Defense, in the 3M litigation, I required that your IT people attend this conference, your corporate IT people, someone from your IT structure needs to be there.  I'm assuming that's not one person for all defendants, I wouldn't think, but you know better than I do there.

And again, you'll be discussing custodians obviously. Who they are or the information they have, where they're located.  And it's not necessarily at this point the number of custodians that's important, but rather, in my opinion, it's the character and the quality and, you know, what those custodians have to offer.

I do want you all to talk about and discuss any ESI protocol.  It's standard form now in any litigation, certainly in any complex litigation.  I will -- I'm not going to go through all of this, the items of ESI that I think are important for your protocol, I can put that into my order.  I'm assuming that -- is Mr. Buchanan here?

Mr. Buchanan, I'm assuming --

MR. BUCHANAN:  Good morning, Your Honor.

THE COURT:  Good morning.  Have we moved beyond TAR or is that like old, old...

MR. BUCHANAN:  I think if anything, Your Honor, I think it's become more prevalent.  So --

THE COURT:  Okay.  But it still exists?

MS. BUCHANAN:  -- we'll be talking about that.

It does.

THE COURT:  I didn't know if there was something more sophisticated and advanced.

MR. BUCHANAN:  Different flavors, but, yes, it still exists.

THE COURT:  Okay.  Well, I want you all talking about TAR.  And I know that to be Technology-Assisted Review, I think.  I believe.  Okay.  You'll address that in your protocol.

Also I want you to discuss at the meeting to the extent it's appropriate, but a phase privilege review.  So, you know, preserve, review, produce, object, respond, judicial review, it's all time consuming and requires an enormous investment on the part of, you know, the parties as well as the Court, so be talking about that.

Obviously a deposition protocol, which is standard.

And then now you get to talk about pilot cases as well.

Anything else that you feel I need to incorporate into an order for you all in terms of your meeting?  Yes, Ms. Relkin.

MS. RELKIN:  Thank you.  Yeah, this litigation is a little different in terms of product ID because of the extremely long latency.

THE COURT:  Okay.

MS. RELKIN:  So Depo was -- Depo-Provera was approved for contraception in 1992 when generic -- went off patent in 2002 and then generics came onto the market in 2004.

THE COURT:  Right.

MS. RELKIN:  So there are some cases, you know, from discovery states with very old exposure.  And working on this since pretty much April, we had discovered, you know, some challenges in getting older records.

I think in this litigation we need a separate track for subpoenaing pharmaceutical distributors and the actual institutions.  Unlike a typical drug where the patient picks it up from the pharmacy, that happens in some small minority, most of the cases, the women go to their doctor, their clinic --

THE COURT:  Right.

MS. RELKIN:  -- hospital system that, you know, has a clinic and gets "the shot," as it's called.  And we've had some luck getting, but a lot of times, they don't necessarily have the NDC code.  I'm talking about post -- anybody who had it before 2004 when it started having generic competitors.  We know if there's proof in a medical record that they got Depo-Provera shots, not a problem, we know it's brand name. But from 2004 forward, their product ID can be -- there can be clear proof that they have been getting the shot, the injection, but sometimes it's not crystal clear whether it is a

brand name.  There's authorized generic, which is an interesting part of this case --

THE COURT:  Uh-huh.

MS. RELKIN:  -- and then a regular generic.  And, I think, we all agree that if it's -- if some -- if a woman only got pure, pure generic, never had authorized generic or brand name, absent them being from an innovator state, which is really just California, Massachusetts, they don't have -- they won't be able to meet their burden.

So, I think, we need to be able to have a parallel track early on, particularly with your 120-day deadline, on product ID that we can actively serve subpoenas on these distributors and the actual, you know, health clinics around the country, planned parenthood facilities, and so forth.

THE COURT:  Well, I did -- I didn't look -- I didn't know all of that.  So I want to confess to that, but I did look at these five cases.  I did look at when, according to the complaints, that's all I have, when the injections were administered.  And I -- based on the five cases, I have, I believe, a good sampling of time frames.

MS. RELKIN:  Right.

THE COURT:  So I -- maybe we'll -- you'll get a sense of that in these five cases.  But beyond the five cases, I'm not opposed to a separate track for those cases, but those cases, we need a way of identifying those cases that you're

talking about. I don't want to give everyone an extended period of time just because some may legitimately need an extended period of time.

So I would think that would be something for you all to work on at your conference. And then come back to me with a proposal. But I -- this won't be the case for every case, right, and for every plaintiff?

MS. RELKIN: Sure, hopefully --

THE COURT: Yeah.

MS. RELKIN: -- you know, most of the filed cases have figured that out, but sometimes it is really challenging and --

THE COURT: Well, we do hope that the lawyers figured that out before they filed the case.

MS. RELKIN: Right. Right. But sometimes the statute of limitations and it's -- it's the third-party subpoena, we'll need to, you know, just be aggressive in trying to get that information because some -- we call a doctor's office and they're like, yes, we can -- the medical records show the injection, but it doesn't necessarily have the NDC code to prove that it's the brand name. So we -- drug distributors and the healthcare systems will need to do an organized third-party discovery, you know, plan within the plaintiffs' group.

THE COURT: Okay. And -- yeah, we've had this come

up, you know, unique -- unique discovery needs in other cases and I'm not opposed to a court order as opposed to a subpoena for difficult to obtain, you know, medical information, if that's what --

MS. RELKIN:  That's terrific.

THE COURT:  -- if that's what you need.

Because a lot -- sometimes what you hear back from the providers is, you know, we don't have to -- this is usually in psychological -- in the realm of psychological information, but -- medical information.  But here I'm not opposed to that, it might save some time if we just had an order requiring the production.

MS. RELKIN:  That would be great, we can brainstorm on that.

THE COURT:  Okay.

MS. RELKIN:  Thank you so much.

THE COURT:  All right.  Sounds good.

Anything from you all on that issue?

(No response.)

Anything else about the Rule 26 conference?

All right.  As you know from my Pretrial Order, your report is due March the 7th.  And I hope that's not going to be a problem, but that should include what we've discussed here and in the context of the pilot cases, as well.

Your second case management conference is March the

10th at 9 a.m.  You'll present that -- well, you'll present it ahead of time, but we'll have it from the 7th, but we'll discuss it at the case management conference and then beyond -- from there, I'll enter a comprehensive case management scheduling order.

Once discovery gets underway, you know, even on those Defense issues, the preemption and the general causation, I'm happy to set regular telephone conferences.  We've done this -- I've done this in the other MDLs and we can do it every other week and then as needed.  We can talk about that at the next -- be thinking about it -- we can talk about that at the next case management conference.  If I'm not available, Judge Cannon certainly, I'm sure, can step in and be available.

I will be scheduling case management conferences every Monday, once a month.  And my practice in the past, and I don't see any reason of -- to change that, because it -- it seemed to work for the parties, for the litigation as a whole, and it worked for me, was to have pre-conference meetings with leadership that narrowed issues and informed the presentation at the -- during the CMC.

I felt it -- I just felt it was an efficient use of Court and the parties' time.  But you all discuss that at your meeting and let me know, and then we'll -- if you would like to proceed in that fashion as well, then we can plan for that for the 10th.

One thing I've done in prior cases, particularly in Abilify, which a pharma case, is science day. And in 3M we had several educational days; always helpful to the Court. With that said, because we're front loading with these pilot cases, the general causation defense, I'm not sure science day is necessary.

And I hate saying that because I love science day, but I'm just not sure it's necessary and that you need to go to the time and the expense of that because of front loading those issues. I see several of you nodding in agreement, so, but discuss it. I'm, obviously, not opposed to a science day, but just don't know that it's necessary.

Okay. Let's -- let me turn a minute, we're almost at the end.

Let me turn a minute to special masters. I have used and utilized special masters in the prior MDLs, they are -- have been beneficial to me, particularly in 3M. And -- but I've used -- I used them in Abilify as well as, we had settlement masters and others. I would -- I have what I -- what I would like to utilize in this litigation, I'll let you know what that -- who they are and what roles they would play, you all can think about this.

First of all, on the settlement master, I do intend -- and we'll talk about this in a minute. I don't mean to get ahead of myself -- but in terms of a settlement

committee, those of you who know me from prior MDLs, you know that I want you all talking about resolution early on, whether that -- that evolves into anything, that's neither here nor there at this point, but I want the committee in place. And I don't -- one reason is I don't want to appoint a committee or appoint a special master and send out smoke signals to the world that may or may not be accurate.

And so if I just do it from the beginning, day one, then that's standard practice for Judge Rodgers and nobody -- nobody reads into it too much.

So -- but here, now that I've said that, what I -- what I think may make the most sense, and, again, being -- being, believe it or not, sensitive to finances for you all, because we have Judge Cannon, I don't know that we really need a special master settlement or settlement -- excuse me, special master day one. Now, I've just contradicted what I said a moment ago about smoke signals, but I think that just having a committee, and it's a committee of few, a very small committee, but meet with Judge Cannon after every CMC. So it would be once a month. You know, it doesn't have to be lengthy, but there's a meeting and at least a discussion albeit perhaps brief, I think we should start that, you know, from day one. So I'm going to ask you to do that after the second CMC. And I'll let her coordinate with you.

As far as the other two positions, I've had in 3M,

not in Abilify, but in 3M, Judge David Herndon, as -- you know, I jokingly referred to him at the end of 3M as the special master of all.  Very, very invaluable on -- I can't even name the number of fronts that he's been invaluable on to -- I think, to the parties, but also to the Court.

I started him out at a very narrow role and it quickly expanded because he -- he was so effective.  I would like Judge Herndon to be involved in this litigation, you all put that on your discussion agenda, but I'm likely to have someone involved, so, you all, again, think about that.  I'm sure -- I'd be surprised if you all don't know of Judge Herndon, even those who weren't involved in 3M.

All right.  The other position that I will insist on is the CPA position for the plaintiffs' side.  And that would be Mr. Randy Samson.  Those of you involved in both the Abilify and 3M know -- plaintiffs' lawyers know of Mr. Samson.  I know he's not everyone's favorite person because of the role, that's nothing personal, but just the role that he plays.  But I'm not going to take your time now to explain to you the -- all of the many reasons why that CPA position has proved just critical in -- in the other two litigations, particularly 3M, but it has been for me.

And for those of you that have had multiple MDLs and been involved in them and you have some idea of what a hornet's nest common benefit can be at the end of an MDL when you

haven't had someone like Mr. Samson keeping track of submissions of time and expenses from day one and approving of those from day one, then you know how difficult it can be, if you haven't had that.

And I'm actually looking -- I don't know that I've ever heard any judge say they were looking forward to the common benefit order, but I actually am in 3M looking forward to it because I just -- I know -- I don't want to say it's going to be easy, but it's certainly not fraught with the problems that many MDLs are fraught with in this context. So the plaintiffs are on notice that the Court would like Mr. Samson involved as a CPA.

Okay. Back now to the last -- this will be the last topic and that is organization of the Plaintiffs' counsel, well Defense as well, but I read in your position papers with the number of Defendants here, I believe you all agree there's no need for the appointment of formal leadership on the Defense side, but I'll turn to you in just a moment. Think about it. If I'm wrong about that, I'll certainly hear from you.

But on the Plaintiffs' side, I am open to approaching leadership in this litigation a little differently than in the prior two litigations in terms of -- not so much in terms of structure but in terms of how appointments are made. And I am -- I am not opposed in this litigation to a slate being proposed to the Court. And you can propose competing slates.

Again, I'm all about trying new things, I haven't done that before. And I'm not saying that if you propose a slate, just one slate, that I'm going to adopt it. But I want to give you that opportunity. What I -- I am looking for, as you know from prior MDLs if you've been involved before me, is, you know, I want a plaintiff leadership structure that is able to, in terms of capacity, skill, financial resources, reputation, to fairly and efficiently lead the Plaintiffs' side of the MDL. But I want the leadership to be balanced. I want it to reflect diversity. I think diversity is still an important thing to strive for, so diversity, you know, of all types, but particularly in this litigation, because of the Plaintiffs, I want that particular diversity reflected in the leadership. Now, that doesn't mean I'm looking for every single leadership to be a female, but females need to be adequately represented in your leadership.

I'm also -- will be looking for people, and I only know this based on my own experience, obviously, but looking for people with -- although, let me stop a minute. I do contact other colleagues at times about attorneys who have applied for leadership, so I -- but I'm looking for people who have a demonstrated track record of working together successfully, all right. People who can build consensus, people who are able to amicably manage disagreements. I'll certainly be looking for that, because as I talked about

earlier, tensions can certainly be at a high at times.

So, again, I'm not opposed to a slate. If you all want to propose that, even competing slates. I would, though, ask that you do that -- make that proposal by next Friday -- or the 28th.

I may adopt your slate if it's only one slate. If there are competing slates, I may combine slates. Or if I don't feel that I'm able to achieve the leadership structure and appointments that I believe are necessary, then I will -- I will entertain applications for leadership positions. And I would do that and have those -- this will be a quick process for me anyway. So if your slate is submitted on the 28th, I would expect to have a decision about that out within a day or two. If I'm not going to accept the slates and I'm going -- or if I'm going to take some portion of the slate but also allow for -- do a hybrid and allow for applications, those applications would be due quickly. So they would be due on the 7th and I would get that order out quickly with the application.

So in terms of structure for leadership, you know, there's some standard common positions: Lead Counsel and there may be more than one lead.

Liaison Counsel: Obviously, we've talked about the federal and state liaison, I think that's important here. And for that position, let me pause for a minute, I'm not opposed

to having a Defense appointment for that as well. It could work with the Plaintiff appointment. I haven't done that in the past, but I think that makes sense. I wish I had done that in 3M.

Also, obviously, Executive Committee and a Steering Committee. I'm not going to tell you now about how many members I think need to be. The number is not that important to me. Frankly, I'd rather it be more robust, you know, more positions with more opportunities for people than not.

Also subcommittees have been effective in my experience. In 3M in particular, the ESI subcommittee and the Law and Briefing subcommittee, I thought, were very beneficial. But there may be -- there may be others that you all want to see.

And then I mentioned a Joint Settlement Committee, so -- I may not have said it was joint, but obviously it needs to be a Joint Settlement Committee.

So Mr. Petrosinelli, maybe I would ask for you all to submit a couple of names to me for that, that purpose.

MR. PETROSINELLI:  I will, Your Honor.  Thank you.

THE COURT:  Okay.  Thanks.

And lastly, I am not inclined, you might persuade me otherwise, for the Plaintiffs, but I'm not inclined to appoint a Common Benefit Committee at this point. We can talk more about that, but I -- I think Mr. Samson and maybe one lawyer

working with him would be sufficient.  And if I determine later that that's not sufficient, then the beauty of sometimes of being a judge, I can change that and put something different in place.

Either way, regardless of what the Court ends up -- what method I use for appointment and the appointment process, there will be a re-appointment annually, so that will continue.

Okay.  What have -- what have I left -- anything before I excuse Mr. Brown and Mr. Woody, anything from anyone else that we need to discuss?  We've discussed a lot.

MR. PETROSINELLI:  Your Honor, if could I ask a question about the appointments.

THE COURT:  Yes.

MR. PETROSINELLI:  Just if we're going to have our Rule 26 conference on March 3rd, if appointments aren't made before then, did you -- were you intending to make interim appointments?

THE COURT:  There will be.

MR. PETROSINELLI:  Okay.

THE COURT:  I'm hoping that I can make the appointments before the 3rd, but, if not, there will be, at a minimum there'll be interim appointments.

MR. PETROSINELLI:  And then on the Defense side, just to pick up what Your Honor said, I think we talked and there are only, although there may be, I guess, six or seven named

companies, there are really three groups and I just think, at this time, we don't need an appointed Defense leadership committee of any kind.

I do think -- and I'm glad Your Honor raised it -- I do think it would good to have a Defense Liaison Counsel.  I think if there is someone on the Plaintiffs' side, it just would make sense to have that, so we'd like to submit that.

THE COURT:  So I mentioned the Federal-State Liaison Counsel, but you're talking about a traditional just regular liaison?

MR. PETROSINELLI:  I am.

THE COURT:  Okay.  Yeah, sure.  Great.

MR. PETROSINELLI:  Thank you.

THE COURT:  I'm not opposed to that at all.  So you'll submit that to me, a suggestion?

MR. PETROSINELLI:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Thank you.

Anyone else with questions, observations, comments?

Okay.  Mr. Brown and Mr. Woody, it's nice to see you both again.  Thank you for coming.  And we'll be done here in just a moment.

(Mr. Brown and Mr. Woody exited the courtroom at 10:41 a.m.)

THE COURT:  So I will be entering an order following this conference hopefully that will capture what's been

discussed here.  And then the next -- I guess, the next thing will be that you all will submit a slate, if you choose to do so, or slates, and that will be by the 28th.

Could I ask for your submission by the 28th on the liaison -- both federal-state and the regular liaison?

MR. PETROSINELLI:  Of course, Your Honor.

THE COURT:  Okay.  Thank you.

And then you'll have your meeting.  And then we'll be back together on -- on the 10th.

Okay.  Is there anyone here both Defense side or Plaintiffs' side who has an objection or knows of a conflict which would lead to an objection, obviously, to BrownGreer handling the litigation support role for this MDL?

(No response.)

On the Zoom, anyone?

(No response.)

MR. TRISCHLER:  I'm sorry.

THE COURT:  No, go ahead.

MR. TRISCHLER:  Clem Trischler for Greenstone and Viatris, Your Honor.

I have no objection to BrownGreer's appointment or involvement.  Like everyone here, I've been involved in MDLs where they have done a terrific job.  The only issue, and I think this is probably more for the Rule 26 conference, is understanding the allocation of fees among the parties because

there's some Defendants here, present company included, who think they have a lesser role in the litigation than others and so there may be a need for discussion on allocation.  But in terms of their appointment, no issue there but I just wanted to bring that issue to the Court's attention.

THE COURT:  Thanks, Mr. Trischler, that's fine.  And I should have made it more clear, I guess, in terms of sort of providing that service or function.  In terms of pricing, if that can't be -- if that can't be something everyone agrees on, if it's unconscionable whatever their proposal is, then you're not waiving your right to object later to that and just saying this is not something we're going to do.  If you all can't work out the pricing, yeah.

MR. COSGROVE:  And, Your Honor, PJ Cosgrove for Prasco, we have the same position.  We just need to vet the pricing.

THE COURT:  Okay.

MR. COSGROVE:  Thank you.

THE COURT:  All right.  Anyone else?

(No response.)

Okay.  Very good.

All right.  Well, it was wonderful to see everyone. Thank you all for coming all the way to Pensacola.  I know it's not the easiest place to get to, it's getting better, but...

MR. PETROSINELLI:  Could you get some better weather

for us next time?

THE COURT:  I know.  I don't know what happened.  I'm tired of bringing my plants in.

(Laughter.)

Yeah.  Well, it -- hopefully, fingers crossed, this is the last cold snap.

Do you know, Jeremy?  Is this supposed to be it, Charles?  Is this --

MR. BEALL:  There will be, I'm sure, Your Honor.  If we show up next time, there'll be a cold snap.

MR. BRANNING:  I certainly hope it is.

THE COURT:  I hope so too.

Okay.  Well, you all have a nice rest of the day and your weekend and travel safely back to your homes.

THE BAILIFF:  All rise.

(The proceedings concluded at 10:44 a.m.)

_ _ _ _ _

**CERTIFICATE**

I, HEIDI M. DOOGAN, Federal Official Court Reporter for the United States District Court for the Northern District of Florida, do hereby certify the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter, pursuant to the provisions of Section 753, Title 28, United States Code.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

*Heidi M. Doogan*                    Date: February 24, 2025

Heidi M. Doogan, RPR
Official U.S. Court Reporter