**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE:  DEPO-PROVERA (DEPOT    ) Case No. 3:25-md-3140-MCR-HTC
MEDROXYPROGESTERONE            )
ACETATE) PRODUCTS LIABILITY    )
LITIGATION,                    )
                               )
                               )
                               ) Pensacola, Florida
                               ) March 13, 2025
                               )
_____) 9:11 a.m.




**SECOND CASE MANAGEMENT CONFERENCE**


**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE M. CASEY RODGERS,**
**DISTRICT JUDGE**
**(Pages 1 through 40)**




Stenographically Reported By:



HEIDI M. DOOGAN, RPR
Official U.S. Court Reporter
One North Palafox Street
Pensacola, Florida 32502
heidimdoogan@gmail.com


        *Transcript produced with Computer-Aided Transcription.*

**APPEARANCES**:

For the Plaintiffs -

                        Seeger & Weiss, LLP
                  By:   CHRISTOPHER A. SEEGER, ESQUIRE
                        55 Challenger Road, Suite 600
                        Ridgefield Park, New Jersey 07660

For the Defendants -
     Pfizer Inc., and Pharmacia & Upjohn Company, LLC, and
Pharmacia, LLC
                        Williams & Connolly, LLP
                  By:   JOSEPH G. PETROSINELLI, ESQUIRE
                        JESSICA BODGER RYDSTROM, ESQUIRE
                        680 Maine Avenue S.W.
                        Washington, District of Columbia 20024

                              and

                        Clark Partington
                  By:   JEREMY C. BRANNING, ESQUIRE
                        125 East Intendencia Street, 4th Floor
                        Pensacola, Florida 32502

For the Defendants -
     Greenstone, LLC and Viatris, Inc.

                        Pietragallo, Gordon, Alfano,
                         Bosick & Raspanti, LLP
                  By:   CLEM C. TRISCHLER, JR., ESQUIRE
                        301 Grant Street, 38th Floor
                        Pittsburg, Pennsylvania 15219

                              and

                        Dechert, LLP
                  By:   MARK S. CHEFFO, ESQUIRE
                        Three Bryant Park
                        1095 Avenue of the Americas
                        New York, New York 10036-6797

                              and

                        Moore, Hill & Westmoreland, P.A.
                  By:   CHARLES F. BEALL, JR., ESQUIRE
                        350 West Cedar Street
                        Pensacola, Florida 32502

**APPEARANCES (cont'd):**

For the Defendant -
  Prasco, LLC:          UB Greensfelder, LLP
                  By:   GEORGIA HATZIS, ESQUIRE
                        312 Walnut Street, Suite 1400
                        Cincinnati, Ohio 45202-4029

P R O C E E D I N G S

(In open court:)

THE COURT:  Good morning, everyone.  And welcome again for those of you who are back again to Pensacola.  For those of you who are new to Pensacola, welcome.  It's nice to have you all here.

We are here this morning for the second case management conference in the Depo-Provera Products Liability Litigation, it's MDL 3140.

I have Magistrate Judge Hope Cannon is here this morning in the jury box, along with the Judge David Herndon.  As you all know, Judge Herndon has been appointed as a special master.

So let me confirm on the record who is here for the parties at counsel table.  I see Mr. Seeger is at Plaintiffs' counsel table.

And then let me just ask all of the Defense Counsel to introduce yourselves and the client you represent.

Joe, we'll start with you.

MR. PETROSINELLI:  Good morning, Your Honor.  Joe Petrosinelli of Williams and Connolly here for Defendant Pfizer.

THE COURT:  Thank you.

MS. RYDSTROM:  Good morning, Your Honor.  Jessica Rydstrom also of Williams and Connolly, also for

Pfizer.

THE COURT:  Good morning.

MR. BRANNING:  Good morning, Your Honor.  Jeremy Branning for Pfizer.

THE COURT:  Good morning.

MR. BEALL:  Good morning, Your Honor.  Charles Beall for Viatris and Greenstone.

THE COURT:  Okay.  Good morning.

MR. TRISCHLER:  Good morning, Your Honor. Clem Trischler appearing on behalf of Greenstone and Viatris.

MR. CHEFFO:  Good morning, Your Honor.  Mark Cheffo from Deckert for Greenstone and Viatris as well.

THE COURT:  Good morning.

MS. HATZIS:  Good morning, Your Honor. Georgia Hatzis, UB Greensfelder for Defendant Prasco.

THE COURT:  Okay.  Good morning to you as well.

All right.  There are a lot of folks here in the courtroom this morning.  Also I know there were a number on Zoom as well.

For those on Zoom, please let us know if you experience any technical difficulties, we'll try to get that -- get that fixed if there's a problem.

So as of today, the MDL docket reflects a total of 109 member cases that were either transferred to this Court or direct filed here.  I'm sure there are more likely to come.

As you all know, we held our first case management conference in the MDL on February the 21st, just a -- two weeks or so ago. The parties have filed their -- their Rule 26 Joint Report. And we also have now individual applications for leadership roles. We will turn to that matter and the oral presentations in support of those applications following today's CMC.

What I'd like to do this morning in the CMC is really discuss your Rule 26 Report. That is going to be the -- really the focus of this morning's CMC.

I definitely want to start and take a moment to thank all of you that were involved, either on the ground at the Rule 26 meeting or even remotely supporting that Rule 26 meeting, for all of the hard work that you've put into -- into that meeting and into the report.

The report is one of the most thorough, comprehensive that I've ever seen. Really impressive as far as the amount of work, and more so the amount of cooperation that resulted in that work. Very impressive. Great strides in a very short amount of time. It's incredible to see how much work you all did in just -- really, we're just three weeks into this, and you've done months' worth of progress as reflected in the report, and so kudos to all those involved with that process.

I do think the MDL is on track and, as I said, even -- even more so given the report. Very efficient, very

much ready, I think, for you all to -- once leadership is appointed to take over the reins and get those pilot cases in a position where the Court can start making some decisions on issues relative to the MDL as a whole that are reflected in those pilot cases.

All right. I'm going to go through your report just sequentially as you filed it. I'll have some questions for you as we -- as we go. But before we get started, is there anything that anyone wants to bring to my attention just as a threshold -- threshold matter?

(No response.)

THE COURT: No, okay.

All right. Well, let's start then, you submitted a number of orders, proposed orders, for the Court to adopt. And again, appreciate the effort that went into those orders. Most of those orders will actually be entered either later today or tomorrow. There may be some modifications based on our discussions here -- here this morning.

So as to direct -- let's start with direct filing. I don't know if everyone has -- has these orders. But one of the first things that you all identify in paragraph one of that order is a designated forum. And I agree that that is important and it needs to be reflected in every complaint.

We don't -- we'll get to this in a minute -- but there won't be any short form complaints. But as far as the

standard complaint that gets filed, I'm going to ask going forward that you please identify the designated forum in the case caption of your complaint so that it's easy to identify instead of us having to -- to, you know, to try to find it buried in a lengthy complaint.

And you -- on the -- you also in this same paragraph proposed 30 days for a PHV or pro hac vice motion, and that's fine. That is consistent with -- with other orders that I enter in one-off cases, so that's -- that 30 days will be fine.

Also, this may not be relevant since we're not going to have short form complaints, at least initially, but I do want to make sure in your -- in a standard complaint this should be reflected, the citizenship of the parties. There was an issue in a prior MDL before me with short form complaints where the citizenship of the parties was not identified and the Eleventh Circuit flagged that as an issue. So just make sure that's alleged. And again, it shouldn't be an issue with a standard complaint, that should be there anyway.

Okay. Let me turn to something of little more substance in this order, and it's -- it's paragraph 6, and then there are multiple sections to that by letter designation. There -- and I appreciate you all identifying this -- the issue is, and it's highlighted in 6A, is an issue where there's a duplicate case filed in the MDL after the same case was filed in another forum, most likely, you know, state court. And

there's a process that you all have outlined for those -- those cases to be identified and then addressed if there's a subsequent complaint filed here in the MDL duplicative of a complaint that's already been filed and is pending somewhere else.

I am going to ask you all to work on this paragraph and come up with a little bit more clarity for me.  For instance, I'm not sure how I would know -- I wouldn't know -- whether a complaint was pending somewhere else at the time someone filed a complaint here.  But, yet, this -- the way the language is worded -- or the order is worded, it's:  The Court will enter an order to show cause why the second filed case, that would be the MDL case, should not be dismissed.

Well, I don't -- I don't have any way to flag that.  So I'll ask you all to think a little bit more about that before I enter this order.

And then further down there are two paragraphs, D and E, that deal with identifying whether a complaint identifies the correct injury.  As we all know the JPML formed this MDL and limited the injuries available for participation in this MDL to the intracranial meningiomas.  And that has to be the diagnosis or you're not really eligible to be a part of this MDL.

And so paragraph D addresses that and identifies or lays out a process, excuse me, for -- a deficiency process if

that is not the proper diagnosis or injury alleged in the complaint.

And then beyond that in E -- and I'm not really sure what E is getting at, this paragraph E.  It refers to a deficiency, a presumptive deficiency, based on some other violation of this order.

I'm not sure what that would be, other than maybe you didn't have your designated forum properly listed in the complaint.  But I'm just -- I'm not sure what -- what you were getting at.

I do think paragraphs D and E could be merged together.  You have different deadlines.  There are some -- some deadlines that are missing, for instance, on briefing to the Court.

So I want you to give D and E more thought.  I'd also like you to get with BrownGreer on these two paragraphs in terms of the process.  I presume -- and I think I'm correct on this, but I presume and it would be my intent that any deficiency process, whether it's reflected here in this order in these two paragraphs, or beyond that, that that all be accomplished, the process, through MDL Centrality.  And in that -- in that way the Court can keep track of that.  You all can keep track of it.  And -- and that, to me, would promote efficiency for it to be set up that way.  So you'll -- please do speak with BrownGreer.

Orran Brown and Jake Woody are here today via Zoom. I told them they could appear by Zoom, but they are listening and aware of what we're discussing.

Okay. Continuing with paragraph E. And again, this is just something, I think, just needs to be better fleshed out, and this is not criticism, but if I'm going to put my name on the order, I want an order I need to be clear about what I'm ordering you all to do. And so there's some language on the last page, the very end of 6E, regarding tolling -- well, the word tolling is not used, but that's really, I think, what's kind of being captured here. But revised -- not reviving a statute of limitations or a statute of repose or any other time bars when cases are filed here in the MDL that are -- that are deficient.

And so what that means for that case during that period of time that the case is here in the MDL and what happens to that the case if I, in fact, dismiss that case because, for instance, the proper allegation of injury is not a meningioma -- it does not reflect it in the complaint. So that gets dismissed. What did does that mean for that case? I want you all to talk more about that.

As you all know, a statute of limitations or repose -- certainly statute of limitations can be highly fact specific based on individual state law, whether that state has a discovery rule. And -- so I just -- I think we need to make

sure that whatever I'm ordering here is something that I have the authority to order and it is appropriate to order.

Okay. All right. That's -- those are my thoughts or comments on direct filing.

Anyone else? Does anyone have anything else you'd like to -- for me to consider?

(No response.)

THE COURT: Okay. Well, this one -- this order will be sort of in limbo until we work out those last two sections.

Okay. Service of Process is the next order I'll discuss with you.

One thing I guess I will start off by asking is -- and this is an issue throughout these proposed orders, the Defendants are referred to collectively. And was that intentional? Or -- I mean, surely you all recognize that the Defendants are all referred to collectively in all of these orders?

MR. PETROSINELLI: Your Honor, Joe Petrosinelli.

I think it was intentional that -- we had circulated drafts of these orders amongst ourselves and, I think, where it uses Defendants it meant to be collective. There are some pieces where we talk about the different Defendants differently, but where it says Defendants, I think it was meant to be collective.

THE COURT: Okay. I just want to confirm that, I

don't want that to come back later that that's not the case.

So -- and that would be, whenever you present in the future, any proposed orders, I will -- I will assume if it refers to the Defendants collectively, that is what you intended, otherwise you'll make it known that it's otherwise. And it's -- one Defendant may have a different position and you'll -- you'll identify that.

MR. PETROSINELLI: Yes, Your Honor, we will.

THE COURT: All right. There are deadlines -- well, there are not deadlines. I'm going to give you some deadlines. There are deadlines missing in my view in terms of the time that Plaintiffs' counsel and/or Defense counsel should set up their -- your online portal with MDL Centrality. And this will depend on when that platform is up and ready.

And I know Orran and Jake are listening.

I'm going to give you 14 days from the time that the system is ready for you to set up a portal, you have 14 days. If your case is currently pending now for the Plaintiffs, you have 14 days.

Defense, you have 14 days, you know, once the platform is up.

And then for any newly filed cases or transferred in, there'll be a 14-day deadline for those Plaintiffs to set up their -- their portals.

So I'll reflect that and those deadlines in the order

when it's entered, but it's 14 days.

Orran or Jake, any -- any comment on that?

(No response.)

THE COURT:  Okay.

MR. BROWN:  No, Your Honor, that's fine.  And as soon as the Court -- this is Orran Brown -- as soon as the Court enters these orders, the platform will be ready, because we've already sort of done some background work to set up both the Plaintiffs' access and the Defendants' access on the platform.

THE COURT:  Okay.  All right.  Terrific.  Great. Good to hear that.

MR. SEEGER:  Your Honor?

THE COURT:  Yep.

MR. SEEGER:  Could I just ask a question for the folks who are going to have to make that 14-day time frame. How will everybody know when it's up and running?  Will BrownGreer send an e-mail blast out or will there be some kind of notice as to when the clock starts running on the 14 days?

THE COURT:  How about we do it this way -- that's a good point.  Thank you for bringing that up.

And, Orran, how about you all let me know when it is up and running and the -- able to accept the -- the portals and set those up and I'll enter an order and so then everyone will have that and it will be available and everyone will have notice in the future that they have 14 days, if that works.

MR. BROWN:  Yes, Your Honor.

THE COURT:  Okay.  Paragraph -- I guess, it is -- I guess it's 1G refers to other named defendants.  I'm just -- I guess I'm assuming that -- I mean, I know of one other potential defendant and that's -- that's a defendant named in a Illinois case.  But as of this time we know who all the defendants are in this litigation, correct?  I don't know if this was just a placeholder, or do you know?  Yeah?

MR. SEEGER:  That's correct, Your Honor.

THE COURT:  Okay.  Let me ask on paragraph -- well, I guess it really pertains to several paragraphs in this service order.  Are you all contemplating -- it was not reflected, so I'm not sure what -- I'm going to ask the question because I'm not sure -- that lawyers with state court complaints are going to be registered in MDL Centrality for this litigation?  I would be opposed to that, because it's too confusing.

MR. SEEGER:  Yeah, but -- well, no, we were not contemplating that.  But that was the right call obviously though, what you just said, Your Honor.

THE COURT:  Okay.  I mean, obviously, you know, any lawyer with a state court case can contact BrownGreer and set up a portal of their own and -- but in terms of the platform that is set up for this MDL, you need to have a case in this MDL to -- to be a party to the platform and to participate in that.

Anyone disagree with that?

(No response.)

THE COURT:  Okay.  Let me see, I just...

All right.  You all have told me there will be no master and short form pleadings at this time.  If that -- that changes, please let me know if that somehow that you-all's -- your intent there changes on that issue.

As you know, with regard to the pilot cases it was my intent to -- and I -- the reason I set up those cases as I have is so that certain defenses can be identified -- raised, identified and addressed early on in the litigation.  These are defenses that are common -- my understanding is common to the entire population of the MDL in terms of cases that -- those being preemption -- the preemption defense and then also general causation.

I am going to ask you all to work on a process for ensuring that rulings that I make or this Court makes in those pilot cases on those common defenses, that those rulings will apply globally to all of the cases in the MDL.  So we're going to be, I think, talking about that as -- as the pilot cases progress.  And I just want to put it out for everyone to know that that is something that we're -- I'm going to be focused on.  And I'll be happy to hear from everyone, not just -- not just the folks at counsel table this morning, but I'll be happy to hear from everyone on that process.  But it's premature now

to have -- I'm not -- I don't have any decisions on that. I'm really interested in what you all have to present to me on it.

Okay. I did adopt the parties' -- excuse me -- schedule for the pilot cases. That schedule is reflected in the Rule 26 Report, but it's also now been filed as an order -- a scheduling order in the individual pilot cases.

Following the CMC today I will enter, as I always do, a written order summarizing what was discussed here at the CMC. And I will do that for this CMC as well, and I will attach that pilot case scheduling order as an exhibit for the main docket. Because right now that main docket doesn't reflect that actual scheduling order for those individual cases.

A point of clarification for one of the pilot cases. The Valera-Arceo case, is there a hyphen in their last name or no hyphen? Ms. Finken?

MS. FINKEN: Your Honor, I believe there's a hyphen.

THE COURT: There is a hyphen, okay. Thank you.

Okay. From the Rule 26 Report, I understand when I was -- I was a little surprised by this, but I understand now that the Defendants will not be filing any Rule 12 motions. And as I said, I'm a little surprised at that based on what you had -- you had included in your position papers predating the initial CMC. I was expecting that a Rule 12 motion might be filed by at least one of the Defendants.

I'm going to -- I'm going to talk more about that in

a few minutes.  But I want to confirm, and I think I'm right because it's what you put in your report, you're not anticipating any Rule 12 motions?

(No response.)

THE COURT:  All right.  As far as expert testimony on the issue of preemption, I'm going to leave that to you all to continue to work on, work out.  I understand the Plaintiffs believe that an expert or expert testimony may be helpful.  I think maybe the Defendants don't agree with that.  Again, you all will continue to discuss that and work on it.

All I ask -- and I don't have a -- you know, a real position on this.  I'm going to ask, though, that if experts are presented, that all of -- you know, that those reports, as well as the depositions, are done in time for you to finish in time for the deadline, which is 120 days -- 120 days, okay. Regardless of the number of experts, 120 days.

Okay.  The confidentiality order that you all presented, it's Exhibit D.  And I've reviewed that and I am -- I'm fine with entering it with one caveat.  The issue of the sealing of documents, there's a provision in the order that allows for the document -- a document to be sealed and then it's presumptively sealed basically until it's -- until it's not.  And the problem with this is the Court needing to keep track of whether or not you all have actually kept up with your obligation to notify the Court.

And I have the order here, this is on page 11, it's in paragraph 6 -- 6A.  So it's a provisional sealing, and then the party has seven days -- the party designating -- designating the document as sealed has seven days to -- to move -- file a motion to actually seal.  And it's just -- we had this issue -- I've had it in both of my prior MDLs, in Abilify and then also in 3M.  We tried a number of different approaches to sealing.  And given those experiences that I've had in those other two MDLs, I'm going to go back to just the old fashion, you just got to file a motion to seal if you want to seal a document.

Okay.  That way, I -- my clerk's office, my chambers, we're not trying to keep track or needing to keep track as to whether you complied with that seven-day requirement to -- to actually file your motion.  And I do think that this better complies with the law and -- that requires a finding by me to make certain findings as far as documents taken off the public docket.

Any questions about -- about that?

(No response.)

THE COURT:  Okay.  Let's turn then to the proposed order on threshold proof of use and proof of injury requirements.

Your questionnaire that was proposed, I'm -- I'm okay with the -- with the questionnaire.  This is what you all have

come up with.

As far as the document production requirement, I'm also okay with what you've proposed. I think it will capture what we're trying to capture. However, big caveat, there should not be voluminous documents uploaded into MDL Centrality regarding the diagnosis. I mean, it is not going to be up to BrownGreer or the Defendants to go, you know, hunting for truffles in your medical records or your client's medical records to try to find that diagnosis.

And so what I've contemplated all along for this production requirement is, you know, one or two pages. And certainly, certainly no more than -- than five, unless there's a good reason for it.

But I -- and again, I'm gun-shy from, a little bit, from 3M because of -- and there were volumes and volumes of records in that litigation. And I'm sure there are here as well. Your clients all have medical records and many of them have probably been treated for many years. We don't need all of that at this point. This is not the time for full-blown case specific discovery. This is very narrow, very limited to that diagnosis. And I'll be paying attention to this.

I'm going to ask, Orran and Jake, you're here now, I haven't asked you before, but I'm going to ask you now. I want to know if anyone violates this -- this order.

MR. BROWN: (Nods head.)

THE COURT: All right. I'm going to ask the parties -- and this may not be a surprise given my comments of -- in relation to the direct filing order and the deficiency process outlined there -- but I'm going to ask you all to work -- and this will be a leadership issue for now. And I'm going to ask you all to work with BrownGreer regarding the deficiency process for proof of use and injury. And, frankly, that is also going to carry over to the requirement from the direct filing order that your complaint properly identify the meningioma diagnosis as opposed to some other form of -- or some other diagnosis.

And I have Orran and Jake here, they can speak to this far better than I can, but as you all know the traditional vetting deficiency process is back and forth, right. You have -- the Plaintiffs comply with some -- some requirement, a threshold requirement for here, proof of use, proof of injury. The Defendants then have a period of time to identify a deficiency with that -- with that requirement, and then there's a meet-and-confer process, there may be a cure process. And then in your -- in your case and the instant of the order you submitted, some 90 to 100 days later, it may come to my attention.

In my view, this litigation, the vetting requirement is so narrow and so discrete, that I do not think you need a hundred -- Defendants, I don't think you needed 90 to 100 days,

and Plaintiffs -- that does include Plaintiffs as well, so it was really only 45 days for the Defendant to identify the -- the deficiency.  But the whole process, in my view, is too lengthy.  And again, we don't need it in this case.

So what I have come up with in terms of an idea for -- or a process, it's more than an idea because we're going to do it --

(Laughter.)

THE COURT:  -- for vetting -- is BrownGreer is going to assist with this and using AI technology.  And this is where I'm going to get way out of my lane.  So I'm going to turn it over to Orran and Jake for just a minute to explain this but using AI technology to identify the deficiencies.

And I like this very much because it's neutral.  It's a neutral filter.  I'm neutral.  BrownGreer is neutral.  And that's -- the process will at least start that way.  Now that doesn't mean there won't be due process built into this, there will be.  And I'm also willing to allow -- once BrownGreer and its AI tool identifies a deficiency, I'm going to allow the parties to try to work it out on a short time frame, but to work it out.

And if it can't be worked out, then BrownGreer is going to notify me of that deficiency, not the parties.  And this is very loose.  It's going to need -- require some tightening here on terms of the process.

But BrownGreer is then going to notify me of that deficiency that didn't get worked out. And I'm going to decide in my mind whether, yes, this is a deficiency. If it is, then I'm going to notify the parties, and specifically the Plaintiffs, to respond to that.

And if it can be cured, if it is a deficiency, the Plaintiff can cure it, great. And then I'll allow the Defendant an opportunity to object if -- if you do not believe that there has been a sufficient cure. And I'll hear from you in that regard.

And then at the end of the day if the requirement hasn't been met, then they will be an order addressing that with regard to that complaint. Again, this is loose. It -- you know, the devil's in the details. But this can be accomplished in a fraction of the time that you all were contemplating. And I understand why. I mean, this is -- that's the traditional -- that's the traditional way. That's the traditional process for vetting that you all presented to me. But I don't think it has to be that way, particularly in this litigation. It's also far less expensive to do it this way, far less man hours.

But let me ask Jake and/or Orran, is -- can you -- can you maybe make the parties feel any better than I have about this AI tool?

And, by the way, we have done this through BrownGreer

and another AI company in 3M in the settlement process and it's been -- it's been amazing in terms of the time that it has -- it has cut -- cut out of the process because it's so efficient.

Go ahead, either one of you.

MR. BROWN:  Thank you, Your Honor.

This is Orran.  And Jake Woody can fill in too for what I don't cover.

But essentially this Threshold Injury and Use form, the parties shared with us as they were developing it.  So we had some input into it, and we've already -- Jake and his team have already set it up, so it's ready to launch online when the portals launch.  And the form itself has some discipline it, some controls that require certain normalized ways to enter dates and other things.  So there really will be little room for deficiency in the answers that we get in the form.  And that can be assessed electronically in a few seconds, just so the system tells us what's missing, what's not answered.  And there will be very little way to answer the date or name or things in ways that don't conform.

On the AI piece, that's where we start talking about a document that's -- that's uploaded to us, which we'll have naming conventions for and some -- so it will have a certain guideposts or a pathway to know what it is they're trying to show, product use, or show the diagnosis that's required, or in the complaint, that they have the correct diagnosis and

whatever other deficiencies like designated forum that we want to spot.

So what we do in an AI sense is train the system to recognize the -- the keywords for DMPA or the diag- -- the product use to flag for the right product, a flag for the right diagnosis.  And then we can run the documents through that filter and get a result in a matter of seconds as to whether the system thinks it's present, qualifiers.  All of that still requires some human touch running behind it to make sure it's right, but it is pretty -- it's a fast process once we set it up and train the machine about how to look for it.  And it is the way, for example, you can do reviews in -- or case evaluations for documents.  And the fewer number of documents there are, obviously, the faster it is, the less room for machine error.

But that's definitely what we'd like to do with this. And it would be pretty quick and we think saves everybody time and can generate reliable outcomes as to whether it's all -- complies at this sort of threshold level or not, and flag whatever is wrong about a complaint very quickly.

Jake, is there anything to add to that that I didn't cover?

MR. WOODY:  No, that's exactly right.  We can look at the complaint and the records provided to see what's in it, and we can quickly examine the forms that are submitted to see if

the answers to the complaint are otherwise insufficient, and that can be all automated and done very quickly.

THE COURT:  So you could train the system, I presume, to obviously identify meningioma diagnosis, but also maybe it's other diagnosis that -- that may not be a meningioma.  So maybe it's a different type of tumor.  And the parties could assist you with that, and that way those cases would -- would also get flagged if there's something other than a meningioma or there's something other than a meningioma or a meningioma and something else, those can all -- the system can identify that early on?

MR. BROWN:  Yes, Your Honor.

And we -- we would -- we'll work with the parties to make sure that they -- they know the medicine and know what might appear in the medical record or a diagnostic record or a hospital discharge summary or whatever that would be the meningioma correct diagnosis maybe in slightly different wording at times.  They also would be able to tell us what other types of tumors or other types of conditions might appear in a patient like this that do not qualify to be in this MDL, and so we can find them as well.  And so we can identify the positive diagnosis that qualify to be in the MDL and then also identify and keep track of and count how many other things are showing up so that we know what doesn't qualify.

But, yeah, that requires some groundwork with the parties to begin with, people who are more familiar with the

medicine thus far that can train us as to what we train the software to look for.

THE COURT: Okay. Let me thank you for that.

And to the Defense, I might have left this out so -- in terms of sort of due process. If I've determined that a proof of use, proof of injury form and the supporting medical records are not deficient, but you disagree with me, you certainly have, obviously, the right to bring that up at a later date and in summary judgment context if you still believe that the Plaintiff doesn't have the requisite injury, what have you. I mean, you're not losing any opportunity to bring that up to the Court's attention later.

And I'll also give you the opportunity to argue to me as part of this threshold process, but at the end of the day, if I determine that a case satisfies this minimal requirement and moves on, then, obviously, that's not a determination that that Plaintiff has proven his or her case -- or her case, excuse me, no his here, her case.

Okay. Anyone have any questions? I'm sure there are a lot of questions, but that can be raised right now and Orran and/or Jake answer?

(No response.)

THE COURT: Okay. All right. So obviously some -- still some things to work out with the process for deficiencies.

All right.  From your report it appears to me that Pfizer has sole possession of -- I don't know about -- I don't know that I can say all of the potential discovery, but certainly a majority of it.  Is that fair from my reading of what you presented?

MR. PETROSINELLI:  I think that is fair, Your Honor.

THE COURT:  Okay.

MR. PETROSINELLI:  And we're going to begin producing documents even this week, although discovery doesn't formally start until a couple of weeks from now.  We're going to actually start rolling out documents.

THE COURT:  So impressed.  Lawyers ahead of me, that is great.  That's great.

MR. SEEGER:  We'll be very impressed, Judge, when we receive them.  I heard the commitment.

(Laughter.)

THE COURT:  Okay.

MR. PETROSINELLI:  I mean, Mr. Seeger is not looking at a single document just to be clear.

(Laughter.)

MR. SEEGER:  Oh, you had to go there.

THE COURT:  Okay.  And it sounds like you all have worked out to the extent you think any of the other Defendants have a repository of documents, you've talked with them.  And if there is something -- I'm not sure, maybe they have

nothing -- but if there is something, then you're going to work with them to get that produced.

MR. SEEGER: Yes. We -- as you know, Your Honor, the result of this report is from a long meeting with Judge Herndon. And we have heard a lot from the authorized generics about what their role and what their position should be in the litigation. We have to confirm a lot of that --

THE COURT: Yeah.

MR. SEEGER: -- so we're still -- we're working through it with them.

THE COURT: We'll talk about that in a few minutes. Thank you.

No issue on custodians. You all are identifying those custodians and already have?

MR. PETROSINELLI: We've identified an initial list of custodians. There'll be a lot more. And sort of as we start looking at the documents, we'll be talking to the Plaintiffs to identify more potential custodians. And I'm sure when they start looking at what we're producing, they'll have their own ideas.

THE COURT: So are these custodians that you're identifying now limited to preemption or are they general, corporate --

MR. PETROSINELLI: Well, they're limited to preemption and general causation.

THE COURT: Oh, they are limited to those two, okay.

MR. PETROSINELLI: Yes.

THE COURT: Okay. And -- well, I don't need to go there right now. I'll save that question for another CMC.

Okay. ESI protocol, it's a proposed order at Exhibit F. The -- I'm really -- I'm ready to adopt that proposal and enter it as an order of the Court. However, there was an indication that there was a -- not yet an agreement on the search methodology for validating, and -- but you are working on it and maybe have some -- you were thinking you might have something to report today.

MS. RYDSTROM: That's right, Your Honor. This is Jessica Rydstrom.

Mr. Buchanan and I have been working on that and I believe we've reached an agreement, at least as to Pfizer for the search protocol that will be applied for discovery and production here.

THE COURT: Okay. Excellent. Excellent. Good. Thank you for that.

And, Mr. Buchanan, anything to add?

MR. BUCHANAN: Yes, Your Honor. I think we envision as a supplement to the ESI protocol, you know, in a PTO, whatever it is, slash A, reflecting the agreed search and validation protocol for Pfizer. And with the notation that we're going to conform an appropriate protocol with the generic

defendants.  We'd ask until the end of this week to finish the conferral with the generics trying to follow the model that we worked out with Pfizer.

THE COURT:  Okay.  All right.  Anything you all want to add?  No?

MR. TRISCHLER:  Clem Trishcler, Your Honor.

No, that's -- we've been in discussion with Mr. Buchanan about that and we should be able to do something next week.

THE COURT:  Okay.  Very good.  Thank you.

Okay.  As part of the confidentiality order -- and I asked you to address this in my order setting your -- your agenda items for your meeting, but the phased privilege review, you've done that, and I don't have any comments there.  I've spoken with Judge Cannon and she's good with this.

If there's anything anybody else wants to make note of now, that's fine, but, otherwise, we can mark that one off.

Deposition Protocol, that I was ready -- you know, ready to -- to sign off on that order as well, except there was -- there was still a dispute regarding presumptive deposition days for each of the Defendants.  The Defendants propose ten days total combined, meaning non-Pfizer, so the authorized generic Defendants.  I'm sorry.  I should clarified that.  Ten days total combined for the -- for the authorized generics.  The Plaintiffs have proposed 20.

So no surprise, I'm going to give you 15.  And that is collective, though.  So if you determine, Mr. Seeger, that you need something outside of that for an individual Defendant, authorized generic Defendant, you'll need to move for leave for that.

MR. SEEGER:  Understood, Your Honor.

Yeah.  And, Judge, just to be really clear.  We were just talking about the authorized generics, not Pfizer?

THE COURT:  Correct.  You have a separate agreement with Pfizer.

MR. SEEGER:  Yes.

THE COURT:  Yes.  Okay.

MR. SEEGER:  We do.

MR. PETROSINELLI:  Although, if you'd like to go to 20 for Pfizer.

MR. SEEGER:  Sit down, Joe.

(Laughter.)

THE COURT:  Was it 35, is that -- I forget?

MR. SEEGER:  Yes, Your Honor.

THE COURT:  It's something --

(Simultaneous speaking.)

THE COURT:  I saw that.  All right.

All right.  Special masters, I've appointed Judge Herndon and then as well Randy Samson, both of those orders have been entered.

You agreed with what I raised, I think, at the initial case management conference, and that is that perhaps we would not need a science day in this litigation given the pace of the -- of the -- the anticipated pace of the pilot cases, and so I don't disagree with that.

Medical monitoring class actions, I will -- you know, it's been stayed, the deadline, for any class motion -- certification motion has been stayed. I will enter an individual stay in the individual cases that are class cases. I don't think I have done that. We may have one or two --

Do you know, Annette, is it?

MS. WILLIAMSON: Just one.

THE COURT: Just one now, oh.

So I'll enter that stay in that individual case for now.

Okay. Let me turn back to an issue I've referenced earlier as far as 12(b)(6) motions by the authorized generic Defendants and the fact that you surprised me a little bit in that you weren't going to file those, particularly Viatris.

And, you know, I'm not going to press you on why you're -- you're not -- it's up to you whether you file a Rule 12(b)(6) motion or not. However, I've heard enough -- I mean, I've read enough in your early position paper -- papers and then in your Rule 26 Report to wonder myself whether the authorized generics should be in this litigation. Most -- I

mean, primarily Viatris, at least at this point. But I'm not sure the others may be as well.

And I don't think I want to wait until, you know, four months of discovery on preemption and then another however long it's going to take to deal with motions for defendants who really don't belong in this litigation.

And so I'm going to sort of front-load the issue now for all of the -- the generic -- the authorized generics. And I'm going to require that you submit an affidavit to the Court regarding your client's involvement with the drug. And if you don't want to do that, or your client doesn't want to do that, then I'm going to give the Plaintiffs some very limited narrow discovery for deposition. Because I don't see the need for the MDL to be -- to be bogged down by -- and I mean, I say that with all due respect, but if you don't need to be here, you don't need to be here. It's just another -- it's just another layer that we don't need. And so this -- in my mind, this needs to be, again, front-loaded. It needs to be addressed. If you need to be here, you need to be here and you need to participate. If you don't need to be here, then I need to dismiss you.

But these folks, the Plaintiffs, can't dismiss you until they get some discovery to know whether or not they can dismiss you. And so we're going to -- we're going to do that.

And I'm going to ask what I thought was going to be

done at the Rule 26 meeting and, I think, there was some preliminary discussions about this, but it didn't result -- actually, I think we went backwards, because the report reflects no 12(b)(6).  And so I'm going to ask that you all get together and talk again about what form of affidavit the Plaintiffs need in order to determine whether or not to dismiss you all.  If you can't reach an agreement on that, then I'm going to give the Plaintiffs again some limited -- very narrow limited discovery on this issue and then they're going to present it to me.  And I'm going to decide whether you should be dismissed or not.

So any comments?

(No response.)

THE COURT:  I mean, I assume you -- I know your clients don't want to be here if they don't need to be here.

MR. TRISCHLER:  No, Your Honor.  I think that's great.  We're happy to do that, and I'll submit an Affidavit of Noninvolvement for my clients in whatever time period the Court directs.

THE COURT:  Okay.  Yeah, because you've -- you've -- and I'm sorry, just one moment.  You've laid some facts out in the Rule 26 Report as far as involvement or lack of involvement, but I don't have that in any form that I can take any action on.

MR. TRISCHLER:  (Nods head.)

THE COURT: And so that's really what I'm -- I guess I'm looking for is something that -- where I can make a determination whether your clients need to be here or not be here.

MS. HATZIS: (Nods head.)

MR. TRISCHLER: Understood, Your Honor.

Did the Court have a time frame in mind for that affidavit?

THE COURT: Fourteen days.

MR. TRISCHLER: Very well.

THE COURT: Ms. Hatzis? Is it -- am I saying that?

MS. HATZIS: Hatzis. Thank you, Your Honor.

THE COURT: Hatzis.

MS. HATZIS: Yeah, speaking for Prasco, we actually also did make a production yesterday of the agreements that kind of outline Prasco's limited role and the fact that we purely distributed product that was manufactured and sent to us by Pfizer. So we're happy to comply with the Court's order.

THE COURT: Okay. Very good. Very good.

And then we'll see what the -- if you want to submit the affidavit, I guess, I think you should speak with Mr. Seeger first --

MS. HATZIS: Yes.

THE COURT: -- and to make -- to try to come to an agreement on what would satisfy the Plaintiffs. And I don't

want to be a part of that, that's for you all to decide.  I'm only going to get involved if you can't reach an agreement on the affidavit such that you all can take action on it, otherwise then I'll have to get involved.

Okay.  So 14 days I'll see an affidavit.  And if not, then I will -- I'll enter an order for, again, very limited deposition.

And I suppose there -- I don't know, there may be -- there may be some record discovery.  I'm not sure, but I'll have to hear from both sides on that.

MR. SEEGER:  (Nods head.)

THE COURT:  All right.  Moving on, we do have the MDL website now up on our Court's public website and the link for that.  There is a Contacts-Counsel Tab.  And, of course, once the leadership appointments are made, that will be updated.

You all are going to have your hands full with the work kicking off as it is and the pace that it is in the pilot cases, and so I'm going -- and, plus, I've given you some other tasks here.  I'm going to forego a CMC next month.  We will not have a case management conference next month.  I'll decide about whether I want to do something in lieu of a case management conference with leadership or not.  I'll decide that and let you know.  If you don't hear from me, then there won't be anything.  I'll let you know if I think we do need to get together, probably by Zoom.

And then we will pick back up with the case management conferences in May. And I've asked -- I'm going to ask you, excuse me, you all to get together as far as a time frame, a routine date, meaning week and day of the week going forward for the CMCs. My preference is the third or fourth week of the month, because my criminal trial docket is the first two weeks. And when I say that, I have to pause because in May the last two weeks of the month, I have a civil trial commitment. But I may be able to work around that, so I'm just going to ask you all to talk, let me know what you think works best for you all in terms of time of month and the day of the week.

Okay. I think I have now walked through all of the topics I had in my outline.

Anyone have anything that you would like to bring up based on my comments or otherwise?

MR. PETROSINELLI: Not from Defendants, Your Honor.

THE COURT: Okay. Thank you. Thank you.

MR. BUCHANAN: Your Honor, if I may?

THE COURT: Yes.

MR. BUCHANAN: You had discussed at the initial CMC potentially doing discovery conferences as needed given the schedule that the parties are operating under. Should we coordinate through Special Master Herndon if there's a necessity for that, or how would you like us to schedule those

if we need them?  Obviously, we've been cooperating well, but there will be a pace of play over the next 120 days that will be significant.

THE COURT:  Well, we had these set up on a regular schedule, I believe, I had -- I believe, we did that both in 3M and in Abilify, and I'm happy to do that.  If you all want to talk and then propose to me -- and this would be in addition to the CMC, obviously.  So if you want to do it every two weeks, I think that's what we've done in the past.

MR. BUCHANAN:  We can get with the Defense and see.

THE COURT:  Yeah, and we -- I mean, it's my preference let's get them scheduled, and then if you don't need it -- if you don't need to talk with the Court, then we can just cancel for that -- for that time frame.  But, otherwise, it's typically productive to -- to have a meeting, even if it's a short one.

MR. BUCHANAN:  Thank you, Your Honor.

THE COURT:  Okay.  I do prefer short, but that's not always possible.

Okay.  Anything else?

(No response.)

THE COURT:  All right.  Then the next order of business will be the leadership presentations.  I'll take a short break, ten minutes, and then we'll reconvene for those.

I thank everyone who's here for the CMC and then

obviously everyone else is welcome to stay.

MR. PETROSINELLI:  Your Honor, just -- may we as Defendants be excused?  Like do we have to...

THE COURT:  Yeah, no, you do not have to stay.

MR. PETROSINELLI:  All right.  Thank you.

THE COURT:  You're welcome to stay, but, no, you are -- you all are excused, no problem.

Okay.  The Court will be in recess, a short recess.

THE BAILIFF:  All rise.

(The proceedings concluded at 10:12 a.m.)

_ _ _ _ _

**CERTIFICATE**

I, HEIDI M. DOOGAN, Federal Official Court Reporter for the United States District Court for the Northern District of Florida, do hereby certify the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter, pursuant to the provisions of Section 753, Title 28, United States Code.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

*Heidi M. Doogan*                    Date: <u>March 14, 2025</u>
_____
Heidi M. Doogan, RPR
Official U.S. Court Reporter