# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION <br><br> This Document Relates to: <br> *All Cases* | Case No. 3:25-md-3140 <br><br><br> Judge M. Casey Rodgers <br> Magistrate Judge Hope T. Cannon |

## <ins>PFIZER INC., PHARMACIA LLC, AND PHARMACIA & UPJOHN CO. LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION</ins>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1
BACKGROUND ................................................................................3
    A.    Statutory and Regulatory Framework .................................3
    B.    FDA Approves Depo-Provera Without a Meningioma Warning .........6
    C.    Pfizer Asks FDA to Add a Meningioma Warning to Depo-Provera..............................................................................7
        1.    Scientific Literature.................................................10
        2.    Adverse Event Reports .............................................12
        3.    Biological Mechanism and Other Progestins ...........................13
    D.    FDA Rejects Pfizer's Request to Add a Meningioma Warning to Depo-Provera .................................................14
    E.    Plaintiffs Sue, Claiming Pfizer Should Have Warned About a Meningioma Risk and Redesigned Depo-Provera ...........................14
    F.    Pfizer Renews Its Request to FDA for a Meningioma Warning, ████████████████████ .................................................15
LEGAL STANDARD...............................................................................16
ARGUMENT ..........................................................................................17
I.    Plaintiffs' Failure-to-Warn Claims are Squarely Preempted Because FDA Rejected a Meningioma Warning .......................................17
II.    Plaintiffs' Contrary Arguments Are Meritless .............................21
    A.    Pfizer Fully Informed FDA of the Justifications for a Warning .........21
        1.    Pfizer Provided FDA All Material Information.......................22
        2.    There is No Requirement to Provide FDA Known, Immaterial, or Cumulative Information....................................23
    B.    Pfizer's Proposed Label Was Adequate .............................33
III.    Plaintiffs' Remaining Design Defect Claims Are Plainly Preempted..........34
CONCLUSION .......................................................................................36

## TABLE OF AUTHORITIES

Page

### CASES

*Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103 (D. Mass. Mar. 12, 2025) ............................................20

*Dobbs v. Wyeth Pharms.*, 797 F. Supp. 2d 1264 (W.D. Okla. 2011) ......................20

*Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803 (7th Cir. 2018)................................20

*Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882 (7th Cir. 2020).........................21, 26

*Estep v. Boehringer Ingelheim Pharms., Inc.*, 2020 WL 5815927 (Conn. Super. Ct. Aug. 25, 2020)........................................32

*Hispanic Federation v. Byrd*, 2024 WL 905470 (N.D. Fla. Feb. 27, 2024)............16

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291 (N.D. Fla. 2018) .............................................................22

*In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749 (3d Cir. 2019) ...............................................................................33

*In re Depakote*, 87 F. Supp. 3d 916 (S.D. Ill. 2015)...............................................20

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322 (3d Cir. 2024) ...........................................................20, 24, 28, 29

*In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108 (S.D. Cal. 2015), *adhered to after vacatur and remand*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021) ................................................20

*In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F. Supp. 3d 164 (D. Mass. 2021), *aff'd*, 57 F.4th 327 (1st Cir. 2023) .........................................*passim*

*In re Zofran (Ondansetron) Prods. Liab. Litig.*, 57 F.4th 327 (1st Cir. 2023)..........................................................................*passim*

*Lyons v. Boehringer Ingelheim Pharms., Inc.*, 491 F. Supp. 3d 1350 (N.D. Ga. 2020)..................................................20, 31, 32

*Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299 (2019) ....................*passim*

ii

Page

Cases—continued:

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013)........................................17, 35, 36

*Pfaff v. Merck & Co.*, 627 F. Supp. 3d 134 (E.D.N.Y. 2022) ...........................3, 19

*Rheinfrank v. Abbott Labs*, 119 F. Supp. 3d 749 (S.D. Ohio 2015) ................19, 34

*Ridings v. Maurice*, 444 F. Supp. 3d 973 (W.D. Mo. 2020) ...................................32

*Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861 (7th Cir. 2010)............20

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................*passim*

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015) ....3, 35

## STATUTES, REGULATIONS, AND RULES

21 U.S.C. § 355.................................................................................................3, 4

21 C.F.R.
    § 201.57..................................................................................................4, 5
    § 314.50......................................................................................................3
    § 314.70..................................................................................................5, 35
    § 314.80..................................................................................................7, 12
    § 314.102.............................................................................................4, 6, 33
    § 314.105....................................................................................................4
    § 314.110....................................................................................................5
    § 314.125....................................................................................................5

71 Fed. Reg. 3922 (Jan. 24, 2006)
    3934............................................................................................................4

73 Fed. Reg. 49,603 (Aug. 22, 2008)
    49,604........................................................................................................4
    49,608........................................................................................................5

Fed. R. Civ. P. 56 ................................................................................................16

Page

# OTHER AUTHORITIES

Amended Complaint, *Toney v. Pfizer, Inc.*,
  No. 3:24-cv-624 (N.D. Fla. filed June 4, 2025), Dkt. 31 .............................15, 35

Brief for United States, *Merck Sharp & Dohme Corp. v. Albrecht*,
  587 U.S. 299 (2019) (No. 17-290), 2018 WL 4562163 .................................5, 26

FDA, Guidance for Industry: Good Pharmacovigilance Practices and
  Pharmacoepidemiologic Assessment (Mar. 2005) .............................................12

# INTRODUCTION

Most preemption cases involving branded pharmaceutical products are complicated. They become mired in thorny record questions about whether the manufacturer had enough scientific evidence to propose a warning about the injury at issue and, if so, whether there is "clear evidence" that FDA would have rejected the warning. As the Court knows, this case is entirely different. Pfizer asked FDA for permission to change the Depo-Provera label to warn of the exact injury at issue in Plaintiffs' lawsuits (meningioma), and Pfizer gave FDA the scientific evidence that supported its request. But FDA rejected the warning. Federal law thus preempts Plaintiffs' attempt to end-run FDA's determination with state-law tort claims.

In *every reported case* where a court has considered this circumstance—led by Judge Saylor's decision in the *Zofran* MDL and the First Circuit's affirmance of his ruling[1]—the court has found preemption. This case should be no different.

The critical facts are undisputed: In late 2023, after a review of recently published epidemiological studies, Pfizer concluded that a potential causal association existed between long-term use of medroxyprogesterone acetate, or "MPA" (the active ingredient in Depo-Provera), and meningioma (a typically benign tumor). In February 2024, Pfizer presented its analysis to FDA and requested

---

[1] *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F. Supp. 3d 164 (D. Mass. 2021), *aff'd*, 57 F.4th 327 (1st Cir. 2023).

1

approval to add a meningioma warning to the labels of all Pfizer medications containing MPA.

FDA denied Pfizer's request. Following a nine-month review of Pfizer's application—which Pfizer backed with dozens of citations to scientific literature and adverse event reports—FDA sent Pfizer a Complete Response Letter (meaning, as its title implies, that this was FDA's complete and final response). FDA "determined" that it "cannot approve" Pfizer's request for a meningioma warning, because "[t]he findings of the available observational studies alone do not support the addition of a warning on Meningioma risk to medroxyprogesterone acetate (MPA)-containing products." The agency did not ask Pfizer for any further analysis or suggest any other type of warning.

FDA's rejection precluded Pfizer from changing the Depo-Provera label to warn about a risk of meningioma. Federal law gives FDA extensive control over "the information that appears on brand-name prescription drug labels." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019). Accordingly, state-law claims based on the premise "that a drug manufacturer failed to warn consumers of [certain] risks associated with using [a] drug" are preempted whenever there is "'clear evidence' that the FDA would not have approved a change to the drug's label" to include warnings about those risks. *Id.* at 302-03 (quoting *Wyeth v. Levine*, 555 U.S. 555, 571 (2009)). This is a question of law for the Court to decide, which

is why courts have held that plaintiffs cannot rely on "expert" opinions to escape preemption. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, 57 F.4th 327, 339-40 (1st Cir. 2023). Here, the evidence of FDA's disapproval is not just clear, it is an established fact. Pfizer asked to add a warning about meningioma, the very injury Plaintiffs allege, and FDA issued a Complete Response Letter rejecting the request. "No clearer evidence could be forthcoming." *Pfaff v. Merck & Co.*, 627 F. Supp. 3d 134, 144 (E.D.N.Y. 2022).

As for Plaintiffs' remaining claims premised on an alleged design defect, such claims are likewise "clearly preempted" where, as here, FDA has already certified the product as safe and effective for use and further agency approval would be required to change the drug's design. *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015).

## BACKGROUND

### A.    Statutory and Regulatory Framework

1. The Federal Food, Drug, and Cosmetic Act bars drug companies from marketing or selling new pharmaceutical products without FDA's approval. 21 U.S.C. § 355(a). To obtain approval, a manufacturer submits a New Drug Application (NDA) for FDA's review. *See* 21 U.S.C. § 355(b)(1). Manufacturers must provide substantial information about the medication, including scientific data about its safety and efficacy. *See id.*; 21 C.F.R. § 314.50(d)(5)(viii).

The manufacturer must also propose labeling for the product that complies with FDA regulations. *See* 21 C.F.R. § 201.57(a). The agency conducts "a detailed review of [any] proposed labeling" and "allow[s] only information for which there is a scientific basis to be included." 73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008); *see also* 21 U.S.C. § 355; 21 C.F.R. § 314.105(c). In short, FDA "makes careful judgments about what warnings should appear on a drug's label for the safety of consumers." *Albrecht*, 587 U.S. at 302.

2. The standard for adding a warning about a "clinically significant hazard" to the label is when "there is reasonable evidence of a causal association with a drug." 21 C.F.R. § 201.57(c)(6)(i). Importantly, "a causal relationship need not have been definitely established." *Id.*

The statutory and regulatory framework gives manufacturers and FDA several routes to update a drug's label. Manufacturers "generally seek advance permission from the FDA to make substantive changes to their drug labels" by submitting a Prior Approval Supplement, or "PAS." *Albrecht*, 587 U.S. at 304; *see also* 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006). FDA "communicate[s] with applicants about scientific, medical, and procedural issues that arise during the review process," and "exercise[s] its scientific judgment" in analyzing the data presented in the PAS. 21 C.F.R. §§ 314.102(a), 314.105(c).

4

In narrow circumstances, manufacturers may provide notice to FDA that they intend to amend labeling, including adding a warning, through the Changes Being Effected (CBE) regulation.  But regardless of whether the manufacturer proceeds by PAS or CBE, FDA ultimately must approve the proposed label change, and the standard is the same: there must be "reasonable evidence of a causal association" between the medication and a "significant hazard."  *Id.* §§ 201.57(c)(6)(i), 314.70(c)(6)(iii)(A); *see also* 73 Fed. Reg. at 49,608.  If FDA finds insufficient evidence of a causal association, the agency may order the manufacturer to stop distributing products with the revised labeling.  21 C.F.R. § 314.70(c)(7).  Because of this start-stop risk, FDA has "[h]istorically … accepted PAS applications instead of CBE supplements … where significant questions exist on whether to revise or how to modify existing drug labeling."  Br. for U.S. at 5, *Albrecht* (No. 17-290), 2018 WL 4562163 ("*Albrecht* Br.").  Under either route, FDA "will reject" the proposed labeling if it "is false or misleading or if it does 'not comply with the requirements for labels and labeling in [21 C.F.R. P]art 201.'"  *Id.* at 6 (quoting 21 C.F.R. § 314.125(b)(6), (8)).

When FDA rejects a proposed label, it sends the manufacturer a "complete response letter" that reflects FDA's "complete review of the data submitted" and describes "the specific deficiencies that the agency has identified."  21 C.F.R. § 314.110(a)(1), (2).  If FDA needs more data or information to evaluate an

5

application, FDA reviewers "make every reasonable effort to communicate promptly to applicants" before rejecting a proposal. *Id.* § 314.102(b).

### B.  FDA Approves Depo-Provera Without a Meningioma Warning

MPA is "a synthetic progestin" that is "structurally related to the endogenous hormone progesterone." Ex. 8 (Pfizer, PAS (Feb. 5, 2024)) at -36.[2]  MPA has been marketed and sold around the world since 1959 to treat a variety of conditions, including certain cancers.

In 1992, FDA approved the marketing and sale of MPA—sold under the brand name Depo-Provera Contraceptive Injection—for contraception.  Ex. 7 (FDA, Approval of NDA 20-246 (Oct. 29, 1992)) at -45017-18.  Depo-Provera utilizes MPA to create a simple and effective contraceptive solution: one injection every three months prevents at least 99% of pregnancies. Ex. 8 (PAS) at -23-24.

When FDA approved Depo-Provera as safe and effective, it approved the drug's label without any reference to a risk of meningioma—and no one claims such a risk existed at that time. Ex. 7 (NDA Approval) at -45024-27.  Since then, Pfizer has submitted, and FDA has approved, four other NDAs for MPA-containing medications, each containing extensive information about MPA and its potential

---

[2] Pincites preceded with a hyphen reference the Bates number that appears in the lower righthand corner of the document.

risks.  As with Depo-Provera, FDA approved the labels for these products without any reference to a risk of meningioma.

### C.    Pfizer Asks FDA to Add a Meningioma Warning to Depo-Provera

Federal law makes drug manufacturers responsible "for the content of [their drug] label[s] at all times," meaning a manufacturer must "craft[] an adequate label" and "ensur[e] that its warnings remain adequate as long as the drug is on the market." *Wyeth*, 555 U.S. at 570-71.  So manufacturers "promptly review all adverse drug experience information" from sources like "clinical investigations," "epidemiological/surveillance studies," and "scientific literature."  21 C.F.R. § 314.80(b).  And if these monitoring efforts reveal "adverse drug experiences," manufacturers flag those for FDA.  *Id.* § 314.80(c) (reporting requirements).

That happened here.  During a "routine literature review," Pfizer scientists flagged a February 2023 epidemiological study published by Abou-al-Shaar, Ex. 8 (PAS) at -36, which reported data on 25 female patients who "harbor[ed] one or more intracranial meningiomas related to chronic DMPA [depot MPA] use."  Ex. 11 (Abou-al-Shaar 2023) at 1.  That study concluded that "[t]here appears to be a clear progestin meningioma syndrome associated with chronic DMPA use."  *Id.*

The Abou-al-Shaar article triggered a review by Pfizer scientists of other published literature, as well as single-patient adverse event reports in the company's safety databases.  In June 2023, in the midst of this review, results from a different

epidemiological study (Roland) became available, showing a statistically significant increased risk of meningioma in patients in France who used Depo-Provera for more than one year.  Ex. 8 (PAS) at -42; Ex. 21 (Roland 2023) at 47.[3]  The study was published in English in March 2024, and the authors noted that their study "of meningioma risk is the first to expand the list of progestogens of interest" to Depo-Provera, "detailing the risk associated with each progestogen, with different modes of administration."  Ex. 22 (Roland 2024) at 9.

Pfizer scientists reviewed the evidence and in late 2023 decided that the available information met the standard for adding a warning to the labels for Depo-Provera and the company's other MPA-products, namely: although a causal relationship between Depo-Provera use and meningioma had not been established, the team agreed there was enough evidence of a potential causal association (with long-term use) that a warning was justified.  Ex. 8 (PAS) at -46.

So, in February 2024, Pfizer sent FDA a PAS requesting a warning about meningioma risk on the labels for five MPA-containing products.  *Id.* at -1-2, -36. On the very first page of the label, under the header "Warnings and Precautions," Pfizer sought this language: "Meningioma: Discontinue if meningioma is diagnosed.

---

[3] The specific data for Depo-Provera showed that of the MPA users who experienced meningioma, seven had used the product for more than three years.  Ex. 23 (Roland Supplementary Material) at Table L.

Caution is advised when recommending Depo-Provera CI to patients with a history of meningioma." *Id.* at -3. Pfizer also sought to provide a longer warning in the "Full Prescribing Information" portion of the label:

> **5.4 Meningioma**
> Meningiomas have been reported following long-term administration of progestins, including medroxyprogesterone acetate. Depo-Provera CI should be discontinued if a meningioma is diagnosed. Caution is advised when recommending Depo-Provera CI to patients with a history of meningioma.

*Id.* at -10.

Pfizer similarly proposed an advisory to health care professionals to "[c]ounsel patients with a history of meningioma about the possible increased risk of meningioma *[see Warnings and Precautions (5.4)]*." *Id.* at -22 (brackets in original). And Pfizer proposed language modifying the label's "Patient Information" packet, advising patients "before taking Depo-Provera" to "tell [their] healthcare provider" if they "have ever had a meningioma." *Id.* at -25.

Pfizer included in its PAS a "Clinical Overview" justifying Pfizer's "proposed addition of a warning on the topic of meningioma." *Id.* at -33-49. The document included three main categories of information: epidemiological studies, dozens of adverse event reports, and a discussion of the biological mechanism by which Depo-Provera and other progestins could affect meningioma risk.

### 1.    *Scientific Literature*

Pfizer devoted the bulk of the Clinical Overview to epidemiologic observational studies examining a potential link between Depo-Provera and meningioma, the first of which (Dewata) was published in 2017.  Pfizer noted "multiple … sources discussing the influence of MPA in the development and growth of meningiomas," and put "[t]he most relevant literature sources" front-and-center.  *Id.* at -40, -46.  Pfizer thus highlighted studies that directly examined the potential association between Pfizer's products (as opposed to other progestins) and meningioma.

The Roland study was the most comprehensive.  It analyzed "all cases of women" in France "who underwent intracranial meningioma surgery between 2009 and 2018," a total of 18,061 women, and found that "[p]rolonged use" of certain progestogens, including Depo-Provera, was "found to be associated with meningioma risk."  *Id.* at -42; Ex. 21 (Roland 2023).  The study found that women who used MPA for more than one year had an "odds ratio" of 5.62—meaning such women were 5.62 times more likely to develop meningioma than a woman who did not take MPA.  *See* Ex. 8 (PAS) at -42.  Pfizer noted the authors' conclusion that their "large epidemiological study … once again confirm[ed] an effect of progestogens on the risk of … meningioma."  *Id.*

Pfizer marshalled other epidemiological studies regarding Depo-Provera. Abou-al-Shaar studied 25 patients who took DMPA and exhibited meningiomas: the authors found "a clear progestin meningioma syndrome associated with chronic DMPA use." *Id.* at -41; Ex. 11 (Abou-al-Shaar 2023). Dewata's study of 212 patients revealed an association between DMPA and meningiomas beginning at ten years of use (odds ratio of 2.33) and growing after fifteen years of use (odds ratio of 4.45). Ex. 8 (PAS) at -40; Ex. 17 (Dewata 2017).

Pfizer also summarized observational studies that purported to explain *why* higher-dose progestins, including Depo-Provera, might be associated with meningioma. For example, Supartoto's study of 115 patients concluded that "long exposure to exogenous progesterone may increase the risk of developing meningioma" based on the finding that exogenous progesterone was linked to a "lower expression of PR [progesterone receptors] and NF2 [neurofibromatosis-2] mRNA" in the patients studied. Ex. 8 (PAS) at -40; Ex. 25 (Supartoto 2019).[4] Hensiek also found a "likely link" between high-dose MPA and meningioma based on his study of a patient who used MPA for four years and exhibited a meningioma that lacked progesterone receptors. Ex. 8 (PAS) at -41; Ex. 19 (Hensiek 2009).

---

[4] The Supartoto article cited in Pfizer's 2024 PAS was published in 2019, not 2018. *Cf.* Ex. 8 (PAS) at -48 n.23.

### 2.     *Adverse Event Reports*

Pfizer also sent FDA its analysis of adverse event reports (AERs), which Pfizer had previously provided to FDA, for patients taking MPA products and reporting a meningioma diagnosis.  An AER reports "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related."  21 C.F.R. § 314.80(a).

The AERs contained in Pfizer's Clinical Overview came from Pfizer's Global Safety Database.  Ex. 8 (PAS) at -42.  Out of the approximately 100,000 AERs collected by Pfizer over the medication's long history, Pfizer's search of the database located only "34 cases (0.03%)" that "reported a diagnosis of meningioma."  *Id.* at -43.  Pfizer reviewed these cases "in detail" and relayed the relevant information to FDA: patient demographics, reporting source, treatment duration, indication, and dosage.  *Id.* at -43-44.  Pfizer highlighted that in three cases (discussed at length), the "withdrawal of MPA led to reduction or complete resolution of [meningioma] symptoms."  *Id.* at -44.  In other words, Pfizer flagged that, consistent with its proposed label, some individuals who had been diagnosed with meningioma had their symptoms reduce or resolve after stopping the medicine—a phenomenon known as "dechallenge."  *See* FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment 6-7, 17-18 (Mar. 2005).

### 3. *Biological Mechanism and Other Progestins*

Pfizer also supported its request for a meningioma warning with information on the biological mechanism by which progestins could theoretically cause meningioma. Ex. 8 (PAS) at -38-39. Specifically, Pfizer stated that "[h]ormonal factors may have a role in the development of meningioma, as suggested by several lines of evidence," including that meningiomas appear more frequently in "post-pubertal women compared with men," and that "progesterone, androgen and estrogen receptors have been identified in meningiomas." *Id.* at -38.

Pfizer also outlined information about other progestin-containing drugs and their relation to meningioma. For instance, Pfizer said that "[m]ultiple observational studies have explored a possible relationship between low-dose estrogen and progestin exposure … and the risk of meningioma, with mixed results." *Id.* Regarding cyproterone acetate, a particularly potent anti-androgen and progestin, the Clinical Overview flagged that cyproterone is "contraindicated in people with a history of meningioma and should be discontinued if meningioma is diagnosed." *Id.* What's more, Pfizer's proposed warning itself mentioned other progestins; it stated that "[m]eningiomas have been reported following long-term administration of progestins, including [MPA]." Ex. 8 (PAS) at -10.

**D.    FDA Rejects Pfizer's Request to Add a Meningioma Warning to Depo-Provera**

On November 1, 2024, after nine months of consideration, FDA sent Pfizer a Complete Response Letter ("CRL") rejecting Pfizer's request to add a meningioma warning to Depo-Provera's label.  The CRL stated: "We have completed our review of these applications and have determined we cannot approve these applications in their present form."  Ex. 9 (FDA, Complete Response Letter) at 1.  FDA rejected the request because, in FDA's view, "[t]he findings of the available observational studies alone do not support the addition of a warning on Meningioma risk to medroxyprogesterone acetate (MPA)-containing products."  *Id.*

**E.    Plaintiffs Sue, Claiming Pfizer Should Have Warned About a Meningioma Risk and Redesigned Depo-Provera**

Two theories of liability animate every claim in this MDL: failure to warn and defective design.  *See, e.g.*, Am. Compl. ¶¶ 120-266, *Toney v. Pfizer, Inc.*, No. 3:24-cv-624 (N.D. Fla. filed June 4, 2025), Dkt. 31.  Plaintiffs' failure to warn claims stem from the allegation that Pfizer should have warned Plaintiffs or their doctors of the risk that Depo-Provera can cause meningioma.  *E.g.*, *id*. (pleading strict liability—failure to warn, negligent failure to warn, negligent misrepresentation, fraudulent misrepresentation, and breach of express and implied warranty).  Plaintiffs' defective design claims are similarly premised on the allegation that

Depo-Provera can cause meningioma. *E.g.*, *id.* (pleading strict liability—design defect, negligence, negligent design defect).

**F.    Pfizer Renews Its Request to FDA for a Meningioma Warning, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**

In September 2024, after Pfizer submitted its initial request for a meningioma warning, two developments occurred. *First*, the Pharmacovigilance Risk Assessment Committee (PRAC) at the European Medicines Agency (the EU equivalent of FDA) concluded that "information on meningioma should be included" on European labels for Depo-Provera. Ex. 10 (Updated PAS) at -7473945. PRAC required the labeling "to be differentiated based on the indicated use, route of administration and the dosage strength" of the MPA-containing product. *Id.* Pfizer had been engaged with PRAC's review in rough parallel with FDA's review of Pfizer's PAS. *Second*, on September 30, 2024, a new large-scale epidemiological study was published that involved U.S. patients and reported a statistically significant increased risk between "injection MPA exposure" and "cerebral meningiomas" "that became stronger with a longer duration of use of injection MPA." Ex. 18 (Griffin 2024).

After reviewing FDA's CRL and these other developments, Pfizer sent FDA an updated PAS on June 12, 2025. Ex. 10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at -7473944-45. ▮▮▮▮▮

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████. *Id.* at -7473945. Two months

later, FDA has still not approved any meningioma warning, and Pfizer's renewed

request remains pending.

## LEGAL STANDARD

The Court "shall grant summary judgment" when "there is no genuine dispute

as to any material fact and ... the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The Court may grant summary judgment on some or all

outstanding claims. *Id.* And it may grant summary judgment based on "purely legal

questions," including whether federal law preempts state claims. *See Hispanic

Federation v. Byrd*, 2024 WL 905470, at *1 (N.D. Fla. Feb. 27, 2024) (citation

omitted).

Federal law preempts plaintiffs' state-law claims when there is "clear

evidence" that FDA would not have approved a proposed labeling change regarding

the injury plaintiffs allege. *Wyeth*, 555 U.S. at 571. Although determining whether

that standard is met may involve "contested … facts," the trial court must "treat the

… question not as a matter of fact for a jury but as a matter of law for the judge to

decide." *Albrecht*, 587 U.S. at 315, 317.

## ARGUMENT

Plaintiffs' claims are preempted, a conclusion reinforced by every court to confront similar facts. Federal law preempts state law "where it is impossible for a private party to comply with both state and federal requirements." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (cleaned up). That principle applies with equal force to "state common law … that require[s] drug manufacturers to warn drug consumers of the risks associated with drugs." *Albrecht*, 587 U.S. at 303. Where federal law prohibits what state common law requires, state law is preempted, and state tort claims fail. *See id.*

This is a clear preemption case because FDA expressly barred Pfizer from adding a warning about meningioma risk, which Plaintiffs say state law required. And Plaintiffs' remaining design defect claims are either derivative of their failure-to-warn claims or preempted on similar principles.

## I.    Plaintiffs' Failure-to-Warn Claims are Squarely Preempted Because FDA Rejected a Meningioma Warning

In *Wyeth v. Levine*, the Supreme Court held that FDA's labeling determinations preempt state-law tort claims in two situations: *first*, where the manufacturer cannot independently make the change that plaintiffs claim state law requires; or *second*, where there is "clear evidence" that "FDA would not have approved" a proposed label change. *Wyeth*, 555 U.S. at 568-71. Typically, in the second situation, the manufacturer has not proposed a warning and the question is

what, hypothetically, FDA would have done if it had. But this is the rare case where the manufacturer agreed that the standard for a labeling change was met, proposed a warning to FDA, and FDA rejected that proposal.

That makes this a paradigm case for preemption under *Wyeth* step two. *Wyeth* explained that state-law claims are preempted where a manufacturer "supplied the FDA with an … analysis concerning the specific dangers at issue," "but was prohibited from" making a change by FDA. 555 U.S. at 572-73. The Court was more explicit in *Albrecht*: state law claims are preempted if "the drug manufacturer … fully informed the FDA of the justifications for the warning required by state law and … the FDA, in turn, *informed the drug manufacturer* that the FDA would not approve changing the drug's label to include that warning." 587 U.S. at 314 (emphasis added).

Plaintiffs' state-law claims are thus preempted for the simple reason that (1) Pfizer "fully informed the FDA of the justifications for the warning [allegedly] required by state law," and (2) FDA "informed [Pfizer] that the FDA would not approve changing [Depo-Provera's] label to include that warning." *Id.* Pfizer gave FDA a detailed analysis of the reasons for a warning in its PAS. *See supra* Background Section C. And based on the information in Pfizer's NDA, PAS, and other available information, FDA issued a CRL stating that FDA had reviewed Pfizer's request and rejected it because "[t]he findings of the available observational

studies alone do not support the addition of a warning." Ex. 9 (CRL) at 1. In short, there is "'clear evidence' that the FDA would not have approved" a meningioma warning for Depo-Provera because FDA *in fact* rejected that warning. *Albrecht*, 587 U.S. at 302. "No clearer evidence could be forthcoming." *Pfaff v. Merck & Co.*, 627 F. Supp. 3d 134, 144 (E.D.N.Y. 2022).

In *every* other reported case where a drug manufacturer asked FDA to add a warning label for the very injury at issue in the litigation and the FDA rejected that warning, courts have found preemption. Those courts uniformly agree that a "PAS submission and rejection … readily meet[s] the clear evidence standard." *In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1124 (S.D. Cal. 2015), *adhered to after vacatur and remand*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021). In *Zofran*, for example, a manufacturer submitted a PAS proposing a birth defect warning based on recent epidemiological studies. 57 F.4th at 334-35. FDA "rejected the labeling proposals." *Id.* at 333. The First Circuit agreed with the MDL court that this rejection rendered plaintiffs' claims preempted as a matter of law. *Id.* at 342. Similarly, in *Rheinfrank v. Abbott Laboratories*, plaintiffs alleged a manufacturer should have warned that administering its antiepileptic drug to pregnant women could cause developmental delays in children. 119 F. Supp. 3d 749, 755 (S.D. Ohio 2015). But the manufacturer had already requested this warning and FDA rejected it. *Id.* at 763-64. The result: preemption. *Id.* at 766.

19

The list continues.  Indeed, every reported case that Pfizer is aware of involving similar facts has reached the same result.  *See, e.g.*, *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 873 (7th Cir. 2010); *Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103, at *8 (D. Mass. Mar. 12, 2025); *Lyons v. Boehringer Ingelheim Pharms., Inc.*, 491 F. Supp. 3d 1350, 1367 (N.D. Ga. 2020); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015); *see also Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 813 (7th Cir. 2018); *Dobbs v. Wyeth Pharms.*, 797 F. Supp. 2d 1264, 1276-77 (W.D. Okla. 2011).  Under *Wyeth*, no material differences exist between those cases and this one.  That alone calls for preemption.

Plaintiffs have previously referenced the Third Circuit's decision in *Fosamax*, but that case did not involve a proposed warning about the specific injury at issue.  The manufacturer submitted a PAS requesting a warning that described the risk of one type of injury ("stress fractures"), even though the specific injury plaintiffs alleged Fosamax caused was more serious ("atypical femoral fractures").  *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322, 355-56 (3d Cir. 2024).  FDA responded with a CRL rejecting the proposed warning and noting that "your justification for the proposed … language is inadequate.  Identification of 'stress fractures' may not be clearly related to the atypical subtrochanteric fractures that have been reported in the literature."  *Id.* at 351-52.  Because FDA's CRL could

be read to mean that "there is no basis to include language referring to generic stress fractures in a warning that is supposed to be about atypical femoral fractures," the court held there was not clear evidence FDA would have rejected a warning about the latter injury. *Id.* at 354. Here, by contrast, and in the numerous other cases cited above, Pfizer requested a warning about meningioma (Plaintiffs' alleged injury) and supported that request with evidence about meningioma risk. The consequence of FDA's rejection is clear: Plaintiffs' claims are preempted.

## II.    Plaintiffs' Contrary Arguments Are Meritless

This groundswell of caselaw matching the circumstances here leaves Plaintiffs with only two arguments: (1) that Pfizer did not give FDA enough information, and (2) that Pfizer's proposed label was inadequate. Neither holds any water.

### A.    Pfizer Fully Informed FDA of the Justifications for a Warning

The dispositive question is not whether Pfizer provided the agency with every possible piece of data; it is whether Pfizer "submitted all *material* information to the FDA." *Albrecht*, 587 U.S. at 317 (emphasis added). Pfizer did that here because it "disclosed the *relevant* data underlying its desired … warning." *See Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 891 (7th Cir. 2020) (emphasis added).

### 1.    Pfizer Provided FDA All Material Information

As detailed above, Pfizer supported its request for a meningioma warning with a Clinical Overview that emphasized "[t]he most relevant literature sources," including recent, large-scale epidemiological studies that demonstrated a statistically significant association between Depo-Provera and meningioma based on the experiences of thousands of women who used the medication.  Ex. 8 (PAS) at -40.  The Roland study alone evaluated 18,000 women and "confirm[ed]" that certain progestogens—and MPA specifically—increased the risk of meningioma.  *Id.* at -42.    Indeed, most epidemiological studies in Pfizer's PAS repeatedly found statistically significant associations between Depo-Provera and meningioma.  These large-scale observational studies are the gold standard in cases like this where randomized controlled trials are not available.  *Cf. In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018) (Rodgers, J.).

But Pfizer did not stop there.  The Clinical Overview also discussed numerous adverse event reports (including ones with dechallenge evidence), explained the biological mechanism by which synthetic progestins could cause meningiomas (which often express progesterone receptors), and discussed the associations between meningioma and other progestins.  *See supra* Background Section C.  Pfizer's explanation "fully informed" FDA "of the information concerning the safety of" Depo-Provera and "the justifications for the warning label that plaintiffs contend

was required by state law." *Zofran*, 541 F. Supp. 3d at 200.  Pfizer also "supplied the FDA with an … analysis concerning the specific dangers at issue."  *Wyeth*, 555 U.S. at 572-73.  Federal law requires nothing more.

> ###   2.    There is No Requirement to Provide FDA Known, Immaterial, or Cumulative Information

As plaintiffs in these situations always do, Plaintiffs here contend Pfizer should have given FDA more or different information in its PAS.  But Plaintiffs cannot point to any other information relevant to FDA's consideration that the agency did not already know, and their criticisms of Pfizer's Clinical Overview seek to impose an extraordinary burden that does not exist in the preemption caselaw.

1.  Plaintiffs disclosed two expert reports that opine that Pfizer should have given FDA more information to support the proposed warning—the suggestion being that if only that had happened, FDA would have approved the warning.[5]  But expert testimony on this issue is irrelevant; the quantum of evidence Pfizer needed to provide FDA in order to obtain preemption is a "question[] of law" reserved for the Court.  *See Zofran*, 57 F.4th at 340 (expert opinion on preemption "likely inadmissible").  As the Supreme Court has explained, "the [agency disapproval]

---

[5] These experts are Drs. David Kessler and Nicholas Butowski.  Plaintiffs also served reports from three other experts, who opine that "reasonable evidence of a causal association" exists between Depo-Provera and meningioma.  But for purposes of this motion Pfizer assumes that such evidence exists, making those opinions irrelevant at this stage.

question is a legal one for the judge." *Albrecht*, 587 U.S. at 316. And here, that question is readily answered: FDA undeniably rejected a warning about the very injury Plaintiffs claim Pfizer should have warned about, because FDA stated that it believed the available information did not meet the standard for adding that warning.

Expert testimony therefore would not aid the Court in "evaluat[ing] the nature and scope of [the] agency's determination." *Id.* FDA's decision speaks for itself; experts do not have any specialized knowledge that would help the Court construe the CRL, the "written instrument[]" that "memorialize[s FDA's] considered judgments." *Id.* (citation omitted). To the contrary, Plaintiffs' lead expert, Dr. David Kessler (a former Commissioner of FDA), admitted that his understanding of FDA's words in the CRL is ██████████████████████████████████ Ex. 1 (Kessler Tr.) at 218:22-23. In preemption motions, experts are not permitted to offer their own speculative views of what FDA thought or meant. *See Fosamax*, 118 F.4th at 353 ("[T]he interpretation of the [CRL] is a question of law … .").

Nor can experts opine on the subjective motivations behind FDA's labeling determination. In his report, Dr. Kessler, for instance, claims FDA would have approved Pfizer's warning if only Pfizer had submitted more evidence. Ex. 4 (Kessler) ¶ 402. But Dr. Kessler later admitted during his deposition that his opinion was pure speculation because he ███████████████████████████████████████

24

███████████████████████████ Ex. 1 (Kessler Tr.) at 40:16-18.  In his words, ██

████████████████████████ *Id.* at 231:11-12.

For similar reasons, Plaintiffs' proffered experts have nothing relevant to add about FDA's internal decision-making processes.  For all Dr. Kessler—or any other expert—knows, FDA's review of Pfizer's PAS could have been performed by a reviewer "█████████████████████████████████████████████

███████████████████████████████." Ex. 1 (Kessler Tr.) 226:8-14. Similarly, FDA's determination could have been the product of reviewers who were

██████████████████████████████████████████████████

Ex. 1 (Kessler Tr.) at 229:21-22, 228:2-5.  Neither Dr. Kessler nor any other expert knows how FDA weighed the information it received, what it reviewed, whether it did its own independent research, or whether it consulted other experts in the field. All of that, Dr. Kessler agrees, *is* possible.  More fundamentally, there is no need for this Court to assess FDA's behind-the-scenes thinking when a complete record exists of the information that Pfizer gave FDA and FDA's considered response.  Under *Albrecht*, the Court itself interprets that written record and decides the preemption question as a matter of law.

2.  In attempting to undermine the straightforward conclusion that Pfizer gave FDA sufficient data to make an informed determination, Plaintiffs try to hold Pfizer to a burden that does not exist.  Under *Albrecht*, Pfizer "fully informed the FDA of

the justifications for the [meningioma] warning" if it "submitted all *material* information." 587 U.S. at 303, 317 (emphasis added); *accord Dolin*, 951 F.3d at 891; *Zofran*, 541 F. Supp. 3d at 198. Pfizer did not need to re-submit information FDA already knew about, including from the Depo-Provera NDA. *See Zofran*, 57 F.4th at 332 (crediting "safety and efficacy" data manufacturer supplied "to the FDA" in its NDA); *id.* at 342 ("the relevant issue" is "whether the FDA was informed," "not who … informed it"). Nor did Pfizer have to submit immaterial information. *Albrecht*, 587 U.S. at 317.

In addition, Pfizer was not required to submit "cumulative" "information concerning risks of a materially similar type, severity, and frequency as those revealed in [other submitted] information." *Albrecht* Br. at 28 n.11. In other words, as FDA has previously explained, if "FDA previously determined that … evidence of X was insufficient to warrant a warning about risk Y, the existence of additional but similar information about X would be insufficient to justify a warning." *Id.*

Nothing Plaintiffs or their experts have identified was new to FDA. Pfizer was not required to remind FDA that *one* Depo-Provera patient (among 1,718) developed multiple meningiomas during a pre-approval clinical trial for Depo-Provera. Ex. 4 (Kessler) ¶ 386. This was information FDA had for decades from Pfizer's NDA. Ex. 5 (NDA Supportive Safety Data) at -52107-08. Nor was Pfizer required to reiterate to FDA the analysis Pfizer had already presented in an AER

submitted in 2002, which noted that "[e]pidemiological evidence, including the greater incidence of female patients, and a positive association with pregnancy suggest[s] a role for female sex hormones in regulating the growth of meningiomas." Ex. 4 (Kessler) ¶ 420.

Another of Plaintiffs' experts, Dr. Nicholas Butowski, similarly opines that Pfizer's PAS should have included a "case report" of a patient who developed meningiomas "after 17 years of progesterone therapy," which did not include Depo-Provera but rather a higher dose of MPA used to treat a rare, serious lung disease, in addition to another high-dose progestin. Ex. 3 (Butowski) at 91; Ex. 16 (Cottin 2004). But there is no basis to conclude (nor does Dr. Butowski suggest) that this report would have changed FDA's mind given the 34 AERs Pfizer *did* discuss, which showed "a possible association between MPA administration and meningioma" that "cannot be excluded." Ex. 8 (PAS) at -44-45.

Notably, Plaintiffs' experts cannot even agree about the right amount of information they claim should have been given to FDA. In Dr. Kessler's view, the 26 literature references Pfizer provided were too much information, because Pfizer had a responsibility to "synthesize[]" those voluminous materials for FDA. Ex. 1 (Kessler Tr.) at 230:21-25. Dr. Butowski, by contrast, claims that Pfizer did not give FDA enough scientific literature, and that only the "hundreds of references" discussed in his own expert report would have been sufficient. Ex. 2 (Butowski Tr.)

at 118:16-19. Neither standard has any grounding in the law. Indeed, plaintiffs will always be able to argue (through an expert or otherwise) that the manufacturer could have cited more studies or done more analysis. That was plaintiffs' strategy in *Zofran*, for example, but the First Circuit rightly held that additional information plaintiffs' experts flagged was irrelevant where FDA had access to all material information. *See* 57 F.4th at 341-43.

3.    In any event, none of the information Plaintiffs' experts have identified would defeat preemption. As explained above, *supra* Section II.A.1, Pfizer's PAS contained discussion and analysis addressing each relevant consideration necessary for FDA's evaluation, including epidemiological studies and information regarding the biological mechanism by which progestins could cause meningiomas. Importantly, Pfizer directed the FDA to large-scale observational data (like Roland's 2023 study, which considered over 18,000 women and was published after peer review in March 2024) that consistently reported an association between MPA and meningioma. Ex. 8 (PAS) at -42. The additional information Plaintiffs have identified was all known, immaterial in light of what was provided, or cumulative (or all of the above).

In *Fosamax*, the plaintiffs offered the same criticisms of the manufacturer's PAS submission as Plaintiffs do here. *See* 118 F.4th at 345-47. The Third Circuit had no trouble affirming the MDL court's determination that Merck "fully

28

informed" FDA of the basis for the proposed warning, including providing epidemiological studies showing a statistically significant association between Fosamax and fracture injuries. *Id.* at 349. Notably, the court observed that "it stretches credulity to believe that Merck was attempting to mislead the FDA when, in the [PAS] itself, the Company advocated for a new Precautions warning on the Fosamax label." *Id.* at 346. The same is true here.

***Biological Mechanisms.*** Dr. Kessler and Dr. Butowski assert that "██████████

████████████████████████████████████████████████

█████████████████████████████████████." Ex. 4 (Kessler) ¶ 376; *accord* Ex. 3 (Butowski) at 90. Those assertions are inaccurate. Pfizer told FDA *in its PAS* that "progesterone, androgen and estrogen receptors have been identified in meningiomas." Ex. 8 (PAS) at -38. And Pfizer supported this proposition with citations to several articles, *see id.* at -38 nn.6-8,[6] which among other things discuss the "data showing that [progestin] molecules [are] capable of binding to progesterone receptors to promote the development and progression of meningiomas." Ex. 12 (Agopiantz 2023).

***Bioavailability and Dose Information.*** Dr. Kessler claims Pfizer's PAS should have contained "███████████████████████████████████████████

---

[6] Those articles are appended as Ex. 12 (Agopiantz 2023), Ex. 14 (Blankenstein 2000), and Ex. 15 (Carroll 1999).

████████████████████████████████████████████. Ex. 4

(Kessler) ¶ 397. But FDA had bioavailability information regarding all MPA-

containing products from the NDAs for each product, including Depo-Provera. Ex.

6 (NDA Bioavailability Data) at -50516-677. And the Roland study, which Pfizer

cited and discussed in the PAS, Ex. 8 at -42 n.25, observed the association between

progestogens and meningioma across a variety of products, doses, and routes of

administration. Ex. 21 (Roland 2023) at 9.

*Epidemiological Studies.* Dr. Kessler cites six articles that, in his view, Pfizer

should have transmitted to FDA. Ex. 4 (Kessler) at ¶¶ 366-369.3.[7] But each is

cumulative of information already discussed in Pfizer's PAS. Indeed, Dr. Kessler

conceded that Dewata's 2017 article, Supartoto's 2019 study, and an abstract from

the 2023 version of Roland's article, all of which were in the PAS, "████████████

████████████████████████████████████████████████" *Id.* ¶ 365.

Given that, Dr. Kessler's proposed additional citations are cumulative.

*Other Progestins.* Pivoting away from Depo-Provera, Dr. Kessler contends

Pfizer should have "████████████████████████████████████████████████████

████████████████████████████████." Ex. 4 (Kessler) ¶ 371 (emphasis

---

[7] Dr. Kessler's cited articles are appended as Ex. 13 (Bailey 2024), Ex. 18 (Griffin 2024), Ex. 20 (Pourhadi 2023), Ex. 22 (Roland 2024), Ex. 24 (Supartoto 2016), and Ex. 26 (Wahyuhadi 2018). The Griffin and Bailey articles post-dated Pfizer's February 2024 PAS submission.

added).  Dr. Butowski argues the same.  Ex. 3 (Butowski) at 90-91.  But Pfizer did discuss other progestins in its PAS.  Ex. 8 (PAS) at -38.  Pfizer also directed FDA to the Roland (2023) data, which noted "high risks of meningioma … for the prolonged use of cyproterone acetate" and two other progestin products.  Ex. 21 (Roland 2023) at 10.  And Pfizer's proposed warning flagged that other progestins are associated with meningiomas.  Ex. 8 (PAS) at -10.

*Foreign Regulators.*  Dr. Kessler also argues that Pfizer's PAS should have specifically mentioned the actions of foreign regulators.  He notes that the Canadian label for Depo-Provera has listed meningiomas not in the warnings section, but among dozens of other possible "Adverse Reactions," since 2006 (though he doesn't know why); that Austrian regulators planned to add a meningioma warning to MPA-containing products in 2007 (but did not); and in September 2024, that PRAC ultimately concluded a meningioma warning for Depo-Provera was appropriate.  Ex. 4 (Kessler) ¶¶ 388-91.

These foreign actions are immaterial because "foreign drug labels are based on different regulatory standards."  *Lyons*, 491 F. Supp. 3d at 1365.  So "[t]he mere existence of a differently structured and written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate."  *Id.* (citation omitted).  Indeed, American and foreign regulators regularly look at the same safety evidence and reach different conclusions about whether a drug can be *sold*, let alone

what labels should attach to a marketed product.  *See* Ex. 1 (Kessler Tr.) at 257:21-258:2 (acknowledging regulators in different countries require "███████████ ████████████████████████████████████████████████████████").

Accordingly, a different decision of a foreign regulator does not justify a label change, so long as foreign regulators were analyzing "substantially similar evidence."  *See, e.g.*, *Lyons*, 491 F. Supp. 3d at 1365; *Ridings v. Maurice*, 444 F. Supp. 3d 973, 994 (W.D. Mo. 2020); *Estep v. Boehringer Ingelheim Pharms., Inc.*, 2020 WL 5815927, at *8, *13 (Conn. Super. Ct. Aug. 25, 2020).

Here, FDA indisputably had access to substantially similar safety information. Dr. Kessler does not contend Canada based its labeling decision on any new or different information—he doesn't even know why the Canadian label was changed. *See* Ex. 4 (Kessler) ¶ 388.  Dr. Kessler claims Austrian regulators based their views on two AERs and literature linking progestins (generally) to meningioma.  *Id.* at ¶ 389.  But Pfizer gave FDA relevant AERs and scholarship indicating a link between progestins and meningioma. Ex. 8 (PAS) at -43-46 (AERs), -38 & nn.2, 9, 10-15 (progestins).  The same goes for PRAC.  Dr. Kessler chiefly claims that PRAC had access to different AERs and an additional epidemiological study that associated an "increased risk of meningioma" with "progestin-only" hormone therapy.  Ex. 4 (Kessler) ¶ 390.1-.2 (citing Ex. 20 (Pourhadi 2023)).  But again, Dr. Kessler has no

idea what literature or adverse events FDA reviewed, and in any event, FDA had access to substantially similar information. *See supra* Section II.A.1.

*    *    *

Because Pfizer gave FDA all material information on the association between meningioma and Depo-Provera, FDA was "fully informed," as that term is defined in the caselaw, when it rejected Pfizer's request for a meningioma warning.

## B.    Pfizer's Proposed Label Was Adequate

That leaves Dr. Kessler's remarkable suggestion that the CRL means nothing because Pfizer sought a warning for "██████████████████████████ ████████████████████████████." Ex. 4 (Kessler) ¶ 437. That suggestion is factually wrong: Pfizer's PAS sought a meningioma warning for five specific brand-name Pfizer products that contain MPA, not "all progestins." Ex. 8 (PAS) at -1. And if FDA truly thought a meningioma warning was necessary for some products (and not others), that would have been an "easily correctable deficienc[y]" that FDA could have "promptly" communicated to Pfizer. 21 C.F.R. § 314.102(b). At a minimum, FDA would have "addressed" the issue in its CRL. *Id.* Take *Avandia*, where FDA told the manufacturer in a CRL that it had "reviewed the data provided [by the manufacturer] and found that the information presented was *inadequate*." *In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749, 758 (3d Cir. 2019) (cleaned up). FDA further told the manufacturer to submit

33

additional information "in order to address the *deficiency* of this application." *Id.* FDA knows how to tell a manufacturer that it has presented "inadequate" information, and that did not happen here—clear evidence that FDA did not, in fact, view Pfizer's PAS or proposed warning as inadequately presented or explained.

Finally, Plaintiffs have suggested that Pfizer should have changed its label long before 2024 using the CBE regulation. *E.g.*, Ex. 4 (Kessler) ¶ 424. But that timing argument is demonstrably wrong, and irrelevant to the *Wyeth* step-two situation here, where the question is whether clear evidence of FDA's intention exists. Because FDA rejected a proposed meningioma warning in 2024 based on the larger body of evidence available then, that is clear evidence FDA would have rejected such a warning "at any earlier time," when a smaller body of research and evidence existed. *Zofran*, 541 F. Supp. 3d at 205; *accord Rheinfrank*, 119 F. Supp. 3d at 769.

## III.    Plaintiffs' Design Defect Claims Are Plainly Preempted

Plaintiffs' failure to warn claims are the thrust of each pilot complaint, and those claims are preempted for the reasons discussed above. Plaintiffs also raise additional claims—like negligence, fraudulent misrepresentation, and breach of warranty—that, "in substance, are premised on a failure to warn." *See Zofran*, 541 F. Supp. 3d at 206. So those claims are equally preempted. *See id.*

34

Plaintiffs' design defect claims are preempted many times over. To the extent Plaintiffs allege that the "marketing" and "warnings" for Depo-Provera were insufficient, *e.g.*, *Toney* Am. Compl. ¶ 206, these are repackaged failure-to-warn claims, and "design-defect claims that turn on the adequacy of a drug's warnings are pre-empted by federal law." *Bartlett*, 570 U.S. at 476.

Plaintiffs similarly claim that Depo-Provera is defectively designed because it can cause meningioma, or because it poses unnecessary risks compared to a lower-dose MPA subcutaneous injection. *E.g.*, *Toney* Am. Compl. ¶¶ 149-77. But FDA approved Depo-Provera as safe and effective in 1992. Ex. 7 (NDA Approval); *see also* Ex. 1 (Kessler Tr.) at 39:20-25 (█████████████████████████████ ███████████████████████). Moreover, a change to Depo-Provera's design—namely, its dosage or route of administration—would constitute a "major change" requiring prior approval from FDA. 21 C.F.R. § 314.70(b)(2)(i). That prior approval requirement makes it impossible for Pfizer to comply with a different state-law standard. So Plaintiffs' "design defect claim[s are] clearly preempted by federal law." *Yates*, 808 F.3d at 298-99.

Finally, to the extent Plaintiffs allege Pfizer should stop selling Depo-Provera and instead promote Depo-SubQ Provera 104, that "'stop-selling' rationale [is] incompatible with [the Supreme Court's] pre-emption jurisprudence." *Bartlett*, 570

U.S. at 488.  A manufacturer "is not required to cease acting altogether in order to avoid [state-law] liability."  *Id.*

## CONCLUSION

The Court should enter judgment in favor of Pfizer on all claims stated in the pilot complaints.  If it does so, Pfizer would then seek a preemption-based judgment for all other "claims in the MDL."  Pretrial Order No. 26 at 1, ECF No. 364.

Date: August 22, 2025                    Respectfully submitted,

                                         By: */s/ Joseph G. Petrosinelli*
                                         Joseph G. Petrosinelli (admitted *pro hac vice*)
                                         Jessica B. Rydstrom (admitted *pro hac vice*)
                                         Annie E. Showalter (admitted *pro hac vice*)
                                         WILLIAMS & CONNOLLY LLP
                                         680 Maine Ave SW
                                         Washington, DC 20024
                                         Tel. 202-434-5000
                                         jpetrosinelli@wc.com
                                         jrydstrom@wc.com
                                         ashowalter@wc.com

                                         *Attorneys for Defendants Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Company LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

**I HEREBY CERTIFY**, in compliance with Local Civil Rule 56.1(E), that the foregoing document contains 7,966 words, excluding the portions of the memorandum that do not count toward the word limit under Local Civil Rule 7.1(F).

By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (admitted *pro hac vice*)
Jessica B. Rydstrom (admitted *pro hac vice*)
Annie E. Showalter (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
Tel. 202-434-5000
jpetrosinelli@wc.com
jrydstrom@wc.com
ashowalter@wc.com

*Attorneys for Defendants Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 22nd day of August 2025, a true and correct copy of **Pfizer's Memorandum in Support of Its Motion for Summary Judgment Based on Federal Preemption** was filed electronically with the Clerk of Court and served upon all parties via CM/ECF.

By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (admitted *pro hac vice*)
Jessica B. Rydstrom (admitted *pro hac vice*)
Annie E. Showalter (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
Tel. 202-434-5000
jpetrosinelli@wc.com
jrydstrom@wc.com
ashowalter@wc.com

*Attorneys for Defendants Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Company LLC*
