**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION <br><br> This Document Relates to: <br> All Cases, including: <br> *Toney v. Pfizer, No. 3:24-cv-624* <br> *Schmidt v. Pfizer, No. 3:25-cv-81* <br> *Valera-Arceo v. Pfizer, No. 3:25-cv-98* <br> *Wilson v. Pfizer, No. 3:25-cv-100* <br> *Blonski v. Pfizer, No. 3:25-cv-167* | Case No. 3:25-md-3140 <br><br> Judge M. Casey Rodgers <br> Magistrate Judge Hope T. Cannon |

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. DEVA SANJEEVA JEYARETNA PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT***

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

MOTION ............................................................................................................... 1

PRELIMINARY STATEMENT .............................................................................. 1

LEGAL STANDARD ............................................................................................. 3

ARGUMENT ......................................................................................................... 5

    I.    Dr. Jeyaretna's opinion that the increased meningioma risk is limited to "recent" users and dissipates after the drug is out of the blood stream is unreliable and should be excluded. ................................................................... 5

    II.   Dr. Jeyaretna cannot reliably opine that only "prolonged" Depo-Provera use could cause Plaintiffs' injuries. .................................................................. 8

    III.  Dr. Jeyaretna's opinion that Depo-Provera's effects are limited to meningiomas with a predominance of progesterone receptors is unreliable. ................................................................................................... 10

    IV.  Dr. Jeyaretna's opinion that Depo-Provera cannot initiate meningiomas is unreliable and does not undercut general causation. ................................. 12

    V.   Dr. Jeyaretna's opinion as to when Depo-Provera's risks were known or should have been known is irrelevant to general causation and unreliable. ................................................................................................... 14

CONCLUSION ...................................................................................................... 15

LOCAL RULE 7.1(B) CERTIFICATION

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page

CASES

*Chapman v. Proctor & Gamble Dist., LLC,*
  766 F.3d 1296 (11th Cir. 2014)....................................................................... 4, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ...................................................................................... 1, 3, 4

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ................................................................................................ 4

*Hendrix ex rel. G.P. v. Evenflo Co.,*
  609 F.3d 1183 (11th Cir. 2010)....................................................................... 4, 13

*In re Abilify (Aripiprazole) Prods. Liab. Litig.,*
  299 F. Supp. 3d 1291 (N.D. Fla. 2018)...................................................... 1, 3, 4, 7

*McClain v. Metabolife Int'l, Inc.,*
  401 F.3d 1233 (11th Cir. 2005)..................................................................... 11, 13

*McDowell v. Brown,*
  392 F.3d 1283 (11th Cir. 2004)...................................................................... 7, 10

*Rink v. Cheminova, Inc.,*
  400 F.3d 1286 (11th Cir. 2005).............................................................................. 3

*United States v. Frazier,*
  387 F.3d 1244 (11th Cir. 2004)............................................................................. 4

RULES

Fed. R. Evid. 403 .................................................................................................... 4

Fed. R. Evid. 702 ...........................................................................................Passim

Fed. R. Evid. 702(d)................................................................................................ 4

## MOTION

Pursuant to Local Rule 7.1, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs move to exclude the testimony of Dr. Deva Sanjeeva Jeyaretna.

## PRELIMINARY STATEMENT

Depo-Provera can cause brain tumors, known as meningiomas. Pfizer's general-causation experts, including neurosurgeon Dr. Deva Sanjeeva Jeyaretna, concede that fact. According to Dr. Jeyaretna, "dMPA causes [meningioma] growth" in some patients. Ex. 1[1] at 79:7-8. He repeatedly confirmed: "[Y]es, I agree, in the appropriate subset of patients, it does cause growth" and "lead to more clinically significant meningiomas." *Id.* at 79:11-15.[2] That answers the question of "general causation—whether [Depo-Provera] is capable of causing" Plaintiffs' injuries. *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018) (Rodgers, J.).

Unable to dispute that Depo-Provera can cause meningiomas, Dr. Jeyaretna instead tries to carve off categories of Plaintiffs by proposing made-for-litigation limitations on the risk caused by Depo-Provera. But he has no reliable method to justify across-the-board causal cutoffs.

---

[1] Referenced exhibits are to the Declaration of Caleb Seeley, filed herewith.
[2] *See also, e.g.*, *id.* at 29:24-30:19, 79:19-80:9, 81:16-82:1, 102:15-21.

Because they fail Rule 702, the Court should exclude Dr. Jeyaretna's opinions that the increased meningioma risk: (1) is limited to "recent" use; (2) is limited to "prolonged" use; (3) is limited to patients whose meningiomas have a predominance of progesterone receptors; (4) is limited to worsening of pre-existing meningiomas; and (5) was first apparent in 2023. Specifically, he offers no reliable basis to opine that a patient is safe a year after stopping Depo-Provera, as he conceded that meningiomas may continue to grow and cause injuries long after cessation of use. As to duration of use, he offers no reliable support for his one-year threshold and ignores contrary statistically significant epidemiology. Dr. Jeyaretna admits that there is no scientific basis for his opinion that Depo-Provera's effects are limited to meningiomas with a predominance of hormone receptors. And Dr. Jeyaretna's opinions about Depo-Provera's role in initiating meningiomas, as well as when evidence of Depo-Provera's risks became apparent, do not fit and are unreliable.[3]

---

[3] An extensive discussion of the factual background underlying this litigation can be found in Dkt. 427, Plaintiffs' Memorandum in Support of Their Opposition to Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Co. LLC'S Motion for Summary Judgment Based on Federal Preemption (filed Sept. 19, 2025). This motion assumes familiarity with the background on Depo-Provera and meningiomas.

2

**LEGAL STANDARD**

The analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702 is set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Expert testimony is reliable and relevant—and therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Abilify*, 299 F. Supp. 3d at 1304. The proponent of the expert testimony has the burden of proving each element by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

To be qualified, the expert must have "sufficient knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Abilify*, 299 F. Supp. 3d at 1305 (citation omitted).

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Id.* Reliability depends on "several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique

3

has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community." *Id.* Opinion evidence "connected to existing data only by the *ipse dixit* of the expert" should be excluded. *Chapman v. Proctor & Gamble Dist., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014). The "opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702(d) advisory committee's note (2023). Opinions that lack a reliable factual basis or are not supported by the scientific literature may be excluded. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1199 (11th Cir. 2010).

Finally, to be helpful, expert testimony must be relevant, in that it "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *Abilify*, 299 F. Supp. 3d at 1305. Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997). Even if expert testimony satisfies *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

4

## ARGUMENT

**I.    Dr. Jeyaretna's opinion that the increased meningioma risk is limited to "recent" users and dissipates after the drug is out of the blood stream is unreliable and should be excluded.**

Dr. Jeyaretna seeks to testify that Depo-Provera's risks exist only in "recent" users because the drug's role promoting meningioma growth stops upon leaving the user's blood stream. Ex. 2 at 4, 28-31. But Dr. Jeyaretna has no reliable basis to opine that only recent Depo-Provera use could have caused Plaintiffs' injuries.

To start, Dr. Jeyaretna concedes that there are reliable epidemiological studies finding a statistically significant increased risk of meningioma with *any* use of Depo-Provera at *any time*. *See, e.g.*, Ex. 1 at 119:1-120:6, 125:2-16. He provides no reliable basis to discount these findings. Indeed, Dr. Jeyaretna admitted he considered no pharmacokinetic data or scientific literature assessing the time between meningioma initiation and diagnosis. *Id.* at 134:7-9, 135:4-136:17 (conceding time until diagnosis could be longer than ten years and "depend[s] on a number of factors"). Additionally, Dr. Jeyaretna recognized that epidemiological evidence would determine the risks a patient faces after stopping Depo-Provera. *See id.* at 141:22-142:7. But he said he "was not able to read into that evidence" because his epidemiology knowledge is limited. *Id.* at 142:5-6. And although at deposition he repeatedly deferred to epidemiologists to interpret the findings of the published literature, *e.g., id.* at

5

125:10-21, Dr. Jeyaretna himself failed to consult an epidemiologist to fill in the gaps in his expertise, *id.* at 125:22-126:1.

Further, Dr. Jeyaretna provides no basis to opine that there is some period of time after which an exposed individual would be safe from the increased risk of meningioma. *Id.* at 127:4-14 ("No, I can't give you a period of time [after stopping use] where they are safe."), 132:25-133:2 ("Q. Do you have an idea of how long it takes for dMPA to exit the bloodstream? A. I do not."). He does not define "recent," and neither in his report nor in his deposition does Dr. Jeyaretna identify any cutoff after which Depo-Provera cannot have caused Plaintiffs' injuries. *Id.* at 126:12-127:14, 160:13-162:15. In fact, he conceded that any temporal requirement is unknown: "[T]he reason I didn't define it is I think we don't know." *Id.* at 126:2-11.

Next, while Dr. Jeyaretna framed his opinion around the mechanistic idea that Depo-Provera stops causing meningioma cells to multiply once the drug is "no longer at [an] active level in the bloodstream," *id.* at 126:19-20, he failed to even investigate what level of the drug counts as "active exposure," *id.* at 126:7-11; *see also id.* at 113:20-25, 401:13-402:2. He likewise did not know "when you reach that level." *Id.* at 126:7-11. Offering a vague, undefined opinion based on nothing more than his own say-so is unreliable.

Even if Dr. Jeyaretna could identify a time period after which Depo-Provera no longer promotes meningioma growth on a mechanistic level, such an opinion

6

would not reliably bear on the general-causation question of whether Depo-Provera was capable of causing Plaintiffs' injuries. *See Abilify*, 299 F. Supp. 3d at 1305; *see also id.* at 1351 (excluding evidence that did "not 'fit' the disputed facts in this case or 'logically advance' resolution of the only material question at this stage, namely, whether [the drug] is capable of causing [the plaintiffs' injuries]") (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). That is because, as set out below, meningioma growth trajectories are not uniform, and a meningioma can still injure a patient regardless of whether the meningioma is growing.

First, Dr. Jeyaretna conceded that after a patient stops taking Depo-Provera, a meningioma can continue to grow, can stay stable in size, or may regress. Ex. 1 at 128:6-130:14, 179:17-180:20, 182:21-183:4, 193:9-194:10. Even within a single individual, one meningioma may grow while another does not. *Id.* at 211:3-25. And patients whose meningiomas are surgically removed still face a risk of recurrence. *Id.* at 146:22-147:2, 160:7-12. Dr. Jeyaretna therefore conceded that he cannot opine that withdrawal of Depo-Provera will eliminate the increased meningioma risk. *Id.* at 200:14-21; *see also id.* at 206:5-16 (no studies show that stopping progestin use will cause tumor to return to size it was before exposure).

Moreover, a patient's risks from a meningioma are not strictly tied to a tumor's size or growth. *Id.* at 28:10-29:19, 199:11-22. A stable meningioma "does not mean the patient is risk-free." *Id.* at 184:7-11. Even if a meningioma shrinks, the

patient still faces a risk of developing symptoms. *Id.* at 148:14-18. A meningioma may become symptomatic, and be detected and require surgery, years or even decades after it develops. *See id.* at 42:16-43:5 (delayed symptoms after diagnosis), 135:4-136:22 ("many, many years" or even "many decades" may pass between meningioma's formation and diagnosis), 197:22-198:13. Dr. Jeyaretna could not identify a cutoff—not even 10 years—after taking a hormone like Depo-Provera when a patient would no longer face a risk of meningioma symptoms or diagnosis. *Id.* at 126:12-127:14, 160:13-162:15.

In short, according to Dr. Jeyaretna, the relationship between Depo-Provera use and the risk of meningioma depends on a host of individualized factors. *E.g.*, *id.* at 184:14-22, 197:22-198:13. The patient-specific factors leave Dr. Jeyaretna with no reliable basis to limit Depo-Provera's risks to only "recent" users. Rather, a given patient's meningioma symptoms and diagnosis may appear years after she stops taking Depo-Provera. Dr. Jeyaretna's opinion therefore does not reliably bear on general causation.

## II. Dr. Jeyaretna cannot reliably opine that only "prolonged" Depo-Provera use could cause Plaintiffs' injuries.

Dr. Jeyaretna's testimony about the duration of Depo-Provera use needed to cause a meningioma should also be excluded. In his report, Dr. Jeyaretna does not offer an opinion about the duration of use necessary to cause increased meningioma risk. Instead, he used the word "prolonged" when conceding that Depo-Provera can

cause meningiomas. Ex. 2 at 20, 23, 26, 31, 34. At his deposition, Dr. Jeyaretna testified that by "prolonged" use, he meant use for at least a year. Ex. 1 at 89:16-90:17. But Dr. Jeyaretna provides no reliable method to conclude that the increased risk of meningioma requires at least one year of Depo-Provera exposure.

Dr. Jeyaretna's opinion is that Depo-Provera causes meningiomas to grow by stimulating the progesterone receptors present in pre-existing meningioma cells. *Id.* at 111:24-113:1, 113:13-19. He states that once Depo-Provera reaches a level where it can act on progesterone receptors, it can start impacting growth, but he concedes that he has no opinion as to what level of Depo-Provera is required, and directly admits that he is unaware whether there is a minimum safe level of Depo-Provera and did not identify any such level of exposure in his report. *Id.* at 113:20-114:3, 401:13-402:2. He admits that if a patient was known to have a meningioma, he would advise her not to use even a single dose of Depo-Provera. *Id.* at 112:17-113:12, 400:10-22.

Furthermore, Dr. Jeyaretna concedes that reliable scientific research came to a different conclusion, finding a statistically significant increased meningioma risk in patients with less than one year of Depo-Provera use. *E.g.*, *id.* at 90:5-6, 93:1-19; Ex. 3 (Griffin article). And he provides no basis for discounting that finding in order to opine that the exposure must be "prolonged." Dr. Jeyaretna was not able to level any criticism against the Griffin study. Ex. 1 at 93:9-11. He admitted that Griffin's

study was "reliable," *id.* at 93:14, and that clinicians and neurosurgeons like him would rely on the paper, *id.* at 93:13-15. Yet nowhere in his report does Dr. Jeyaretna acknowledge the epidemiological evidence finding that less than a year's duration of Depo-Provera use significantly raises meningioma risk.

At most, Dr. Jeyaretna discussed at deposition another study (Xiao) that found increased risk in short-term users but only reached statistical significance with longer-term use, so Dr. Jeyaretna just picked a number—one year—somewhere in between the studies' findings. *Id.* at 89:16-90:17, 93:9-19; Ex. 4. Guessing at numbers is not just an unscientific methodology; it is no methodology at all. *See McDowell*, 392 F.3d at 1300-01 ("[T]estimony [that is] more of a guess than a scientific theory … simply fails the tests for expert opinion."). No research supports a one-year cutoff—just Dr. Jeyaretna's ipse dixit. An opinion is not admissible simply because an expert says so. *See id.*

**III. Dr. Jeyaretna's opinion that Depo-Provera's effects are limited to meningiomas with a predominance of progesterone receptors is unreliable.**

Dr. Jeyaretna provides no basis other than his own say-so for his opinion that Depo-Provera acts only on meningiomas in which the "predominance" of hormone receptors are progesterone receptors. *E.g.*, Ex. 2 at 4.

Dr. Jeyaretna begins with the uncontroversial idea that there is a plausible biological mechanism that explains Depo-Provera's relationship to increased

10

meningioma risk. Ex. 1 at 259:4-20; Ex. 2 at 24-25. But then he makes an unsupported leap, claiming that Depo-Provera can promote only meningiomas in which a "predominance" of hormone receptors are progesterone receptors. Ex. 2 at 24-26; Ex. 1 at 290:18-291:22 ("I chose the phrase 'predominantly,' so I'd say 50, 51%."). This opinion, however, is premised on nothing. No study supports the requirement that a certain percentage of cells express progesterone receptors, much less the requirement that such cells be a "predominance." Ex. 1 at 291:23-292:21. Dr. Jeyaretna admits that he simply picked a number out of thin air because "we don't know where that number lies," but it is his personal view that the number should not be "too low or too high." *Id.* at 290:18-291:22.

While "picking a position in the middle," *id.* at 291:23-292:7, may sound reasonable, it is not a reliable methodology. Dr. Jeyaretna conceded that no study finds that the effect of Depo-Provera is restricted to tumors expressing a predominance of progesterone receptor cells, *id.* at 291:23-292:21. Indeed, some published, peer-reviewed studies deem a meningioma to be "progesterone-receptor positive" so long as even 1 percent of the meningioma expresses progesterone receptors. *Id.* at 295:2-6. Dr. Jeyaretna's proposed cutoff is no more than ipse dixit. The Court cannot "simply tak[e] the expert's word for it." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005).

11

Beyond that, Dr. Jeyaretna could not conclude that progesterone receptors are the sole mechanism for Depo-Provera to promote meningiomas. Ex. 1 at 295:10-296:19. He admitted that scientific literature suggests "various proposed mechanisms" by which Depo-Provera stimulates meningioma growth. *Id.* at 246:21-247:10. Perhaps Depo-Provera acts entirely through progesterone receptors, or perhaps "it's nothing to do with progesterone." *Id.* at 296:11-19. The various mechanisms might work in concert. *Id.* at 247:11-13. "We don't know," Dr. Jeyaretna says. *Id.* at 247:13; *see also id.* at 296:9-10, 19.

Finally, even if Dr. Jeyaretna's progesterone-receptor-positivity opinion were reliable, it would not be helpful. It is not routine practice to test meningioma patients' hormone receptors. Ex. 2 at 9; Ex. 1 at 297:15-23. And testing provides a static view of what may be a dynamic process; as Dr. Jeyaretna wrote outside the litigation in a published article, "exposure to progestins has been implicated in changing the molecular characteristics of meningiomas." Ex. 5 at 2.

## IV. Dr. Jeyaretna's opinion that Depo-Provera cannot initiate meningiomas is unreliable and does not undercut general causation.

Although he concedes that Depo-Provera can cause meningioma growth and lead to the clinical presentation of these tumors, Dr. Jeyaretna opines that "there is no reliable scientific evidence that Depo-Provera is capable of initiating meningiomas." Ex. 2 at 3. However, multiple peer-reviewed publications and authors from respected journals describe progestins as "initiating" meningiomas.

12

*See* Ex. 6 at 4 ("This relationship between exogenous hormone use and multiple meningioma formation suggests a critical role of progestin to induce the tumoral initiation of multiple specific meningeal cells."); Ex. 7 at 5 (summarizing studies "suggest[ing] that progestin induces the initiation of tumors from multiple meningeal cells"). Dr. Jeyaretna's opinion lacks support in the scientific literature and should be excluded. *See Hendrix*, 609 F.3d at 1199.

Beyond that, Dr. Jeyaretna's opinion is at odds with his own published scientific writing on the subject. Outside this litigation, Dr. Jeyaretna wrote: "Exposure to progesterone is an important physiological fact implicated in meningioma development and growth." Ex. 1 at 251:16-22; Ex. 5 at 2. He testified that, in his own writing, he considers the word "development" to refer to tumor initiation and uses the word "growth" to refer to the separate process of tumor growth. Ex. 1 at 17:22-18:18. His shifting view undermines the reliability of his litigation-driven opinion.

Additionally, just for this litigation, Dr. Jeyaretna made up a new test to assess evidence of initiation. Ex. 2 at 19. He could not cite any source for his proposed test. Ex. 1 at 285:21-286:1. That lack of acceptance—apparently by any scientist—further shows Dr. Jeyaretna's proposed test to be unreliable. *See, e.g.*, *McClain*, 401 F.3d at 1251.

13

Finally, the Court should find general causation regardless of how it rules on expert testimony about meningioma initiation. Dr. Jeyaretna admitted that Depo-Provera can cause meningiomas to grow and contribute to the development of a patient's symptoms, regardless of whether it initiated a new meningioma or exacerbated an existing one. Ex. 1 at 286:2-11. That demonstrates that Depo-Provera "has the potential to cause" Plaintiffs' injuries and thus establishes general causation. *Chapman*, 766 F.3d at 1306. As to a specific Plaintiff, a meningioma's origin might factor into precisely how Depo-Provera caused injuries. Still, Dr. Jeyaretna's opinion does not reliably undercut general causation.

**V.     Dr. Jeyaretna's opinion as to when Depo-Provera's risks were known or should have been known is irrelevant to general causation and unreliable.**

Dr. Jeyaretna's opinion that Depo-Provera's risks were unknown until 2023 is unhelpful and does not fit. The question before the Court is general causation: whether Depo-Provera can cause meningiomas. Dr. Jeyaretna agrees that it can. When that causal link became apparent is not a question of general causation. Dr. Jeyaretna's view therefore is not helpful in answering the pertinent question.

Moreover, Dr. Jeyaretna's timing opinion is unreliable and inconsistent. In his report, in his deposition, and throughout his published work outside of litigation, Dr. Jeyaretna acknowledges and relies on scientific evidence going back decades that connects Depo-Provera with meningioma growth. *E.g.*, Ex. 1 at 221:21-222:7 (discussing all progestins), 231:25-232:13; *see also, e.g., id.* at 222:8-12, 233:7-

14

236:16 (discussing in particular MPA (medroxyprogesterone acetate) like Depo-Provera). Throughout his report, Dr. Jeyaretna not only recognizes but relies on case reports, case series, biological-mechanism studies, and case-controlled studies specific to MPA and Depo-Provera (and finding a statistically significant increased risk of meningioma) that predate the Roland study's publication in 2023.

Dr. Jeyaretna provides no reliable basis to ignore this mountain of evidence. Indeed, for his entire career as an attending or consulting neurosurgeon, since 2014, Dr. Jeyaretna admits that he would have counseled women about the increased meningioma risks from progestins. *Id.* at 228:19-229:8. And before Pfizer retained Dr. Jeyaretna for this litigation, he authored peer-reviewed publications that acknowledge that the relationship between sex hormones and meningiomas is "robust and long-recognized" and has been studied "for decades," and that hormone receptor expression in meningiomas has been documented "for nearly half a century." Ex. 8 at 1; Ex. 1 at 238:2-239:8, 239:16-20, 259:21-260:4; *see also* Ex. 5; Ex. 1 at 251:16-252:14 (Dr. Jeyaretna citing articles from 1958 and 1983). That leaves Dr. Jeyaretna unable to reliably opine that Depo-Provera's risks became known only in 2023.

## CONCLUSION

Plaintiffs' motion to exclude the testimony of Dr. Deva Sanjeeva Jeyaretna should be granted.

15

Dated: April 22, 2026

/s/ *Christopher A. Seeger*
Christopher A. Seeger
(admitted *pro hac vice*)
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

*Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Blonski*

David C. Frederick
(admitted *pro hac vice*)
Ariela M. Migdal
(admitted *pro hac vice*)
Jimmy A. Ruck
(admitted *pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
jruck@kellogghansen.com

Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
   Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

Michael A. Sacchet
(admitted *pro hac vice*)
Heather M. McElroy
(admitted *pro hac vice*)
Eli Temkin (*pro hac vice pending*)
Ciresi Conlin LLP
225 S. 6th Street, Suite 4000
Minneapolis, MN 55402
Telephone: (612) 361-8220
mas@ciresiconlin.com
hmm@ciresiconlin.com
emt@ciresiconlin.com

Ellen Relkin
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Schmidt*

*Co-Chairs Law & Briefing*

16

Tracy A. Finken, Esq.
Anapol Weiss
One Logan Square
130 N. 18th Street
Suite 1600
Philadelphia, PA 19103
Telephone: (215) 735-1130
(215) 735-0773 (Direct Dial)
tfinken@anapolweiss.com

*Counsel for Plaintiff Valera-Arceo*

Virginia M. Buchanan
Levin, Papantonio, Proctor, Buchanan,
  O'Brien, Barr & Mougey, P.A.
316 South Baylen Street (32502)
P.O. Box 12308
Pensacola, FL 32591
Telephone: (850) 435-7023
vbuchanan@levinlaw.com

*Counsel for Plaintiff Wilson*

17

## <u>LOCAL RULE 7.1(B) CERTIFICATION</u>

I hereby certify that, pursuant to Local Rule 7.1(B), counsel for Plaintiffs made a good-faith effort to resolve the issue addressed in this Motion by telephone with Pfizer's counsel on April 16, 2026.  Pfizer opposes the relief sought by this Motion.


Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
  Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

18

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that the foregoing memorandum complies with Local Rule 5.1(C) because it was prepared using Times New Roman 14-point font. This memorandum also complies with Local Rule 7.1(F) because, excluding those portions of the memorandum exempted by Local Rule 7.1(F), it contains 3,413 words.

Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
   Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Toney*

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 22nd day of April 2026, a true and correct copy of this **Motion and Memorandum of Law in Support of Motion to Exclude Testimony of Dr. Deva Sanjeeva Jeyaretna Pursuant to Federal Rule of Evidence 702 and Daubert** was filed electronically with the Clerk of Court and served upon all parties via CM/ECF.

Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
   Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

20