**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Cases; including:<br>*Toney v. Pfizer*, No. 3:24-cv-624<br>*Schmidt v. Pfizer*, No. 3:25-cv-81<br>*Valera-Arceo v. Pfizer*, No. 3:25-cv-98<br>*Wilson v. Pfizer*, No. 3:25-cv-100<br>*Blonski v. Pfizer*, No. 3:25-cv-167 | Case No. 3:25-md-3140<br><br><br>Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. EMILY B. LEVITAN UNDER FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT***

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. ii

MOTION............................................................................................................... 1

PRELIMINARY STATEMENT ........................................................................... 1

LEGAL STANDARD............................................................................................ 3

ARGUMENT ........................................................................................................ 5

I.  DR. LEVITAN'S OPINION ON CAUSATION MORE THAN TWO YEARS AFTER CEASING DEPO-PROVERA LACKS A RELIABLE BASIS ........................................................................... 5

II.  DR. LEVITAN'S OPINION THAT DEPO-PROVERA TAKEN FOR LESS THAN ONE YEAR CANNOT CAUSE MENINGIOMA IS UNRELIABLE .................................................... 11

III.  DR. LEVITAN'S OPINION THAT DEPO-PROVERA ONLY CAUSES GROWTH OF EXISTING MENINGIOMAS LACKS A RELIABLE BASIS AND WILL NOT ASSIST THE TRIER OF FACT .............................................................................................. 13

IV.  DR. LEVITAN'S OPINION THAT NO RELIABLE EVIDENCE FOR A CAUSAL RELATIONSHIP EXISTED BEFORE 2024 IS UNRELIABLE AND IRRELEVANT TO GENERAL CAUSATION ............................................................. 18

CONCLUSION .................................................................................................... 19

LOCAL RULE 7.1(B) CERTIFICATION

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

CASES

*3M Combat Arms Earplug Prods. Liab. Litig.*, *In re*, 2022 WL 1223232
(N.D. Fla. Mar. 10, 2022) ................................................................. 3-4

*Abilify (Aripiprazole) Prods. Liab. Litig.*, *In re*, 299 F. Supp. 3d 1291
(N.D. Fla. 2018) ..............................................................4, 11, 12, 15, 17

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999) .............................3

*Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296
(11th Cir. 2014) .................................................................................1, 4, 17

*Cordoves v. Miami-Dade Cnty.*, 2015 WL 2258457 (S.D. Fla. Mar. 2,
2015) ...................................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .........................1, 3, 10

*Deepwater Horizon Belo Cases*, *In re*, 2020 WL 6689212 (N.D. Fla.
Nov. 4, 2020), *aff'd*, 2022 WL 104243 (11th Cir. Jan. 11, 2022) ........ 1-2, 18

*Denture Cream Prods. Liab. Litig.*, *In re*, 2015 WL 392021 (S.D. Fla.
Jan. 28, 2015), *aff'd sub nom. Jones v. SmithKline Beecham*,
652 F. App'x 848 (11th Cir. 2016) ................................................................8

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................4, 10, 11

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) .......................4

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014) .................................8

*Lebron v. Secretary, Florida Dep't of Children & Families*,
772 F.3d 1352 (11th Cir. 2014) .............................................................16, 17

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005) .....................2, 18

*McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004) ......................................11, 13

*Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005) ....................................3, 6

ii

RULES

Fed. R. Evid.:

    Rule 702.................................................................................1, 2, 3, 15, 17

    Rule 702(d) advisory committee's note to 2023 amendment..........................4

N.D. Fla. Loc. R. 7.1 .................................................................................1

## MOTION

Pursuant to Local Rule 7.1, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), plaintiffs move to exclude the testimony of Dr. Emily B. Levitan.

## PRELIMINARY STATEMENT

All experts in this litigation, including Pfizer's expert Dr. Emily Levitan, a professor of epidemiology, agree that there is a causal association between Pfizer's drug, injectable Depo-Provera,[1] and the growth of brain tumors, known as meningiomas. *See*, *e.g.*, Ex. 2 (Levitan Tr. 29:24-30:7) (testifying that "[f]or some women who have taken Depo-Provera for a long period of time, I agree that Depo-Provera can cause the growth of meningioma"); Ex. 1 (Report 3) (explaining that data shows "if a woman uses dMPA continuously for one year or more, then she has an increased risk of the growth of benign cranial meningioma"). This answers the question of general causation, which "refers to the 'general issue of whether a substance has the potential to cause the plaintiff's injury.'" *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (citation omitted); *see In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *8 (N.D. Fla. Nov. 4, 2020) (Rodgers, J.) ("General causation . . . is concerned with whether a 'drug or chemical *can* cause the harm plaintiff alleges,' that is, whether a chemical agent

---

[1] Depo-Provera is the brand name for Depot injection of medroxyprogesterone acetate ("DMPA"), sometimes written as dMPA.

'increases the incidence of disease in a group[.]'") (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005)) (emphasis in *McClain*), *aff'd*, 2022 WL 104243 (11th Cir. Jan. 11, 2022).

Dr. Levitan attempts to limit this fundamental consensus on general causation by opining on the outer limits of the risk caused by Depo-Provera. But her opinions do not meet the standards for reliability under Federal Rule of Evidence 702, and the Court should exclude Dr. Levitan's opinions that: (1) there is no reliable evidence that an increased risk of meningioma continues two years after stopping DMPA (or that the meningioma risk diminishes or disappears for all former DMPA users); (2) Depo-Provera taken for less than one year cannot cause meningiomas; (3) Depo-Provera causes growth only of existing meningiomas; and (4) the increased meningioma risk was first apparent in 2024.

First, Dr. Levitan offers no reliable basis to opine that, two years after stopping DMPA, an individual is safe from DMPA's increased meningioma risk. It is a conclusion that no study has ever reached, and it is premised entirely on Dr. Levitan's speculation. Contrary to her own unsupported conclusion, Dr. Levitan admits that meningiomas, even if smaller, may continue to pose risks for symptoms long after cessation of use. Second, her opinion that there is insufficient evidence of an increased risk for women who have used Depo-Provera for less than a year lacks reliable support and ignores epidemiological studies that reach a contrary

conclusion.  Third, Dr. Levitan's opinion about Depo-Provera's role in initiating meningiomas is unreliable.  Fourth, her opinion that there is no reliable evidence of the causal association between Depo-Provera and meningioma before 2024 failed to consider a number of studies, including early biomechanism evidence supporting a causal association.  This opinion also has no bearing on the question of general causation.  The Court should exclude these opinions as unreliable.

## LEGAL STANDARD

Pfizer bears the burden of showing, by a preponderance of the evidence, that Dr. Levitan's testimony is admissible.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)).  The analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702 is set forth in *Daubert* and its progeny.  *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).  To be admissible, expert testimony must be offered by an expert "sufficiently qualified to testify about the matters he intends to address"; the expert must use a "sufficiently reliable" methodology "as determined by the sort of inquiry mandated in *Daubert*"; and "the testimony [must] assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *In re 3M Combat Arms Earplug Prods.*

3

*Liab. Litig.*, 2022 WL 1223232, at *1 (N.D. Fla. Mar. 10, 2022) (Rodgers, J.); *see also Chapman*, 766 F.3d at 1304.

To be reliable, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla. 2018) (Rodgers, C.J.). Reliability depends on "several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community." *Id.*

To assist the trier of fact, expert testimony must be relevant to an issue in the case, in that it "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *Id.* Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). An expert's opinion must "stay within the bounds" of what can be concluded from a reliable application of the expert's methodology. Fed. R. Evid. 702(d) advisory committee's note to 2023 amendment. Opinions that lack a reliable factual basis or are not supported by scientific literature may be excluded. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1199-1200 (11th Cir. 2010).

4

## ARGUMENT

### I.    DR. LEVITAN'S OPINION ON CAUSATION MORE THAN TWO YEARS AFTER CEASING DEPO-PROVERA LACKS A RELIABLE BASIS

Dr. Levitan's opinion (at 3) that there is no reliable evidence that an increased risk of meningioma continues two years after stopping DMPA is unsupported and based on speculation.  The Court should exclude it.

**A.**    Dr. Levitan provides no reliable basis to opine that there is some period of time after which an exposed individual is safe from DMPA's increased risk of meningioma.  Her conclusion is novel.  Dr. Levitan admitted that none of the five studies she relies on for this opinion reached the position she offers in her report.  *See*, *e.g.*, Ex. 2 (Levitan Tr. 75:15-25).  And she conceded that she was unaware of any study expressing the opinion that an increased risk of meningioma disappears two years after stopping DMPA.  Ex. 2 (Levitan Tr. 76:1-77:11).  In fact, Dr. Levitan testified that no study has ever considered whether the increased risk of meningioma stops two years after using DMPA.  Ex. 2 (Levitan Tr. 98:13-19).

Dr. Levitan roots her opinion in speculation.  She explained that the main basis for her opinion is that Griffin & Arend 2025 and Reynolds 2025 show that "current or recent users" of DMPA had a "higher" odds ratio for meningioma when compared to "current and former" DMPA users.  Ex. 2 (Levitan Tr. 98:23-99:5).  Dr. Levitan

admitted that none of the studies she relied on for this opinion "specifically examined" risk for just "former users of dMPA." Ex. 2 (Levitan Tr. 98:13-22).

Lacking any study on point, Dr. Levitan resorts to comparing: (1) a group of current and recent DMPA users against (2) a group of current and former DMPA users. Because the studies say nothing about the specific risks for *former* DMPA users, Dr. Levitan speculates about what the meningioma risk might be for those former DMPA users (she never identifies an odds ratio for them). Yet despite her speculation, Dr. Levitan admitted that, if a woman took DMPA, was diagnosed with a meningioma, and then stopped DMPA, she was unable to "comment" on whether this woman "would still have symptoms two years after stopping." Ex. 2 (Levitan Tr. 155:20-25). Dr. Levitan's concession that she has no idea whether a woman who stopped taking DMPA for two years will have symptoms is fatal to her opinion that the meningioma risk "decreases" once the therapy stops. Ex. 2 (Levitan Tr. 29:14-21); *see also* Ex. 2 (Levitan Tr. 193:8-10). The Eleventh Circuit has rejected expert opinions when experts relied on speculation to reach their conclusions. *See Rink*, 400 F.3d at 1292 (excluding opinion that "required" an "unsupported 'leap of faith' which is condemned by *Daubert*").

Dr. Levitan's extrapolation of the meningioma risk (odds ratio) from a mixed group of current and former DMPA users to support an opinion limited to former users overreaches beyond what the data can reasonably justify. She admitted that

6

no author has "ever looked at that data" and "come to the same conclusion." Ex. 2 (Levitan Tr. 100:1-11). Dr. Levitan conceded her opinion was conjecture. *See* Ex. 2 (Levitan Tr. 99:13-24) (admitting that "the math" "suggests" that the "former users" have a lower odds ratio than "current users"). Moreover, the two studies she relies on most significantly for this opinion (Ex. 3 (Griffin & Arend 2025) and Ex. 4 (Reynolds 2025)) did *not* "report whether [meningioma] risk decreases after a woman stops taking dMPA." Ex. 1 (Report 30, 32).

To the contrary, Griffin & Arend 2025 and Reynolds 2025 conclude that there *is* an increased risk of meningioma for women who have ceased taking Depo-Provera one year ago and two years ago in comparison to non-users. *See, e.g.*, Ex. 3 at 6 (Griffin & Arend 2025) (DMPA exposure within two years of diagnosis associated with an odds ratio of 3.73 compared to non-active control group); *see also* Ex. 1 (Report 30) (same). At bottom, studies showing an increased meningioma risk at one year and two years after cessation, which did not report odds ratios for the level of risk after that timeframe, fail to support Dr. Levitan's conclusion that Depo-Provera's increased risk of meningioma decreases or disappears after two years.

Reinforcing the speculative nature of her opinion is the fact that Dr. Levitan was unable to provide a specific timeline for the alleged decrease in Depo-Provera's meningioma risk. When asked how much she thought the risk purportedly decreased after two years, she admitted that "the data currently available doesn't provide an

7

exact timeline." Ex. 2 (Levitan Tr. 45:6-14); *see also* Ex. 2 (Levitan Tr. 44:23-45:1) (explaining "there's not sufficient data to draw a bright line and say this is the point at which your risk has returned to baseline"). That concession alone renders her opinion unreliable. *See In re Denture Cream Prods. Liab. Litig.*, 2015 WL 392021, at *25 (S.D. Fla. Jan. 28, 2015) ("[C]onjecture and rough approximation lack[] the intellectual rigor required by *Daubert*."), *aff'd sub nom. Jones v. SmithKline Beecham*, 652 F. App'x 848 (11th Cir. 2016) (per curiam); *see also Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014) (not an abuse of discretion to exclude expert opinions when a "leap from data to opinion [i]s too great"). Dr. Levitan's concession that the data does not provide a timeline for any alleged decrease in meningioma risk underscores that her opinion that Depo-Provera's risk subsides after two years is arbitrary and lacks a reliable basis.

**B.** Dr. Levitan's opinion suffers an additional defect: a failure to consider that meningioma regression after discontinuation of DMPA does not mean the patient is risk-free of meningioma symptoms. *See* Ex. 1 (Report 51). She acknowledged that, after a patient stops taking Depo-Provera, meningiomas may exist – even "two years after" DMPA exposure. Ex. 2 (Levitan Tr. 88:11-89:6). She also admitted that it can take "decades" between a "causal exposure" from DMPA and the "time" it takes to "diagnose[]" a meningioma given that meningiomas can grow slowly. Ex. 2 (Levitan Tr. 146:3-17). *See also* Ex. 9 (Jeyaretna Tr. 148:8-18)

8

(admitting that he could not say that tumor regression meant a patient was "now risk-free of meningioma symptom[s]"); Ex. 10 (Horbinski Tr. 60:5-61:12) (acknowledging that even "low-grade" meningiomas can have "serious consequences" including an association "with increased risk of mortality").[2]

Furthermore, Dr. Levitan failed to consider that even smaller meningiomas following regression may pose ongoing risks. During questioning, she conceded that the existence of a meningioma, even if smaller than it used to be, could "[p]otentially" still be "problematic" for the patient. Ex. 2 (Levitan Tr. 90:19-22). In fact, there is also evidence that some former DMPA users may be left with tumors that are larger than they were to start. *See* Ex. 10 (Horbinski Tr. 146:5-147:15). Dr. Levitan's report fails to grapple with the fact that, even if a meningioma becomes somewhat smaller after cessation (which it does not always do), there is no certainty that the former user will be risk-free of meningioma symptoms in the future.

Consequently, Dr. Levitan was unable to quantify the purported decreased risk for DMPA users who stopped using it for two years. *See* Ex. 2 (Levitan Tr. 45:6-14). This overlooked fact undercuts Dr. Levitan's opinion that there is "no evidence that the risk persists more than two years" after stopping Depo-Provera.

---

[2] Exposure to progestins can change "the molecular characteristics of meningiomas." *See* Ex. 9 (Jeyaretna Tr. 257:20-25). Dechallenge studies do *not* show that the tumor (even if it has regressed) has further altered its molecular makeup. Therefore, risk persists from these meningiomas. *See supra* pp. 8-9.

Ex. 2 (Levitan Tr. 41:8-14).  *See Cordoves v. Miami-Dade Cnty.*, 2015 WL 2258457, at *8 (S.D. Fla. Mar. 2, 2015) (striking expert's opinion because the record contained "critical pieces of evidence" that the expert did not review).

In short, Dr. Levitan's unsupported *ipse dixit* opinion is not reliable under *Daubert*.  Under questioning, Dr. Levitan admits that not a single study shows that Depo-Provera's elevated risk of meningioma disappears two years after a patient stops taking the drug.  Ex. 2 (Levitan Tr. 183:12-23).  To reach her conclusion, Dr. Levitan speculates that the risk *might* be lower for DMPA users two years after cessation, while having to acknowledge that none of the studies she relies on specifically looked at former DMPA users.  Ex. 2 (Levitan Tr. 98:20-22).

And Dr. Levitan's fixation on regression, while failing to consider ongoing risk factors, renders her opinion that meningioma risk decreases after discontinuation of DMPA unreliable.  She admitted that for certain former DMPA users, she could *not* deny that the meningioma risk indeed "continues," even "after discontinuation of dMPA," because they "may continue to have symptoms from their meningiomas."  Ex. 2 (Levitan Tr. 91:10-92:3).  "[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.  This Court should "conclude that there is simply too great an analytical gap between the data and the opinion proffered."

10

*Id.* Dr. Levitan should not be permitted to offer this novel, speculative conclusion, unsupported by the studies on which she relies, let alone by any study.

**C.** Besides lacking a reliable basis, this opinion fails the "helpfulness" criterion, because it is not a "fit" with the general-causation inquiry of whether Depo-Provera can cause meningioma growth. *Abilify*, 299 F. Supp. 3d at 1305. This opinion is more appropriately considered, if at all, at the specific-causation stage, when a plaintiff with a meningioma must show that *her* meningioma was caused by exposure to Depo-Provera under applicable state-law standards. *See Joiner*, 522 U.S. at 146 (an expert's opinion does not "fit" when there is "too great an analytical gap" between the facts and the opinion); *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts.").

## II.   DR. LEVITAN'S OPINION THAT DEPO-PROVERA TAKEN FOR LESS THAN ONE YEAR CANNOT CAUSE MENINGIOMA IS UNRELIABLE

Dr. Levitan's opinion (at 47) that taking Depo-Provera for less than one year cannot cause meningioma growth is unreliable, stands in conflict with a statistically significant epidemiological study, and should be excluded. She points to five epidemiological studies in Table 4 of her report as the basis for this opinion. *See* Ex. 1 (Report 52-54). But they do not support her conclusion.

Griffin 2024[3] found a significantly *increased* risk for meningioma from DMPA use *less than one year*: an odds ratio of 1.35 for cranial meningiomas (35% increase in odds compared to the unexposed group). *See* Ex. 5 (Griffin 2024). Dr. Levitan dismisses this result by saying that "the fragmentation of the United States healthcare system mean[s]" that Griffin is "subject to misclassifying long-term users as short-term users." Ex. 1 (Report 53). Dr. Levitan's claim that the Griffin study could have misclassified long-term users as short-term users is rank speculation. And Dr. Levitan does not attempt to analyze Griffin's characterization of DMPA users. Dr. Levitan's attempt to ignore Griffin's statistically significant (and contrary) results is not a reliable methodology. *See Abilify*, 299 F. Supp. 3d at 1307 (causation inquiry is guided by the "well-established" Bradford Hill factors).

Dewata 2017 and Roland 2024 did not report the risks for people who used DMPA for less than a year. *See* Ex. 6 (Dewata 2017) and Ex. 7 (Roland 2024). Reynolds's (2025) odds ratio for people exposed to DMPA for less than or equal to one year was 1.05 compared to the unexposed group, which does not support Dr. Levitan's opinion. *See* Ex. 1 (Report 53) (with a CI between 0.55-2.01). Although Xiao 2025 did not report a specific result for one year or less of use, it reported an

---

[3] Dr. Levitan described Griffin, a colleague, as a "competent" epidemiologist. Ex. 2 (Levitan Tr. 93:19-21).

odds ratio of 1.48 for zero to two years of DMPA use (with a CI between 0.91-2.41). *See* Ex. 11 (Xiao 2025). None of these four studies supports Dr. Levitan's opinion.

The Court should exclude Dr. Levitan's unreliable opinion, which is unsupported by her own cited studies. Notably, Dr. Levitan could identify no study establishing short-term use carries no risk or that the risk was limited to long-term usage. And setting aside unsupported conjecture, Dr. Levitan had no substantive answer for the statistically significant finding of increased meningioma risk for DMPA use less than one year (Griffin 2024) or for the increased meningioma risk for patients using DMPA for two or less years (Xiao 2025).[4] Picking one year based on speculation is not a methodology, reliable or otherwise. *See McDowell*, 392 F.3d at 1300-01 (holding that "testimony [that is] more of a guess than a scientific theory . . . simply fails the tests for expert opinion").

## III. DR. LEVITAN'S OPINION THAT DEPO-PROVERA ONLY CAUSES GROWTH OF EXISTING MENINGIOMAS LACKS A RELIABLE BASIS AND WILL NOT ASSIST THE TRIER OF FACT

Dr. Levitan states that "it is plausible that dMPA could promote the growth of existing meningiomas, but it does not appear plausible that dMPA initiates

---

[4] To the extent Dr. Levitan relies on biomechanism studies (Ex. 1 (Report 47)) to assert that taking Depo-Provera for less than one year cannot cause meningioma growth, the Court should exclude this basis given Dr. Levitan's admitted lack of qualification. *See infra* pp. 15-17.

13

meningioma development." Ex. 1 (Report 54).[5] *See also* Ex. 2 (Levitan Tr. 148:3-7) ("Depo-Provera seems to be implicated in making meningiomas that are already there grow and not necessarily the initiation of that meningioma."). This opinion lacks a reliable basis, and, to the extent she relies on the biomechanism of meningioma to reach this conclusion, she is unqualified to offer it. Finally, this opinion does not bear on the general-causation issue before the Court. The Court should exclude it.

A.       In her report, Dr. Levitan briefly states that, "[b]ased on my review of the epidemiology and the reports submitted by other experts," it "does not appear plausible that dMPA initiates meningioma development." Ex. 1 (Report 54). She cites Griffin & Arend 2025 and Reynolds 2025 as "suggest[ing]" that current DMPA users are at "a higher risk of meningioma" than past users. Ex. 1 (Report 51). From this assumption, Dr. Levitan infers that the risks "suggest" that DMPA has "a growth effect . . . rather than an initiation effect that confers elevated risk years after exposure." *Id.* Dr. Levitan fails to explain *why* allegedly different risk levels support her opinion that Depo-Provera cannot initiate meningioma development. Dr. Levitan's cursory explanation about why these studies purportedly support her conclusion fails to provide a reliable basis for her opinion.

---

[5] It is unclear if Dr. Levitan is offering this conclusion as a formal opinion. She does not list this in her summary of opinions. *See* Ex. 1 (Report 3, 47) (absent from the list containing opinions a, b, and c).

14

Neither epidemiological study that Dr. Levitan relies on for her opinion reaches her conclusion. Nor could they, as Pfizer's other epidemiological expert acknowledges. *See*, *e.g.*, Ex. 8 (Barnhart Tr. 148:11-149:9) (conceding that epidemiological studies cannot determine whether a meningioma that is diagnosed was initiated by Depo-Provera). The epidemiological studies do not assess participants at baseline to determine whether they had a meningioma before starting Depo-Provera. Ex. 8 (Barnhart Tr. 149:22-150:2). Indeed, these studies are not designed to address the opinion Dr. Levitan is offering. Her "methodology" of reviewing only certain epidemiological studies is not "properly applied to the facts at issue" – in this case, whether a meningioma existed, or could have existed, before Depo-Provera accelerated its growth. *Abilify*, 299 F. Supp. 3d at 1305.

**B.**     In her deposition, Dr. Levitan explains that she is in fact relying on biomechanism studies – an area in which she lacks expertise – to offer this opinion. *See* Ex. 2 (Levitan Tr. 166:5-15) (explaining that she is "looking at the biology studies" to understand whether Depo-Provera "initiates the tumors or just makes existing tumors bigger").

Rule 702 permits a witness to testify as to scientific, technical, or other specialized knowledge only if the witness is qualified. The rule recognizes five bases for qualification: "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. But qualification in a particular area on one of those bases is not carte

blanche to testify on any matter – "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary, Florida Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014). In *Lebron*, the Eleventh Circuit held that a doctor with a background in clinical psychiatry and the treatment of drug abuse was not qualified to testify about the rates of drug use among applicants for a state benefit program. *Id.* at 1369. Because he did not "'propos[e] to testify about matters growing naturally and directly out of research [he had] conducted independent of the litigation,'" and instead "'developed [his] opinions expressly for purposes of testifying,'" the Eleventh Circuit held the district court properly excluded the doctor's testimony on grounds that he was unqualified to testify. *Id.* (citation omitted; alterations in *Lebron*).

Dr. Levitan opines on biomechanism studies, yet she does not profess expertise in this area. *See* Ex. 1 (Report 1-2) (only describing "expertise" in "epidemiologic study design and statistical analysis"); *see also* Ex. 2 (Levitan Tr. 166:5-15) (admitting that "biology studies" is "not" her "primary area of expertise"). She admitted that she is not a biologist and not a pathologist. Ex. 2 (Levitan Tr. 167:24-25). And she acknowledged that she is not a medical expert in meningiomas, nor is she a neurosurgeon or clinician. Ex. 2 (Levitan Tr. 22:3-5, 144:21-23). Given her background, her "charge was to evaluate the epidemiologic literature." Ex. 2 (Levitan Tr. 211:25-212:5).

16

Like the doctor in *Lebron*, Dr. Levitan may be qualified to offer an opinion on epidemiological studies (even if her opinions lack a reliable basis), but her expertise is limited.  Her qualification as an expert under Rule 702 can thus extend no further.  Dr. Levitan is not qualified to testify about why the biomechanism studies she looked at support her opinion that DMPA cannot initiate meningioma development.  Dr. Levitan's testimony about this subject does not grow naturally out of her academic expertise; she developed her opinions "expressly for purposes of testifying."  *Lebron*, 772 F.3d at 1369.  She thus lacks relevant expertise and is not qualified to speak on such matters, and her opinion on initiation should be excluded.

**C.**    Finally, Dr. Levitan's opinion on meningioma growth versus initiation is irrelevant to the current general-causation inquiry before the Court.  The question on general causation is whether Depo-Provera "has the potential to cause the plaintiff's injury."  *Chapman*, 766 F.3d at 1306; *see Abilify*, 299 F. Supp. 3d at 1306 (general causation concerns whether the drug "can, in general, cause the type of harm alleged by the plaintiff").  Dr. Levitan admits "it is plausible that dMPA could promote the growth of existing meningiomas," in part because of the fact that meningiomas "frequently have progesterone receptors."  Ex. 1 (Report 54).

## IV. DR. LEVITAN'S OPINION THAT NO RELIABLE EVIDENCE FOR A CAUSAL RELATIONSHIP EXISTED BEFORE 2024 IS UNRELIABLE AND IRRELEVANT TO GENERAL CAUSATION

In a throwaway line, Dr. Levitan says (47): DMPA's "increased risk" for meningioma "could be reliably identified only starting when the Roland study, which was the first study to focus specifically on dMPA use and control for age as a confounder, was published" in 2024.[6] But Dr. Levitan ignored evidence, including biomechanism evidence from the 1990s showing progestins can cause meningiomas, which undercuts her opinion that no reliable evidence of causation existed before 2024. *See*, *e.g.*, Ex. 9 (Jeyaretna Tr. 258:14-259:20) (admitting that 1990s publications like Carroll offered "a biologically plausible mechanism" for progestins "to promote meningioma growth").

Beyond that point, however, this opinion should be excluded at this stage, because it is irrelevant for the general-causation inquiry: "whether a 'drug or chemical *can* cause the harm plaintiff alleges,' that is, whether a chemical agent 'increases the incidence of disease in a group.'" *Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *8 (quoting *McClain*, 401 F.3d at 1239) (emphasis in *McClain*). *When* the evidence of the causal association existed may be relevant to

---

[6] It is unclear if Dr. Levitan is offering this conclusion as a formal opinion. She does not list this in her summary of opinions. *See* Ex. 1 (Report 3, 47) (absent from the list containing opinions a, b, and c).

18

when Pfizer's duty to warn arose, but not to general causation.  The Court should exclude this opinion for purposes of a general-causation analysis.

## CONCLUSION

Plaintiffs' Motion to exclude the four opinions of Dr. Emily B. Levitan should be granted.

Dated: April 22, 2026

/s/ *Christopher A. Seeger*
Christopher A. Seeger
(admitted *pro hac vice*)
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

*Lead Counsel for Plaintiffs and
Counsel for Plaintiff Blonski*

David C. Frederick
(admitted *pro hac vice*)
Ariela M. Migdal
(admitted *pro hac vice*)
Jimmy A. Ruck
(admitted *pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
jruck@kellogghansen.com

Michael A. Sacchet
(admitted *pro hac vice*)
Heather M. McElroy
(admitted *pro hac vice*)
Eli M. Temkin (*pro hac vice pending*)
Ciresi Conlin LLP
225 S. 6th Street, Suite 4000
Minneapolis, MN 55402
Telephone: (612) 361-8220
mas@ciresiconlin.com
hmm@ciresiconlin.com
emt@ciresiconlin.com

*Co-Chairs Law & Briefing*

Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
   Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Toney*

Ellen Relkin
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Schmidt*

20

Tracy A. Finken, Esq.
Anapol Weiss
One Logan Square
130 N. 18th Street
Suite 1600
Philadelphia, PA 19103
Telephone: (215) 735-1130
(215) 735-0773 (Direct Dial)
tfinken@anapolweiss.com

*Counsel for Plaintiff Valera-Arceo*

Virginia M. Buchanan
Levin, Papantonio, Proctor,
Buchanan,
  O'Brien, Barr & Mougey, P.A.
316 South Baylen Street (32502)
P.O. Box 12308
Pensacola, FL 32591
Telephone: (850) 435-7023
vbuchanan@levinlaw.com

*Counsel for Plaintiff Wilson*

21

## LOCAL RULE 7.1(B) CERTIFICATION

**I HEREBY CERTIFY** that, pursuant to Local Rule 7.1(B), counsel for plaintiffs made a good-faith effort to resolve the issue addressed in this Motion by telephone conference on April 16, 2026 with Pfizer's counsel.  Pfizer opposes the relief sought by this Motion.

Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*

Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
  Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that the foregoing document complies with Local Rule 5.1(C) because it was prepared using Times New Roman 14-point font.  This document also complies with Local Rule 7.1(F) because, excluding those portions of the document exempted by Local Rule 7.1(F), it does not exceed 8,000 words (4,399 words).

Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*

Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
  Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 22nd day of April 2026, a true and correct copy of this **Motion and Memorandum of Law in Support of Motion to Exclude Testimony of Kurt Barnhart Pursuant to Federal Rule of Evidence 702 and Daubert** was filed electronically with the Clerk of Court and served upon all parties via CM/ECF.

Dated:  April 22, 2026

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com
*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*

2