**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Cases; including:<br>*Toney v. Pfizer*, No. 3:24-cv-624<br>*Schmidt v. Pfizer*, No. 3:25-cv-81<br>*Valera-Arceo v. Pfizer*, No. 3:25-cv-98<br>*Wilson v. Pfizer*, No. 3:25-cv-100<br>*Blonski v. Pfizer*, No. 3:25-cv-167 | Case No. 3:25-md-3140<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE TESTIMONY OF DR. RACHEL MASCH**
**PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT***

## MOTION

Pursuant to Local Rule 7.1, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs move to exclude the testimony of Dr. Rachel Masch.

## PRELIMINARY STATEMENT

Like all Pfizer's general-causation experts, Dr. Rachel Masch concedes that Depo-Provera can cause the growth of brain tumors known as meningiomas.[1] Indeed, Dr. Masch now counsels her own patients on that risk.[2] That closes the book on "general causation—whether [Depo-Provera] is capable of causing" Plaintiffs' injuries. *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018).

While Dr. Masch concedes general causation, she attempts to limit it to long term and current use, but those opinions fail to meet *Daubert's* reliability standards and should be excluded in their entirety. It is unclear why Dr. Masch has even tendered an opinion at the general causation stage. She freely admits that as a gynecologist, "meningioma is far from [her] wheelhouse" and "far from what [she

---

[1] Ex. 1 (Masch Dep. Tr.) at 96:2-97:11 ("Q. Okay. And that confirms your opinion that Depo-Provera has a risk of meningioma, correct? ... A. Under certain circumstances... Q. [C]an you articulate for me what circumstances you're referring to? ... A. So, the circumstances are current prolonged use of Depo-Provera can have an effect on the growth of an existing meningioma.").
[2] *Id.* at 74:11-18 ("Q. The patient you counseled about Depo-Provera, did you warn her about the risk of meningioma? A. I went through several of the different risks, yes. And that particular patient, I talked about the studies that have been coming out to say there's a slight increased risk.").

1

does] on a day-to-day basis." Ex. 1 at 402:9-14. She is not a neurologist nor an endocrinologist and has never diagnosed a meningioma. *See id.* at 117:25-118:7. Specific liability issues involving gynecology practice and warnings, about which she could potentially opine, are not applicable at this juncture. Dr. Masch has never studied, published, or opined on the causality of a pharmaceutical product inflicting injury, does not consider herself an expert in drug safety, and has never reported an adverse reaction to a drug company or the FDA. *See id.* at 57:11-14; 116:5-15; 118:18-22.

The majority of Dr. Masch's practice is in "complex family planning." Her publications involve primarily how to diagnose and prevent cervical cancer. *See* Ex. 1 at 118:23-119:3; *see also* Ex. 2 (Masch CV) at 5 ("My general research interests are (1) family planning and (2) cervical cancer prevention."). While she has a master's degree in public health, it was not in epidemiology, and she only took two or three classes in epidemiology. *See id.* at 116:16-117:10. In short, she is not qualified nor able to shed light on general causation of meningioma, and her testimony is not relevant at this juncture.

Dr. Masch relies on the interpretation of epidemiological evidence, yet she admitted lacking expertise in epidemiology and failed to even mention let alone rigorously apply any methodology such as Bradford Hill in her report, endeavoring instead to bootstrap it in at her deposition, attempting to come up with a methodology

2

that was lacking when she wrote her report. Her opinions also lack a reliable basis, as they are unsupported by the scientific literature cited and ignore contrary studies.

Alternatively, if Dr. Masch is permitted to offer some limited general causation opinion, the following opinions should be excluded for failing to meet the dictates of *Daubert* and Rule 702:

- The unprecedented and unsupported opinion—which is not shared by any other expert in this litigation—that meningiomas associated with Depo-Provera can "resolve" or disappear after cessation of use, a neuro-oncology-specific opinion that she is wholly unqualified to render.[3]

- The opinion that the risk of meningioma associated with Depo-Provera is limited to "current prolonged use," an issue about which she is not qualified to opine and a conclusion that is belied by some of the very epidemiological studies upon which she relies.

- The opinion that pregnancy is a risk factor for meningioma, and that this risk should be considered in the risk-benefit analysis for Depo-Provera. This is factually incorrect and contradicted by the only epidemiology study on that issue, which she relies on for a different proposition.

_____

[3] Ex. 3 (Masch Rule 26 Rpt.) at 34.

- The opinion that the risk of meningioma associated with Depo-Provera should be evaluated against the risks of unwanted pregnancy, rather than the risks of other contraceptive methods, a red herring and scientifically unsupportable opinion that contradicts Dr. Masch's own patient counseling practices.

- Any opinion she may attempt to offer regarding the lower dose version of Depo-Provera, Depo-SubQ Provera 104 ("SubQ"). While Dr. Masch did not opine on Depo-SubQ in her report, and testified she was not offering an opinion as to SubQ, has never prescribed it, and did not even read the report of Plaintiffs' safer-alternative-design expert, Dr. Dima Qato, Pfizer may nevertheless try to elicit some opinion from her since they have no other expert on point.[4]

The Court should therefore exclude Dr. Masch's opinions in their entirety under *Daubert* and Rule 702 or limit them as set forth herein.[5]

## **LEGAL STANDARD**

The framework for analyzing the admissibility of expert testimony under Federal Rule of Evidence 702 is established by *Daubert v. Merrell Dow*

---

[4] *See* Ex. 1 at 30:10-13; 68:14-17; and 184:2-20.

[5] An extensive discussion of the factual background underlying this litigation can be found in Dkt. 427, Plaintiffs' Memorandum in Support of Their Opposition to Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Co. LLC'S Motion for Summary Judgment Based on Federal Preemption (filed Sept. 19, 2025). This motion assumes familiarity with the background on Depo-Provera and meningiomas.

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Expert testimony is reliable and relevant—and therefore, admissible—when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the methodology used is 'sufficiently reliable' as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *In re Abilify*, 299 F. Supp. 3d at 1304. The burden rests with the party introducing the expert testimony to show by a preponderance of the evidence that these criteria have been met. *Rink*, 400 F.3d at 1292.

Qualification requires that the expert have sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue [] before the court." *Abilify*, 299 F. Supp. 3d at 1305.

Regarding reliability, "an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *Abilify*, 299 F. Supp. 3d at 1305. Reliability depends on "several factors, including: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique

5

is generally accepted in the relevant community." *Id.* Opinions that rely solely on "the *ipse dixit* of the expert" without connection to existing data should be excluded. *Chapman v Proctor & Gamble Dist. Co.*, 766 F.3d 1296, 1305 (11th Cir. 2014). Stated differently, expert opinions "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702(d) advisory committee's note (2023). Opinions that lack a reliable factual basis or are not supported by the scientific literature may be excluded. *See Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1199 (11th Cir. 2010).

Finally, to be helpful, expert testimony must be relevant, in that it "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *Abilify*, 299 F. Supp. 3d at 1305. Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Even if expert testimony satisfies *Daubert* and Rule 702, it may still be excluded under Rule 403 if its probative value "is substantially outweighed by its potential to confuse or mislead the jury." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

## ARGUMENT

### A.    Dr. Masch Is Not Qualified to Offer a General Causation Opinion.

An expert is required to possess "sufficient 'knowledge, skill, experience, training, or education.'" *Hendrix*, 609 F.3d at 1193. Someone lacking expertise in a

particular field may not offer opinion testimony within that area. *Drs. Licensure Grp., Inc. v. Cont'l Cas. Co.*, No. 3:10-CV-98-RV/MD, 2011 WL 13182969, at \*4-5 (N.D. Fla. Sept. 26, 2011). A witness who cannot meaningfully engage with the epidemiological literature is disqualified from relying on it as a basis for their opinions. *Milward v. Acuity Specialty Prods. Grp., Inc.*, 969 F. Supp. 2d 101, 111 (D. Mass. 2013).

Dr. Masch is a gynecologist whose primary clinical practice is in "complex family planning." Even within that wheelhouse, Dr. Masch has never administered a single injection of Depo-Provera, *see* Ex. 1 at 70:6-11 ("Q. Have you ever given a shot of Depo-Provera to a patient? A. I don't think so. Q. It's always done by the nurse? A. Yeah."); she has never published anything about Depo Provera, *see id*. at 119:9-12; and she admitted at deposition she has not meaningfully engaged with the literature concerning the relative safety of Depo-SubQ Provera 104.; *see id.* at 184:17-20.

Dr. Masch has mostly relied on studies supplied by counsel, often misconstruing their results as set forth further below. *See id*. at 26:4-14; 31:9-32-23 (admitting that Pfizer's counsel had provided all but a dozen of the more than 90 references cited on her original reliance list, and all the materials on her supplemental reliance list). Additionally, she testified that she never asked Pfizer's counsel to see any internal studies or analyses performed by Pfizer with respect to

7

Depo-Provera and meningioma. *See id.* at 51:19-22 ("Q. Have you asked counsel to provide you with any internal studies of Pfizer? A. I have not."); *see also id.* at 53:20-54:1 ("Q. Have you asked for any documents where Pfizer employees assessed causality between reports of meningioma and exposure to Depo-Provera? ... THE WITNESS: No."). In fact, Dr. Masch spent merely one to two hours in total "scanning" six of Plaintiffs' expert reports totaling more than 1,000 pages, further illustrating her disregard for any material that contradicts her seemingly preconceived perspective.[6] Saying that Dr. Masch's analytical approach lacked thoroughness would be a significant understatement.

Dr. Masch is neither an epidemiologist, neuro-oncologist, neuroradiologist, nor a neurosurgeon, and has never diagnosed a meningioma, *see id.* at 116:4-9; 116:16-21; 274:6-12; and 402:8-17, yet she offers a range of unsupported and unreliable opinions that fall squarely within those specialized fields—medical areas vastly different from complex family planning.

Despite all the foregoing, Dr. Masch relies on epidemiological and case series literature to support several non-gynecological opinions, including that: (1) only "current prolonged use" of Depo-Provera can cause meningiomas; (2) the risk of

---

[6] Ex. 1 at 29:21-30:9 ("Q. And did you review all 13 of those expert reports? A. Not all 13, no. Q. Which ones did you review? A. I scanned Butowski, Michaels, Lange, Savitz, and Raleigh. Q. Okay. And so is it fair to state -- A. And Kessler. Sorry. Q. Okay. And when you say scanned, given all those expert reports you just identified, about how many hours did you spend reading them? A. Between one and two.").

meningioma associated with Depo-Provera ceases once the individual discontinues its use; and (3) "any impact" of Depo-Provera is "reversible." Masch Rpt. at 34. However, Dr. Masch neither applies nor even references in her report any methodology—such as Bradford Hill—that were used to arrive at these conclusions. At her deposition, she sought to rehabilitate her opinions by claiming she applied "the tenets" of Bradford Hill, but could identify only three of nine criteria, and admitted that she applied these only to isolated studies rather than to the entire body of literature. Ex. 1 at 121:18-122:6; 371:18-22. Dr. Masch tries to bolster her opinions with guidance from professional societies, but these sources are fundamentally unhelpful as they contribute no primary or new evidence. Consequently, her purportedly epidemiology-based opinions rest solely on cherry-picked portions of studies she misrepresents and thus lack a reliable basis.

Indeed, a non-epidemiologist may opine using epidemiology; however, some "specialized education and experience with epidemiology" is needed, and the expert must at a minimum be capable of comprehending and explaining the studies cited. *See Abilify*, 299 F. Supp. 3d at 1354, 1360. Dr. Masch admits that she is "not specifically an epidemiologist," Ex 1. at 116:20-21, and has taken only a few courses on epidemiology, thus she cannot reliably base her opinions on cherry-picked literature. *See Abilify*, 299 F. Supp. 3d at 1360 & n.150 (opinion of expert who "would not hold himself up as an expert" on epidemiology was not reliable); *In re*

*Nuvaring Prods. Liab. Litig.*, No. 4:08-MD-1964 RWS, 2013 WL 791846, at *4 (E.D. Mo. Mar. 4, 2013) (credentialed pharmacologist who disclaimed expertise in epidemiology could not "give expert testimony pertaining to epidemiology"). Dr. Masch could not answer basic questions on epidemiology, such as whether it would be feasible for an epidemiological study to evaluate and report on the discrete areas of the brain where tumors occur. *See* Ex. 1 at 245:24-246:9 ("Q. That would be a real hard epi study to do, wouldn't it, to do an epidemiology study looking for territories of the brain? ... A. It's beyond my -- my area of expertise, so I'm not sure how that is done."). At the same time, she claimed to rely on case series/quasi-epidemiological data for the proposition that Depo-Provera mediated tumors could *only* occur in certain regions of the brain. *See id*. Dr. Masch was unable to reconcile this and many other inconsistencies.

"Without the ability to explain how and why [certain] epidemiological literature . . . should be trusted over conflicting views," the expert's opinion is not "arrived at in a scientifically sound and methodologically reliable fashion." *Milward*, 969 F. Supp. 2d at 112. Possibly because of her limited knowledge of epidemiology, rather than utilizing an accepted methodology for evaluating causal links, such as the Bradford Hill criteria, Dr. Masch chose selected excerpts from the literature and disregarded opposing evidence, as discussed further below. However, scientific reliability demands more than simply examining studies individually and excluding

10

those that do not support one's view. *Davis v. Lockheed Martin Corp.*, 705 F. Supp. 3d 1345, 1351 (M.D. Fla. 2023). This selective approach, relying on hand-picked studies to bolster a preconceived conclusion, falls far short of the comprehensive epidemiological evaluation mandated by Rule 702 and lacks the intellectual rigor necessary to properly assess causation. *Kumho Tire Co., Ltd.*, 526 U.S. at 152.

Dr. Masch acknowledged during her deposition that "I did not state Bradford Hill directly in my report." Ex. 1 at 121:20-21. Although she asserts that "I used many of the tenets ... of Bradford Hill," her report neither organizes its analysis around the Bradford Hill factors nor applies these considerations to the evidence concerning DMPA and meningioma in any clear manner. *Id*. at 121:21-22. The Bradford Hill framework is absent by name, structure, or suggestion. *See id*. at 291:18-21 ("Q. But you don't cite to Bradford Hill anywhere in your report, do you? A. I do not."). An expert who claims to have employed a methodology that is nowhere reflected in their report has either concealed their analytical framework during disclosures or, as here, failed to apply any identifiable methodology at all.

Furthermore, assessing individual studies using Bradford Hill factors instead of applying the framework to synthesize the entire body of evidence is not an accepted scientific method and would produce unreliable conclusions. During her deposition, Dr. Masch was unable to point to any peer-reviewed publication that employs Bradford Hill factors in the way she described—that is, as a means to

11

evaluate the methodological quality of individual studies rather than to assess the overall weight of evidence related to a causal hypothesis. *See* Ex. 1 at 373:11-18 ("Q. Can you identify a publication that assesses strengths and weaknesses of a study or series of studies by applying Bradford Hill factors to individual studies? A. I cannot give you an example at this moment, no."). Under *Daubert*, a methodology that is not described in the scientific literature, has not been subjected to peer review, and cannot be validated against any published application is not a reliable methodology.

Because Dr. Masch is not an expert in the fields (epidemiology, neuro-oncology, neuroradiology, neurosurgery, neurology) in which she attempts to offer opinions, and she does not reliably apply epidemiological principles in evaluating the relevant body of scientific evidence, her opinions should be excluded from general causation in their entirety.

**B.    Dr. Masch's Opinions Lack a Reliable Factual Basis and Will Not Help the Trier of Fact.**

While all Dr. Masch's opinions lack a factually and scientifically reliable basis, the following opinions in particular should be excluded under Rule 702.

**1. Dr. Masch's novel opinion that meningiomas associated with Depo-Provera can "resolve" after cessation of use lacks any reliable basis and is manifestly beyond the scope of her education, training, and experience.**

Dr. Masch opines that meningiomas associated with Depo-Provera can

12

"resolve." Ex. 3 at 34. This outlandish opinion is not shared by any other expert in this litigation, including all of Pfizer's other general-causation experts. For example, defense expert Dr. Craig Horbinski, a neuropathologist whose research is focused on meningiomas, testified there is no evidence whatsoever that meningiomas associated with Depo-Provera "return[ed] to the pre-Depo-Provera" state or "went away." Ex. 4 (Horbinski Dep. Tr.) at 147:13-15, 147:25-148:10, 155:12-14. Similarly, when defense expert Dr. Kurt Barnhart was asked if he had ever "seen any dechallenge report or any other study that shows that off Depo-Provera, that the tumor is completely eliminated," he responded, "No, I don't believe I've seen that." Ex. 5 (Barnhart Dep. Tr.) at 178:17-20.

When confronted with the reality that she is a "lone wolf" in her belief that Depo-Provera-mediated tumors can vanish over time, Dr. Masch had no explanation. Ex. 1 at 277:2-278:9 ("Q. My question was that you disagree with other Pfizer experts because no other Pfizer expert says that meningioma totally resolves or disappears.... A. I wouldn't say that I disagree with them if they didn't mention it. It's just something that I mentioned. It doesn't mean that we are in disagreement."). But they are in disagreement—no one agrees with Dr. Masch that a Depo-Provera-mediated tumor can disappear, and no one has ever observed that to occur. While there is some data on tumors getting smaller, that is very different from vanishing.

Dr. Masch was given multiple chances to back down, but each time she

declined. *See*, *e.g.*, Ex. 1 at 166:8-11 ("Q. And if you wrote in your report, 'entirely vanishes,' are you now stating that was an overstatement? A. No, I am not.").

Perhaps most shockingly, when asked to explain the basis for this one-of-a-kind opinion, Dr. Masch could only point to two case reports she referred to as the "Houdini" studies, as the tumors "disappeared" like the magician Houdini. It was then pointed out to her repeatedly that the "Houdini" cases were both pregnancy-mediated tumors and ***did not involve the use of Depo-Provera***. Remarkably, Dr. Masch stuck to her guns, however faulty:

> Q. But is it your opinion, and some of this you discussed with Ms. Relkin earlier, is that meningiomas can completely resolve following cessation of Depo-Provera?
> A. There have been case reports that indicate they can completely resolve, yes.
> Q. Okay. And earlier when Ms. Relkin asked you to identify those case reports, I believe you turned to ... the Houdini study?
> A. Yes.
> ...
> Q. Okay. Taking a look at this case report. Now, again, this is focused on a single -- it's a case report concerning a single pregnant woman; is that correct?
> A. Yes.
> Q. And this does not concern Depo-Provera, correct?
> A. Correct.
> Ex. 1 at 375:22-378:17.

In opining that meningiomas associated with Depo-Provera can "resolve," Dr. Masch is truly on an island, with no scientific basis for how she got there. This patently unreliable opinion should be excluded.

14

**2. Dr. Masch's opinion that the risk of meningioma from Depo-Provera is limited to current and prolonged use lacks a reliable basis and does not help the trier of fact.**

Dr. Masch claims that the risk of meningioma associated with Depo-Provera is limited to current and prolonged use of the drug. As with her claim that meningioma tumors associated with Depo-Provera can "resolve," Dr. Masch again oversteps, going so far as to state "**the *risk* appears to** decrease or **vanish entirely** after stopping use of the medication." Ex. 3 at 3 (emphasis added). However, these conclusions are contradicted by the very studies upon which she relies. *See, e.g., id.* at 31 (noting that "[b]oth the Reynolds et al (2025) and Griffin & Arend (2025) studies found that associations between DMPA and meningioma were *stronger* when analyses emphasized current or recent exposure.") (emphasis added). As Dr. Masch appears to tacitly recognize, *id.*, while the association may be "stronger" for more recent use, there is still a significant association for less recent use, which a cursory review of the relevant literature reveals is indeed the case. As an example, Griffin & Arend (2025) showed its strongest association at 1-year prior exposure—but the association at 2-years prior exposure was still a two-fold increase over the control.[7]

Additionally, many of the studies upon which Dr. Masch relies have study subjects that were post-menopausal age. For example, the average age in the Griffin

---

[7] *See* Ex. 6 (Griffin & Arend (2025)) at 7 of 11.

(2024) study was 58.2 years old.[8] Similarly, the Roland (2024) study had an average age of 57.6 years old.[9] It is necessarily the case that many of these women who developed meningiomas after taking Depo-Provera for contraception would have stopped taking the drug a number of years before diagnosis. Dr. Masch herself is well-aware that her own patients are not taking Depo-Provera after the age of approximately 51. *See* Ex. 1 at 239:13-24.

Furthermore, Dr. Masch acknowledged at deposition that meningiomas are "typically ... slow growing and it can be years" and sometimes "decades" before they become clinically significant. *Id.* at 126:19-22. In addition to latency, Dr. Masch also recognized the issue of delayed diagnosis. *See id.* at 252:24-253:1 ("You also tend not to image people in pregnancy unless absolutely necessary."); *see also id.* at 253:2-254:9 (acknowledging that not every patient with a headache is going to get an MRI). These facts are irreconcilable with Dr. Masch's opinion that only current use of Depo-Provera can cause meningioma and render it unreliable.

Dr. Masch is similarly one-sided with respect to the "prolonged use" qualifier of her opinion. She stated at deposition that the risk of meningioma only exists for "people who are currently on this medication, and who have been using it for more than one year." Ex. 1 at 158:22-25. But this, too, is belied by the words in her own

---

[8] *See* Ex. 7 (Griffin (2024)) at 4 of 10.
[9] *See* Ex. 8 (Roland (2024)) at 4 of 13.

report. In discussing the powerful positive association found between Depo-Provera and meningioma in the Griffin (2024) study, Dr. Masch accurately stated in her report that "the association became ***stronger*** with a longer duration of use." Ex. 3 at 25. Griffin in fact found a statistically significant increased risk for all duration of use subgroups, including short-term use.[10] Dr. Masch's attempts to limit causation to year-plus users is inaccurate and should be excluded as unreliable.

### 3. Dr. Masch's opinion that Depo-Provera is advantageous to the patient because pregnancy is a risk factor for meningioma is unreliable and unsupported and should be excluded.

Dr. Masch claims that pregnancy is a risk factor for meningioma, yet this contradicts the very literature she cites. Specifically, Pettersson-Segerlind (2021), a large Swedish cohort study she relies on, actually found that pregnancy is not a risk factor for meningioma, directly opposing her assertion. *See* Ex. 1 at 249:2-251:25; *see also* Ex. 9 (Pettersson-Segerlind (2021)) at 1 of 8 (study authors noting their results indicated "pregnancy is not a risk factor for meningioma"). When confronted with this inconsistency during her deposition, Dr. Masch was unable to explain it, stating only that she "would have to spend a little bit more time looking at [the study]," despite having already cited it for a different proposition. *Id.*

---

[10] *See* Ex. 7 at 5 of 10, Table 3.

When asked if she discusses the potential clinical consequences of meningioma with her patients when counseling on Depo-Provera, Dr. Masch responded:

> "I do not get into that level of detail with them, because the risk, again, is quite small. The increase in risk is quite small.... But, again, the risk of pregnancy is there. And also pregnancy can also promote growth of an existing meningioma. So preventing pregnancy would also be to their advantage."

> Ex. 1 at 159:21-160:7.

In this testimony, Dr. Masch asserts that Depo-Provera increases the risk of meningioma, that pregnancy does too, and therefore preventing pregnancy via Depo-Provera would be beneficial for reducing meningioma risk. This position is not only logically inconsistent but also fundamentally flawed given the actual scientific evidence. This opinion is unreliable and should be excluded.

**4. Dr. Masch's opinion that risks of pregnancy are the appropriate risk comparator for evaluating the risk of meningioma associated with Depo-Provera is unreliable and inconsistent with her own patient counseling practices.**

A substantial portion of Dr. Masch's report argues that Depo-Provera's risk–benefit profile "remains positive" by asserting that the risk of meningioma should be evaluated against the risks of unwanted pregnancy, contending that the "appropriate comparator … is not no meningioma risk, but rather the risk of pregnancy." Ex. 3 at 3-4. However, this comparison does not represent a reliable

18

methodology for addressing the causation issues at hand, as the proper comparator is other contraceptive methods. Indeed, Dr. Masch admitted pregnancy is not even the comparator she uses when advising her own patients about Depo-Provera, testifying she does not "posit it as, the alternative is pregnancy," but instead reviews "the spectrum of all contraceptive options." Ex. 1 at 161:18-162:19. Because the risks associated with pregnancy are irrelevant to the causal relationship between Depo-Provera and meningioma—and because relying on those risks contradicts Dr. Masch's own clinical counseling—this litigation-driven opinion should be excluded.

### 5. Dr. Masch should be estopped from offering any testimony on Depo-SubQ Provera 104.

Dr. Masch claims she is not offering any opinions on the comparative risk of Depo-Provera and SubQ and that she did not specifically study that issue.[11] However, at deposition she divulged that of the many patients she has counseled on contraceptive options over her career, not a single one has ever selected the lower dose SubQ option.[12] If Defendants later try to proffer her for opinions related to patient preference and desirability of SubQ, she should be prevented from doing so.

First, Dr. Masch admitted at deposition that she has not bothered to review the report of Plaintiffs' design defect expert, Dr. Dima Qato. *See* Ex. 1 at 30:10-19 ("Q.

---

[11] *See* Ex. 1 at 184:2-6 ("Q. Are you offering any opinions about the comparative safety and efficacy of Depo-SubQ as compared wih Depo-Provera? A. I am not offering that.").
[12] *See id.* at 68:14-17 ("Q. Okay. Have you ever prescribed [Depo-SubQ Provera 104]? A. I have not prescribed that, no.").

Okay. And fair to state you did not read the report of Dr. Dima Qato; is that right? A. Correct. Q. And how did you choose which expert reports you were going to review? A. Based on how relevant I thought they were to me and what I wanted to say."). Dr. Masch has necessarily foreclosed herself from testifying on issues relating to SubQ, since she deemed Plaintiffs' expert report on SubQ not "relevant ... to [her] and what [she] wanted to say." *Id.*[13]

Moreover, while Dr. Masch conceded the importance of using the lowest effective dose of a drug for a given therapeutic purpose, she could not explain why none of her patients had ever opted for the lower dose and equally efficacious SubQ

---

[13] The only defense expert to even address Dr. Qato's design defect opinion was Dr. Levitan, who stated:

> The short-term (weeks to months) pharmacokinetic studies discussed by Dr. Qato demonstrate higher peak and cumulative circulating MPA with the 150 mg intramuscular compared to the 104 mg subcutaneous formulation. Combined with the evidence that the subcutaneous formulation has lower risk of side effects such as headache and nausea than the intramuscular formulation and the findings in the epidemiologic literature that longer duration (years) of use of dMPA (primarily the intramuscular 150 mg formulation given the time periods and locations) is associated with greater risk of meningioma, Dr. Qato concludes that the 104 mg subcutaneous formulation of dMPA has a lower risk of meningioma than the 150 mg intramuscular formulation. While **this is plausible**, there is no direct support for the subcutaneous formulation being associated with less risk of meningioma than the intramuscular formulation in the epidemiology literature.

> Ex. 10 (Levitan Rule 26 Rpt.) at 57 (emphasis added).

Therefore, it is unusual for Pfizer to put forth an expert in the field of gynecology who would not even touch upon the issue.

20

option after receiving her counseling. This is likely due at least in part to Dr. Masch's failure to research or assess the comparative safety of SubQ. *See* Ex. 1 at 184:17-20 ("Q. And you have not done reading to explore whether Depo-SubQ Provera is safer, have you? A. Not specifically, no."). She is therefore unavoidably limited by partiality and a lack of knowledge in her ability to explain the chief benefit of SubQ—a reduction in unwanted side effects and adverse reactions, like meningioma, without any reduction in contraceptive efficacy.

Since Dr. Masch has by her own admission failed to meaningfully engage with the literature, the science, or Plaintiffs' expert report on the relative safety of SubQ, any attempt hereafter to set forth opinions on SubQ should be denied.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' motion to exclude the testimony of Dr. Rachel Masch should be granted.

Dated: April 22, 2026

/s/ *Christopher A. Seeger*
Christopher A. Seeger
(admitted *pro hac vice*)
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

*Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Blonski*

David C. Frederick
(admitted *pro hac vice*)

Bryan F. Aylstock
State Bar No. 078263

Ariela M. Migdal
(admitted *pro hac vice*)
Jimmy A. Ruck
(admitted *pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
jruck@kellogghansen.com

Michael A. Sacchet
(admitted *pro hac vice*)
Heather M. McElroy
(admitted *pro hac vice*)
Eli Temkin (*pro hac vice pending*)
Ciresi Conlin LLP
225 S. 6th Street, Suite 4000
Minneapolis, MN 55402
Telephone: (612) 361-8220
mas@ciresiconlin.com
hmm@ciresiconlin.com
emt@ciresiconlin.com

*Co-Chairs Law & Briefing*
Tracy A. Finken, Esq.
Anapol Weiss
One Logan Square
130 N. 18th Street
Suite 1600
Philadelphia, PA 19103
Telephone: (215) 735-1130
(215) 735-0773 (Direct Dial)
tfinken@anapolweiss.com

*Counsel for Plaintiff Valera-Arceo*

Virginia M. Buchanan
Levin, Papantonio, Proctor, Buchanan,

Aylstock, Witkin, Kreis &
   Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Toney*

Ellen Relkin
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Schmidt*

22

   O'Brien, Barr & Mougey, P.A.
316 South Baylen Street (32502)
P.O. Box 12308
Pensacola, FL 32591
Telephone: (850) 435-7023
vbuchanan@levinlaw.com

*Counsel for Plaintiff Wilson*

23

## LOCAL RULE 7.1(B) CERTIFICATION

**I HEREBY CERTIFY** that, pursuant to Local Rule 7.1(B), counsel for plaintiffs made a good-faith effort to resolve the issue addressed in this Motion by telephone conference with Pfizer's counsel on April 16, 2026. Pfizer opposes the relief sought by this Motion.

Dated:  April 22, 2026

/s/ Bryan F. Aylstock
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Toney*

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that the foregoing memorandum complies with Local Rule 5.1(C) because it was prepared using Times New Roman 14-point font. This memorandum also complies with Local Rule 7.1(F) because, excluding those portions of the memorandum exempted by Local Rule 7.1(F), it does not exceed 8,000 words.

Dated:  April 22, 2026

/s/ Bryan F. Aylstock
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and
Counsel for Plaintiff Toney*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on this 22nd day of April 2026, a true and correct copy of this **Motion and Memorandum of Law in Support of Motion to Exclude Testimony of Dr. Rachel Masch Pursuant to Federal Rule of Evidence 702 and Daubert** was filed electronically with the Clerk of Court and served upon all parties via CM/ECF.

Dated: April 22, 2026

/s/ Bryan F. Aylstock
Bryan F. Aylstock
State Bar No. 078263
Aylstock, Witkin, Kreis &
Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
baylstock@awkolaw.com

*Co-Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Toney*