# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION** | **Case No. 3:25-md-3140** |
| **This Document Relates to:**<br>*All Cases* | **Judge M. Casey Rodgers**<br>**Magistrate Judge Hope T. Cannon** |

**PFIZER INC., PHARMACIA LLC, AND PHARMACIA & UPJOHN CO. LLC'S SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 2

A. FDA Rejects Pfizer's February 2024 PAS .......... 2

B. Pfizer Moves for Summary Judgment, and the Court Asks What FDA Meant in the CRL .......... 5

C. FDA Reviews the Updated PAS and Approves a Limited Warning .......... 6

D. FDA Releases Its Internal Records .......... 7

ARGUMENT .......... 8

I. The Approval Package Confirms That Claims Accruing Before September (Or At Least July) 2024 Are Preempted. .......... 8

A. FDA Issued the CRL Because a Warning Was Unwarranted, Not Because Pfizer's PAS Was Deficient .......... 8

B. The CRL Was Final, Not Provisional .......... 10

C. FDA Was Fully Informed When It Issued the CRL .......... 12

D. FDA Screened Out Other Scientific Literature, Confirming that Plaintiffs' Additional Materials Were Immaterial .......... 13

E. FDA Placed Little Weight on the Griffin Study That Was Not Included in Pfizer's 2024 PAS .......... 15

F. FDA Justified the 2025 Warning Based on Developments that Did Not Exist Until September (or at the earliest July) 2024 .......... 16

II. The Approval Package Alternatively Confirms that All Claims Are Preempted, Regardless of When They Accrued. .......... 17

CONCLUSION .......... 18

## TABLE OF AUTHORITIES

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322 (3d Cir. 2024) ......10, 11

*In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108 (S.D. Cal. 2015) ......14

*In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F. Supp. 3d 164 (D. Mass. 2021), *aff'd*, 57 F.4th 327 (1st Cir. 2023) ......17

*In re Zofran (Ondansetron) Prods. Liab. Litig.*, 57 F.4th 327 (1st Cir. 2023)..12, 18

*Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299 (2019) ......passim

21 C.F.R. § 314.3(b) ......13

21 C.F.R. § 314.110(a)......10, 11

Freedom of Information Act ......1, 7

## INTRODUCTION

At the September 2025 initial hearing, the Court asked what FDA meant in November 2024 when it said that "observational studies alone" did not support a meningioma warning; whether FDA had the "full picture" when it said so; and, if FDA later approved a warning, what the impact on preemption would be. 9/29/25 Hr'g Tr. 36:10-12, 30:21-24, 51:17-20. At the time, the only record evidence bearing on those questions was the Complete Response Letter ("CRL") itself. As the Court observed, the parties did not "know what the FDA was thinking then or what they're thinking now." *Id.* at 44:25-45:3. Plaintiffs' regulatory expert agreed: "I just don't know what's going on at FDA." Ex. 1 (Kessler Tr.) at 231:11-12.

Now the record answers those questions beyond any doubt. On September 25, 2026, in response to a Freedom of Information Act request, FDA released the approval package for Pfizer's June 2025 Depo-Provera meningioma PAS (the "Approval Package"). Ex. A (Approval Package for Depo-Provera CI) at -60205. The Approval Package includes the agency's internal epidemiology reviews, pharmacovigilance analyses, and regulatory memoranda underlying both the November 2024 CRL and the December 2025 approval. Ex. A.

Those records resolve every question in Pfizer's favor. They show that FDA rejected a meningioma warning in November 2024 because its epidemiologists at its Office of Pharmacovigilance and Epidemiology concluded, after their own search

and review of the literature and a 24-page single-spaced report, that the available studies could "not support nor refute" an association between MPA and meningioma. They show that FDA had even more information than Pfizer provided, and that FDA's own screening criteria excluded categories of material Plaintiffs say were missing. They show that, contrary to Plaintiffs' prior speculation, FDA rejected Pfizer's proposed warning because it believed no warning was appropriate for Pfizer's MPA products, not because it thought the request related to "all progestins." And they show that FDA approved a limited warning in December 2025 based on developments that did not exist until after September 2024, while still expressly finding that "causation has not been definitively established" and that the epidemiological studies were "of insufficient quality to establish a causal association."

"Clear evidence" that "FDA would not have approved a change to [a] drug's label" always ends in preemption. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 302-03 (2019). The Approval Package is that evidence in the agency's own words. Plaintiffs' claims are preempted.

## BACKGROUND

### A. FDA Rejects Pfizer's February 2024 PAS

FDA had already evaluated the potential connection between progestins and meningioma when Pfizer submitted its PAS in February 2024. In 2020, FDA's Office of Surveillance and Epidemiology reviewed 14 epidemiologic studies and 96

pharmacovigilance cases on hormonal contraceptives generally (not Depo-Provera specifically) and meningioma. Ex. A at -60007-08. It found no "strong evidence suggesting a causal relationship." *Id.* at -60008. It also concluded that "the current safety data is insufficient to support a labeling change for meningioma" and recommended no regulatory action. *Id.*

In February 2024, Pfizer submitted a PAS seeking a meningioma warning for MPA products. MSJ 7-13. The supporting Clinical Overview presented epidemiological studies, adverse event reports, and biological mechanism data. *Id.* Within weeks, the Division of Urology, Obstetrics, and Gynecology ("DUOG") asked the Division of Epidemiology ("DEPI") to evaluate the PAS for "the following MPA products in DUOG": Depo-Provera SQ and Depo-Provera IM. Ex. A at -60084.

DEPI did not rely on Pfizer's submission alone. It ran its own search of EMBASE and PubMed for articles published on or before May 1, 2024. *Id.* at -60054. It also reviewed the literature in Pfizer's submission to find "any additional articles captured outside of our search criteria." *Id.* That search screened 203 titles and abstracts. *Id.* at -60060 (Fig. 1).

DEPI then applied FDA's screening criteria to those hits. It excluded immaterial content like clinical studies, broad literature reviews, and "[c]ell, receptor, or histology stud[ies]." *Id.* It also excluded conference abstracts without a manuscript and studies reporting only crude relative risk estimates. *Id.* at -60058-61.

DEPI then analyzed the full published version of Roland and a cohort study that Pfizer had not submitted. *Id.* at -60060-62, -60068-70. On August 1, 2024, it produced a 24-page, single-spaced analysis with multiple charts, figures, and evaluations, concluding that the studies "do not support nor refute the presence of an association" between MPA and meningioma. *Id.* at -60065. It concluded that "the findings of the available observational studies alone do not support the addition of a warning on meningioma risk to MPA-containing products." *Id.* at -60066.

FDA's pharmacovigilance staff also reviewed adverse event reports from FAERS, FDA's Adverse Event Reporting System. They identified 31 unique meningioma cases associated with MPA and cautioned that such data "are rarely reliable" for long-latency outcomes. *Id.* at -60009. DUOG then "determined that there was a lack of substantial clinical data supporting an association." *Id.* at -60010. On October 31, 2024, DUOG's project manager recommended issuing a complete response letter "for all" MPA "labeling supplements." *Id.* at -60050.

The next day, FDA issued the CRL. Ex. 9. It adopted DEPI's recommendation nearly verbatim: "[t]he findings of the available observational studies alone do not support the addition of a warning on Meningioma risk to medroxyprogesterone acetate (MPA)-containing products." *Id.* at 1.

### B. Pfizer Moves for Summary Judgment, and the Court Asks What FDA Meant in the CRL

In June 2025, Pfizer submitted an Updated PAS for its two injectable products, citing the September 2024 Griffin study and PRAC's September 2024 labeling decision. Suppl. Br. 2-4. FDA treated the submission as a complete response to the CRL and set a December 12, 2025 goal date. Ex. A at -60082.

In the meantime, per the Court's scheduling order, on August 22, 2025 Pfizer moved for summary judgment based on federal preemption. It argued that Pfizer fully informed FDA of the basis for a warning and that FDA rejected the warning. MSJ 17-21. Plaintiffs responded that Pfizer withheld a smattering of studies, mechanistic research, and a bioavailability analysis. Opp. 15-29. They also argued that the CRL was open to "at least three interpretations," rejected only an "overbroad" warning, and was a provisional step lacking the force of law. *Id.* at 31-35.

At the September 2025 hearing, the Court asked why the CRL referred to "observational studies alone" when Pfizer had "submitted a lot of other things." 9/29/25 Hr'g Tr. 35:18-24. It asked whether FDA had the "full picture" and how anyone could know whether FDA would have considered Pfizer's July 2024 bioavailability analysis (which had not been provided to the agency before the CRL) relevant. *Id.* at 30:20-31:3, 103:7-14.

The Court also questioned whether it could find that FDA had rejected "the specific warning" while the updated PAS remained pending. *Id.* at 44:4-11. As the

Court observed, no one knew "what the FDA was thinking then or what they're thinking now." *Id.* at 44:25-45:3. The Court then asked what a later approval would mean "going backwards." *Id.* at 51:17-52:2. Pfizer answered that "it would depend on what they said as to why they're accepting the request." *Id.* at 52:3-5.

### C. FDA Reviews the Updated PAS and Approves a Limited Warning

We now know exactly how FDA evaluated the Updated PAS. The agency described the resubmission as "based on" PRAC's review and "[a]dditional literature, including a US based study, Griffin et al. published in September 2024." Ex. A at -60010. FDA also noted PRAC's September 2024 recommendations and December 2024 communication to healthcare professionals. *Id*. at -60011.

FDA then updated its adverse event search. It found 973 reports between November 2023 and July 2025. *Id.* at -60010. In 914 of them, the narrative contained "a term related to litigation." *Id.* FDA attributed that pattern to "stimulated reporting" driven by lawsuit advertising. *Id.*

DEPI reviewed four new studies: Griffin (September 2024), Reynolds (June 2025 preprint), Frey (July 2025), and Xiao (September 2025). *Id.* at -60026-30, -60034-35. It concluded that "all studies reviewed were of insufficient quality to infer a potential causal association." *Id.* at -60019. It added that they "cannot inform the relationship between the dose and length of MPA-containing product use and meningioma risk." *Id.*

Notwithstanding the lack of epidemiologic evidence, DUOG's clinical team decided some form of warning was appropriate based on its most recent "multidisciplinary review." *Id.* at -60011. Even so, DUOG found that "meningioma causation has not been definitively established for injectable MPA." *Id.* at -60011-12.

On December 12, 2025, FDA approved the Updated PAS but narrowed Pfizer's proposed language. *Id.* at -59970-72. The approved label states only that "[c]ases of meningiomas have been reported following repeated administration of medroxyprogesterone acetate, primarily with long term use." *Id.* at -59985. It also advises counseling about a "possible risk of worsening meningioma." *Id.* at -59996.

In supplemental briefing, Pfizer noted that FDA rejected the "increased risk" warning Plaintiffs demand. Suppl. Br. 5-10. And Pfizer argued that, at a minimum, claims accruing before September (or at least July) 2024 are preempted. *Id.* at 8-10. Plaintiffs countered that the approval confirms the CRL was provisional and that Pfizer's temporal argument is "speculat[ion]." Suppl. Opp. 3-5, 9-10.

### D. FDA Releases Its Internal Records

FDA received a FOIA request on July 14, 2026, for Supplement 74 to NDA 020246 (Depo-Provera CI) and Supplement 45 to NDA 021583 (Depo-SubQ). Ex. 34 at -60205. On September 25, 2026, FDA produced the records. They are the "written instruments" that "memorialize" FDA's "considered judgments." *Albrecht*, 587 U.S. at 316.

## ARGUMENT

### I. The Approval Package Confirms That Claims Accruing Before September (Or At Least July) 2024 Are Preempted.

#### A. FDA Issued the CRL Because a Warning Was Unwarranted, Not Because Pfizer's PAS Was Deficient

The CRL reflects FDA's considered view that "the literature and observational studies" at that time did "not support the addition of a warning" for meningioma. Ex. A at -60050. Indeed, the CRL tracks, nearly word for word, the recommendation of FDA's epidemiologists, who concluded in August 2024 that "the findings of the available observational studies alone do not support the addition of a warning on meningioma risk to MPA-containing products." *Id.* at -60066.

That conclusion was the result of a detailed, 24-page, single-spaced analysis. DEPI found that the studies meeting its criteria "do not support nor refute the presence of an association" because of an inadequate lookback period for the outcome, missing information on other hormone use, under-ascertainment of less severe meningioma, and inadequate control for confounding factors. *Id.* at -60054. For instance, DEPI noted that in the Roland study, exposure to copper intrauterine devices—the study's negative control—was "unexpectedly" associated with meningioma as well. *Id.* at -60062. And DEPI found that "[n]one of the studies adequately captured exposed dose or duration," so they "cannot be used to inform dose-relationship." *Id.* at -60064.

DUOG then weighed the rest of the evidence. FDA's pharmacovigilance staff analyzed the FAERS database and identified (as Pfizer did in the Clinical Overview it had provided with the PAS) 31 unique meningioma cases associated with MPA through November 2023, while cautioning that FAERS data "are rarely reliable for analyzing adverse events that have a delayed time to onset." *Id.* at -60009. "Upon review of the available literature from DEPI and review of these small number of FAERS reports," DUOG "determined that there was a lack of substantial clinical data supporting an association between MPA containing products and the development of meningioma." *Id.* at -60009-10. DUOG's project manager accordingly recommended "that a Complete Response be issued for all" Depo-Provera "labeling supplements." *Id.* at -60050.

That record answers the Court's question about what FDA meant by "observational studies alone." 9/29/25 Hr'g Tr. 36:10-13. FDA believed that observational studies were the only type of evidence that could have justified a warning, and FDA found them insufficient; the adverse event data did not fill the gap. That is exactly what Pfizer argued during the hearing. *Id.* at 38:12-39:15.

The newly-disclosed records also foreclose each of Plaintiffs' three proposed readings of the CRL. Opp. 31-32. FDA did not need Pfizer to supply "additional observational studies"; FDA conducted its own comprehensive search and analysis. Ex. A at -60054. FDA did not ask for mechanistic or bioavailability analysis; none

of its reviews requests such information, and to the contrary its epidemiologists deliberately screened out "[c]ell, receptor, or histology stud[ies]," which analyze bioavailability. *Id.* at -60060 (Fig. 1).

Nor did FDA reject the warning as "overbroad." The CRL identifies applications for Pfizer's MPA-containing medications. Ex. 9 (CRL) at 1. None of the FDA internal analyses cites oral products, "all progestins," or dose differentiation as a reason for the CRL. Because a CRL must describe all "specific deficiencies that [FDA] has identified," 21 C.F.R. § 314.110(a)(1), that silence is dispositive. As Plaintiffs concede, "[i]f a deficiency is not described, then FDA has not rejected a warning on that basis." Opp. 34.

The Approval Package also ends the debate over expert testimony. Plaintiffs asked the Court to rely on Dr. Kessler's view of what FDA "may have" meant. Opp. 32-33; *see, e.g.*, 9/29/25 Hr'g Tr. 59:9-10, 71:1-7. But the meaning of an agency's decision is a legal question the Court answers from the agency's written record. *Albrecht*, 587 U.S. at 316-17; *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322, 353 (3d Cir. 2024). That record is now complete, and no expert speculation can override what FDA actually wrote.

**B. The CRL Was Final, Not Provisional**

FDA's internal record also forecloses Plaintiffs' claim that the CRL was a "provisional" step carrying "no implication as to the ultimate approvability" of the

warning. Opp. 35; Suppl. Opp. 3-4. A CRL reflects FDA's "complete review of the data submitted." 21 C.F.R. § 314.110(a)(2). That is what happened here: an independent DEPI literature review, a pharmacovigilance analysis, a DUOG determination, and a formal recommendation resulted in the CRL. Ex. A at -60052-77, -60049-51, -60046-48.

FDA's decision also built on its own earlier work. In 2020, after a safety signal surfaced in a Pfizer periodic report for a different hormonal product, FDA's Office of Surveillance and Epidemiology reviewed 14 epidemiologic studies and 96 pharmacovigilance cases. *Id.* at -60007-08. It found no "strong evidence suggesting a causal relationship between hormonal contraceptive use and meningioma," concluding that "the current safety data is insufficient to support a labeling change for meningioma," and recommended no regulatory action. *Id.* at -60008. FDA's December 2025 review then described the 2024 CRL as resting on the insufficiency of the observational evidence—not on any curable defect of form. *Id.* at -60007-16.

In short, FDA's records confirm the CRL meant what it said: FDA could not approve "the addition of a warning" on meningioma risk in November 2024. FDA's act of "formally rejecting a warning label" carries the force of law. *Fosamax*, 118 F.4th at 351 (quoting *Albrecht*, 587 U.S. at 316).

### C. FDA Was Fully Informed When It Issued the CRL

The Approval Package also reveals that in 2024 and again in 2025 FDA conducted a robust, independent review of the scientific literature, relying on more than just the articles Pfizer provided. "[T]he relevant issue" is "whether the FDA was informed," "not who … informed it." *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 57 F.4th 327, 342 (1st Cir. 2023). The Package shows that FDA relied on far more than Pfizer's Clinical Overview. DEPI "conducted a literature search in EMBASE and PubMed for articles published on or prior to May 1, 2024," and it "also reviewed the literature described in the Applicant's submission to further determine if there were any additional articles captured outside of our search criteria." Ex. A at -60054. That search screened 203 titles and abstracts. *Id.* at -60060 (Fig. 1). These epidemiologists then produced a detailed analysis of the literature, complete with charts, diagrams, and summaries.

FDA's search captured the very materials Plaintiffs say FDA lacked. FDA reviewed the full, peer-reviewed BMJ publication of Roland (2024), which defeats Plaintiffs' speculation that FDA saw only an abstract. *Id.* at -60060-61, -60068-69; *contra* Opp. 18, 25. FDA independently identified studies that were not in Pfizer's submission, including Benson (2010), Korhonen (2012), and Jugl (2021). Ex. A at -60061-62, -60071-74. FDA's review also cites Weill (2021) on cyproterone acetate—one of the "other progestin" studies Plaintiffs' expert says Pfizer should have

provided. *Id.* at -60067; *contra* Opp. 19. FDA ran its own FAERS analysis and drew on its 2020 integrated review. Ex. A at -60009-10.

That resolves Plaintiffs' citation to a question raised by a Pfizer employee's email, which the Court discussed at length: whether FDA "received the observational data results they are mentioning or the full picture." 9/29/25 Hr'g Tr. 30:15-31:3; Opp. 23. FDA had the full picture, assembled by its own epidemiologists. Dr. Kessler conceded that FDA's reviewer might be someone who "knows this stuff better than anyone else," producing a "high, high quality" and "extensive memo." Ex. 1 (Kessler Tr.) at 226:8-14, 228:2-5, 229:21-22. The Approval Package confirms that happened here.

### D. FDA Screened Out Other Scientific Literature, Confirming that Plaintiffs' Additional Materials Were Immaterial

Information is material only if it "reveal[s] risks of a different type or greater severity or frequency than previously" submitted information. 21 C.F.R. § 314.3(b); Reply 2-3. The Approval Package shows what FDA treated as relevant evidence and what it did not. DEPI limited its review to observational studies that examined MPA specifically, compared users against a comparator, and accounted for confounders. Ex. A at -60057-58. It excluded case series, case reports, "[c]ell, receptor, or histology stud[ies]," conference abstracts, studies that "[d]id not examine MPA as exposure," and studies reporting "only crude effect estimates." *Id.* at -60058-60.

Those are the categories of material Plaintiffs contend Pfizer withheld: mechanistic research from the 1990s, Opp. 19-20; studies of other progestins and progestins as a class, *id.* at 17, 19; the Bailey conference abstract, *id.* at 18; and small descriptive studies, *id.* at 16-17. Indeed, FDA excluded the 2018 Supartoto study—which Pfizer *did* submit—because its main exposure "was not the treatment or products of interest," and it excluded Dewata (2017) for reporting only crude risk estimates. Ex. A (Approval Package) at -60059. Additional articles of the same kind would have met the same fate. Information that FDA's own experts screen out is not "material" to FDA's decision. *Albrecht*, 587 U.S. at 317; *see In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1131 (S.D. Cal. 2015).

The Approval Package also answers the Court's question about the significance of Pfizer's July 2024 bioavailability analysis. 9/29/25 Hr'g Tr. 103:7-14. In December 2025—after Pfizer had given FDA the bioavailability analysis with its Updated PAS, Suppl. Br. 3—FDA placed no weight whatsoever on it.[1] Instead, the agency based its warning determination on clinical considerations (like dechallenge evidence, which Pfizer had provided), as well as new adverse event reports and literature that did not exist until September 2024. That makes sense: a bioavailability

[1] If FDA had placed any weight on the bioavailability analysis, that would only move the preemption date back to July 2024 from September 2024. Suppl. Br. 10.

analysis of low-dose oral tablets could not have affected a labeling request for injectable products. Reply 5-6.

The same is true of additional adverse event reports. Plaintiffs point to "more than 400 AERs." Opp. 8. But FDA found that 914 of the 973 FAERS reports it received between November 2023 and July 2025 contained "a term related to litigation," reflecting "stimulated reporting" driven by lawsuit advertising. Ex. A at -60010-11. FDA's pharmacovigilance experts also cautioned that FAERS data are "rarely reliable" for long-latency outcomes like meningioma. *Id.* at -60009. More reports of that kind are not material.

### E. FDA Placed Little Weight on the Griffin Study That Was Not Included in Pfizer's 2024 PAS

Plaintiffs call Pfizer's omission of the Griffin study in its 2024 PAS "dispositive." Opp. 18; *see* Suppl. Opp. 5. FDA's epidemiologists disagreed. In December 2025, DEPI reviewed Griffin alongside three other new studies and concluded that "all studies reviewed were of insufficient quality to infer a potential causal association." Ex. A at -60019. DEPI noted that Griffin "did not ascertain information on the use of estrogen-containing products" and adjusted "for only demographic factors and Elixhauser comorbidity score." *Id.* at -60032. Even with Griffin, DEPI wrote that "the findings from the available observational studies alone do not support the proposed labeling revision." *Id.* at -60019, -60034. That Pfizer did not provide Griffin to FDA before the CRL was issued in November 2024 therefore cannot

defeat preemption. At most, Griffin mattered as one part of a body of evidence that did not exist until September 2024, which the FDA evaluated in 2025.

### F. FDA Justified the 2025 Warning Based on Developments that Did Not Exist Until September (or at the earliest July) 2024

The Court asked what a warning approval would mean "going backwards," and Pfizer answered that it would depend on why FDA approved. 9/29/25 Hr'g Tr. 51:13-52:5. FDA has now said why. It explained that Pfizer's resubmission was "based on" two developments: PRAC's signal review concluding that meningioma information should be added to European labeling, and "[a]dditional literature, including a US based study, Griffin et al. published in September 2024." Ex. A at -60010. FDA then ordered an updated FAERS search through July 31, 2025, and re-consulted DEPI. *Id.* DEPI reviewed four new studies. *Id.* at -60026-30, -60036-42. FDA also cited PRAC's September 2024 recommendations and December 2024 communication to healthcare professionals. *Id.* at -60011. On that record, the clinical team "concluded that a labeling change to warn of the potential risk of meningioma with long-term use of injectable MPA is appropriate." *Id.*

Every new input FDA cited came into existence *after* September 2024, and three of the four new studies (all but Griffin) did not exist until after the CRL itself. By contrast, the dechallenge evidence that the clinical team considered was already before FDA in 2024; Pfizer's PAS cited reports in which withdrawal of MPA "led

to reduction or complete resolution" of meningioma symptoms. MSJ 12; Ex. 8 at -44. A fully informed FDA had that evidence in 2024 and still rejected the warning.

That timeline is precisely the circumstance in which courts hold claims preempted before the date the new information arose. Suppl. Br. 8-9 (collecting cases). Plaintiffs' charge of "speculat[ion]," Suppl. Opp. 9, collapses because FDA documented what changed. And Plaintiffs' argument that Griffin and PRAC were "available before the CRL," *id.*, misses the point. Preemption turns on whether a fully informed FDA would have rejected the warning when a plaintiff's claim accrued, and neither development existed before September 2024. Suppl. Reply 2. The Approval Package confirms that FDA found the data as of August 2024 insufficient for a meningioma-related labeling change. That forecloses Plaintiffs' suggestion that Pfizer should have added a warning years earlier. Opp. 19-20. If FDA rejected a warning on the 2024 record, it would have rejected one "at any earlier time." *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F. Supp. 3d 164, 205 (D. Mass. 2021), *aff'd*, 57 F.4th 327 (1st Cir. 2023).

## II. The Approval Package Alternatively Confirms that All Claims Are Preempted, Regardless of When They Accrued.

FDA's internal records confirm that FDA rejected the warning Plaintiffs claim is required under state law: "that Depo-Provera carries an *increased* risk of meningioma for all users." Opp. 12 (emphasis in original). Plaintiffs argue that by placing

a warning in the Warnings and Precautions section, FDA "necessarily recognized" an "increased" meningioma risk for all users. Suppl. Opp. 6-7.

FDA's records say otherwise. FDA approved the warning even though "meningioma causation has not been definitively established for injectable MPA." Ex. A at -60011. Its epidemiologists concluded that the studies "were of insufficient quality to establish a causal association" and "cannot inform the relationship between the dose and length of MPA-containing product use and meningioma risk." *Id.* at -60019, -60034. FDA then narrowed Pfizer's proposed language to state only that "[c]ases of meningiomas have been reported following repeated administration of medroxyprogesterone acetate, primarily with long term use." *Id.* at -59985. FDA likewise changed the counseling language to refer to a "possible risk of worsening meningioma." *Id.* at -59996. That record is "fundamentally incompatible" with a state-law duty to warn that Depo-Provera carries an increased risk of meningioma for all users. *Zofran*, 57 F.4th at 342.

## CONCLUSION

For these reasons and those set forth in Pfizer's prior briefing, the Court should grant Pfizer's motion for summary judgment based on federal preemption and enter judgment in Pfizer's favor on all claims.

Date: October 13, 2026

Respectfully submitted,

By: */s/ Joseph G. Petrosinelli*

Joseph G. Petrosinelli (admitted *pro hac vice*)
Jessica B. Rydstrom (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
Tel. 202-434-5000
jpetrosinelli@wc.com
jrydstrom@wc.com

Loren H. Brown
Matthew A. Holian
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4500
loren.brown@us.dlapiper.com
matt.holian@us.dlapiper.com

*Counsel for Defendants Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Company LLC*

**CERTIFICATE OF WORD COUNT**

**I HEREBY CERTIFY** that the foregoing document contains 4,053 words, consistent with Northern District of Florida Local Rule 7.1(F).

By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
Tel. 202-434-5000
jpetrosinelli@wc.com

*Counsel for Defendants Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Company LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 13th day of October 2026, a true and correct copy of **Pfizer Inc., Pharmacia LLC, and Pharmacia & Upjohn Co. LLC's Second Supplemental Brief in Support of Their Motion for Summary Judgment Based on Federal Preemption** was filed electronically with the Clerk of Court and served upon all parties via CM/ECF.

By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli